# EXHIBIT A

**File & Serve Xpress™**

**HOME**   **FILING & SERVICE**   **ALERTS**   **SEARCH**

Case History   Cases Search   Daily Docket   Transaction Status   Advanced Search

Home >   Results

### Case History Search

Search Created:
3/5/2021 16:32:48 GMT-0500 (Eastern Standard Time)

Printable Version

| | | | |
|---|---|---|---|
| **Court:** DE Court of Chancery Civil Action | **Judge:** Slights, Joseph | **File & ServeXpress Live Date:** | 1/25/2021 |
| **Division:** N/A | **Case Number:** 2021-0066-JRS | **Document(s) Filed:** | 17 |
| **Case Type:** Breach of Contract | **Case Name:** Continental Automotive Systems, Inc. v. Nokia Corporation | **Date Range:** | All |

Choose an action: -- Select --   [Go]   Show 1000 records

1-11 of 11 transactions   <<Prev   Page 1 of 1   Next>>

| ☐ | Transaction | ▲Date/Time | Option | Case Number / Case Name | Authorizer Organization | # | ☐ | Document Type | Document Title | Review Status | Size |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | 66281178 | 1/25/2021 2:17 PM EST | File Only | 2021-0066-JRS Continental Automotive Systems, Inc. v. Nokia Corporation | Philip A Rovner, Potter Anderson & Corroon LLP-Wilmington | 1 | ☐ | Complaint with 3 or More Defendants | Verified Complaint for Breach of Contract for Continental Automotive Systems, Inc. [view] • Linked from (7) | Accepted | 0.5MB |
| | | | | | | | ☐ | Exhibits | Exhibit 1 to Verified Complaint filed on behalf of Continental Automotive Systems, Inc. [view] | Accepted | 8.8MB |
| | | | | | | | ☐ | Verification to Complaint | Verification of Brian Droessler, Head of Software and Connected Solutions in the Interior Division of Continental AG's Infotainment & Connectivity Business Unit, to the Verified Complaint filed on behalf of Continental Automotive Systems, Inc. [view] | Accepted | 0.1MB |
| | | | | | | | ☐ | Supplemental Information Sheet | Supplemental Information Statement Pursuant to Rule 3(A) of the Rules of the Court of Chancery, filed on behalf of Continental Automotive Systems, Inc. [view] | Accepted | 0.5MB |
| ☐ | 66283481 | 1/26/2021 9:29 AM EST | File Only | 2021-0066-JRS Continental Automotive Systems, Inc. v. Nokia Corporation | Philip A Rovner, Potter Anderson & Corroon LLP-Wilmington | 2 | ☐ | Summons Instructions | Summons Instructions Letter to the Register in Chancery from Philip A. Rovner, Esq. Pursuant to 8 Del. C. § 321 [view] • Linked to (1) | Accepted | 0.4MB |
| ☐ | 66296366 | 1/29/2021 3:20 PM EST | File And Serve | 2021-0066-JRS Continental Automotive Systems, Inc. v. Nokia Corporation | Register in Chancery, DE Court of Chancery Civil Action | 3 | ☐ | Issuance of Summons | Issued 1 Summons 1 copy to Counsel via FedEx 01.29.2021. [view] | Accepted | 0.1MB |
| ☐ | 66299802 | 2/1/2021 3:56 PM EST | File Only | 2021-0066-JRS Continental Automotive Systems, Inc. v. Nokia Corporation | Philip A Rovner, Potter Anderson & Corroon LLP-Wilmington | 4 | ☐ | Summons Instructions | Summons Instructions Letter to the Register in Chancery from Philip A. Rovner, Esq. Pursuant to Del. C. § 3104 and Article 10 (a) of the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil or Commercial Matters, Article 5(a) of the Hague Convention and Article 3 of the Hague Convention [view] • Linked to (1) • Linked from (1) | Accepted | 0.4MB |
| ☐ | 66305608 | 2/3/2021 11:48 AM EST | File Only | 2021-0066-JRS Continental Automotive Systems, Inc. v. Nokia Corporation | Philip A Rovner, Potter Anderson & Corroon LLP-Wilmington | 5 | ☐ | Motion | Motion to Appoint International Process Server [view] • Linked to (2) | Accepted | 0.3MB |
| | | | | | | | ☐ | Proposed Order | [Proposed] Order Appointing International Process Server [view] • Linked from (1) | Accepted | 0.1MB |
| ☐ | 66306015 | 2/3/2021 1:03 PM EST | File Only | 2021-0066-JRS Continental Automotive Systems, Inc. v. Nokia Corporation | Philip A Rovner, Potter Anderson & Corroon LLP-Wilmington | 6 | ☐ | Summons | Summons with Affidavit of Service evidencing service was effectuated upon Nokia of America Corporation C-O Corporation Service Company, Registered Agent, on February 3, 2021 by John Garber of Parcels, Inc., Pursuant to 8 Del. C. sec. 321 [view] • Linked to (1) | Accepted | 0.8MB |
| ☐ | 66311418 | 2/4/2021 4:56 PM EST | File And Serve | 2021-0066-JRS Continental Automotive Systems, Inc. v. Nokia Corporation | Joseph Slights, DE Court of Chancery Civil Action | 7 | ☐ | Order | Granted ([Proposed] Order Appointing International Process Server) [view] • Linked to (1) | Accepted | 0.2MB |
| ☐ | 66321157 | 2/9/2021 9:55 AM EST | File And Serve | 2021-0066-JRS Continental Automotive Systems, Inc. v. Nokia Corporation | Register in Chancery, DE Court of Chancery Civil Action | 8 | ☐ | Issuance of Summons | Issued 6 Summons (Hague Convention) 6 copies to counsel via FedEx 2.08.2021. [view] | Accepted | 1.2MB |
| ☐ | 66365153 | 2/23/2021 7:53 PM EST | File And Serve | 2021-0066-JRS Continental Automotive Systems, | Kelly E Farnan, Richards Layton & | 9 | ☐ | Entry of Appearance | Entry of Appearance of Kelly E. Farnan and Blake Rohrbacher of Richards, Layton & Finger, P.A. as counsel for Defendants Nokia Corporation, Nokia of America Corporation, Nokia | Accepted | 0.1MB |

A-1

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Inc. v. Nokia Corporation | Finger PA- Wilmington | | | | Solutions and Networks Oy, and Nokia Technologies Oy with Certificate of Service [view]<br>• Linked to (1) | | |
| | | | | | 10 | ☐ | Stipulation & (Proposed) Order | Stipulation and [Proposed] Order Extending Time to Respond to the Complaint [view]<br>• Linked to (1)<br>• Linked from (1) | Accepted | 0.1MB |
| ☐ | 66367701 | 2/24/2021 2:31 PM EST | File And Serve | 2021-0066-JRS Continental Automotive Systems, Inc. v. Nokia Corporation | Joseph Slights, DE Court of Chancery Civil Action | 11 | ☐ | Order | Granted (Stipulation and [Proposed] Order Extending Time to Respond to the Complaint) [view]<br>• Linked to (1) | Accepted | 0.2MB |
| ☐ | 66395795 | 3/5/2021 4:21 PM EST | Serve Only - Private | 2021-0066-JRS Continental Automotive Systems, Inc. v. Nokia Corporation | Philip A Rovner, Potter Anderson & Corroon LLP- Wilmington | | ☐ | Request For Production (First) | Plaintiff Continental Automotive Systems, Inc.'s Requests for Production of Documents, Set One Propounded to Defendants [view] | N/A | 0.4MB |

1-11 of 11 transactions   <<Prev  Page 1 of 1   Next>>



**About File & ServeXpress**    **Resource Center**    **FAQs**    **Terms & Conditions**    **Privacy**

© 2021 File & ServeXpress, LLC. All rights reserved

**Client Support**
☎ 1-888-529-7587
✉ support@fileandserve.com
💬 Chat Online

A-2

EFiled: Jan 25 2021 02:17PM EST
Transaction ID 66281178
Case No. 2021-0066-

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021- |
| | ) | |
| NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATION, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) ) | |

## VERIFIED COMPLAINT

Plaintiff Continental Automotive Systems, Inc. ("Continental" or "Plaintiff") alleges the following facts and claims against Defendants Nokia Corporation ("Nokia Corp."), Nokia of America Corporation ("Nokia America"), Nokia Solutions and Networks Oy ("Nokia Solutions"), Nokia Technologies Oy ("Nokia Technologies") (Nokia Corp., Nokia America, Nokia Solutions, and Nokia Technologies collectively referred to herein as "Nokia" or "Defendants").

## INTRODUCTION

1.      Continental, a leading provider of cutting-edge automotive components, including gateway products, telematics control units (TCUs), network access devices (NADs), and other devices that use telecommunications technology, brings this lawsuit because of Nokia's refusal to license its alleged standard-essential patents ("SEPs") relevant to the 2G, 3G, and 4G cellular standards to Continental and its suppliers on fair, reasonable, and non-discriminatory (FRAND) terms and conditions.  Continental is a willing licensee, and seeks to pay a FRAND royalty rate for a license to the SEPs owned or controlled by Nokia.  Accordingly, Continental seeks equitable relief in the form of declaratory and injunctive relief regarding its rights and Nokia's breaches of contract law, including the determination and imposition of the FRAND terms and conditions for a license to the SEPs owned or controlled by Nokia.

2.      In today's society, many products in addition to mobile phones also include cellular connectivity.  For example, cars use cellular connectivity for emergency communications, among others.  A car can provide such connectivity primarily through a telecommunications chipset, known as a baseband processor, which is the core electronic component that allows it to transmit and receive information to and from a cellular communications network.  The baseband processor is typically incorporated within a NAD, which is itself a sub-system of the

TCU.  Baseband processors and NADs are also used in various non-automotive applications.  The TCU is then installed into the car.  The TCU includes additional functionality and components beyond cellular communication, such as GPS, interface software, and control functions.  The car into which the TCU (and thus the NAD and baseband processor) is incorporated likewise includes many functionalities having nothing to do with cellular connectivity, which is at best tangential to the main functionality of a car (*i.e.*, transporting people from one location to another).

3.      Continental is a Tier 1 supplier of TCUs to various automotive original equipment manufacturers (OEMs), *i.e.*, car makers.  In certain instances it is also a Tier 2 supplier of NADs to other Tier 1 suppliers, or incorporates its own NADs into the TCU (in effect acting as its own Tier 2 supplier).  In other instances, Continental sources its NADs from other Tier 2 suppliers, who in turn source the necessary baseband processor chipsets that enable cellular connectivity from companies that manufacture such chipsets (*e.g.*, Qualcomm or MediaTek, sometimes referred to as Tier 3 suppliers).  In addition, Continental is developing products which utilize connectivity technology outside the automotive industry, *e.g.*, for use in industrial, agricultural, and marine applications.

4.      Enabling cellular connectivity requires the use of widely-adopted cellular standards, such as the second generation (2G), third generation (3G), and/or

fourth generation (4G) cellular standards adopted by various standard-setting organizations (SSOs), such as ETSI, ATIS, TIA, ARIB, CCSA and others.  Nokia claims to own patents that have been declared essential to these standards, which are relied on and implemented in the components and/or subsystems supplied by Tier 1, Tier 2, and Tier 3 suppliers, including Continental.

5.      On information and belief, all of the Nokia patents at issue in this case are subject to the express and voluntary promises Nokia made to the relevant SSOs pursuant to their Intellectual Property Rights (IPR) Policies.  Such IPR Policies all require Nokia to license its alleged SEPs to any user of the standard that requests a license, and do so on FRAND terms and conditions.  The SSOs relied on such FRAND commitments when they purportedly incorporated Nokia's technology into the standards.

6.      The relevant SSOs require FRAND commitments in recognition of the dangers inherent in collective standard-setting activities, which eliminate competitive technological alternatives that otherwise would have existed in the market.  Once standardized, a technology is "locked in" and must be practiced by all who wish to produce standard-compliant products.  Such lock-in gives SEP owners the market power to exclude companies from practicing the standard, and to raise the cost of practicing the standards by charging supra-competitive royalties in excess of the *ex ante* incremental value of such technology when it still competed with

alternatives.  This phenomenon is often referred to as "hold-up."  Such market power does not derive from the original patenting of the SEPs at issue, but results directly from collective action and incorporation into the standards.  In order to ameliorate the risks posed by the existence of this market power, and as a trade-off for having its proprietary technology included in the standards, which in turn enables the SEP owner to license a much greater volume of products than would be the case if the technology was not used in the standards, the SEP owner is requested to make the FRAND licensing commitment.

7.   Continental, as a supplier of TCUs, NADs, and other products implementing various cellular standards, is a third-party beneficiary of Nokia's FRAND promises to the relevant SSOs.  Those promises obligate Nokia to license its SEPs to Continental on FRAND terms and conditions.  However, Continental's repeated attempts to obtain a FRAND license from Nokia have been unsuccessful.

8.   Nokia's original stated intent was to only offer licenses to the automotive industry at the OEM level, while refusing to license suppliers like Continental.  Continental sought a direct license from Nokia starting in 2017, but for nearly three years was repeatedly met with refusals to offer a direct license that would cover the development, manufacture, and sale of Continental's products. Instead, Nokia has pursued Continental's customers with infringement allegations and/or lawsuits, and has obtained injunctions against at least one Continental

customer based on its use of Continental's products.  Nokia's pursuit of injunctions based on the alleged infringement of its SEPs is directly contrary to its own prior advocacy in this Court when Nokia filed suit against Qualcomm for a FRAND license to Qualcomm's alleged SEPs.

9.     In September 2020, after years of negotiating, Nokia finally provided Continental with an offer for a partial direct license, although it continued to wrongly claim it had no legal obligation to do so.  Yet even Nokia's new offer suffers from numerous important shortcomings.  For example, Nokia's offer incorporates royalty rates that are nowhere close to FRAND, demands royalties from Continental even when Nokia's patent rights are exhausted, and includes other material limitations. There is no reasonable economic, technical, or other valid justification for the high royalty rates being demanded by Nokia.   They are not consistent with the incremental value of Nokia's SEPs, if any, and are contrary to Nokia's own prior positions and advocacy regarding how to calculate a FRAND royalty rate, including when Nokia sued Qualcomm in this Court as a prospective licensee.  Nokia's offer also requires Continental to pay royalty rates to Nokia when Continental is using a Qualcomm chip in a manner that is contrary to the terms of the license agreement that arose out of Nokia's litigation with Qualcomm in this Court.  Continental is a third-party beneficiary of Nokia's agreement with Qualcomm with the right under the terms of the agreement to sue Nokia, and thus Nokia's failure and refusal to

honor the terms of that agreement for the benefit of Continental constitutes another breach of contract by Nokia.

10.    Nokia's failure and refusal to license Continental on FRAND terms causes actual and threatened harm to Continental in numerous ways.  Absent a license, Continental is forced to choose between continuing to make and sell products that are alleged to infringe Nokia's patents, or foregoing such business activity and the associated profits.  Continental is also impaired in its ability and incentive to invest in new products and markets if it cannot supply its customers with licensed products, such that Nokia's patent rights are exhausted.  Indeed, Continental's customers commonly require that Continental secure all necessary licenses and supply products free of third-party IP rights, and further that Continental indemnify its customers for the cost of any patent infringement claims related to Continental's products, as well as the cost of any license fees paid by the customer. Continental's inability to obtain a FRAND license from Nokia interferes with its ability to manage the financial risks of its business and win new business from its customers, and also exposes Continental to onerous indemnity demands.  Since Nokia began its licensing campaign in the automotive industry, and continuing through the present, Continental has faced numerous customer demands for indemnity based on the assertion and licensing of Nokia's patents, including demands that Continental reimburse the customer for royalties paid pursuant to a

pool license which includes Nokia's patents.  The non-FRAND royalties that Nokia is demanding are disproportionate to Continental's margins and expose it to potentially ruinous liability.  Continental could avoid all of these harms if it could obtain a FRAND license to Nokia's SEPs, but Nokia has failed and refused to provide one.

11.    Because of Nokia's refusal to license its 2G, 3G, and 4G SEPs to Continental and other suppliers on FRAND terms and conditions, Continental has brought this lawsuit to (1) address Nokia's breaches of contract, (2) obtain a declaration that Continental is entitled to a direct license covering all of its products which practice the cellular standards, (3) obtain a declaration that Nokia's demanded terms are not FRAND, and (4) obtain, through injunctive relief, a FRAND license to Nokia's SEPs.

## THE PARTIES AND JURISDICTION

12.    Plaintiff Continental Automotive Systems, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at One Continental Drive, Auburn Hills, Michigan 48326.

13.    Plaintiff is an indirect subsidiary of Continental AG, a corporation organized and existing under the laws of Germany.  Continental AG was originally founded in 1871 as a rubber manufacturer, focusing its business on automotive tires.  Since then, Continental AG has expanded into new automotive business areas,

8
A-10

becoming one of the leading suppliers to automotive OEMs worldwide.

14.   The global headquarters for Continental AG's Infotainment & Connectivity Business Unit is now co-located in Deer Park, Illinois, and Regensburg, Germany.   Employees of Plaintiff are primarily responsible for developing and commercializing the TCUs, NADs, and other innovative telematics devices that merge telecommunications, infotainment, and safety features.  Plaintiff has over 100 employees (full or part time) responsible for development of the hardware and software platforms for each of the connectivity products developed and sold by the Continental Group.  Plaintiff also handles the quality control aspects of the telematics business, obtains necessary certifications, conducts testing, handles related legal issues (*e.g.*, intellectual property and open source reviews), and handles the sourcing and purchasing of component parts.   Plaintiff also coordinates the related research and development and sales activity of Continental affiliates around the globe.

15.   Continental's products rely on telecommunications standards, such as the 2G, 3G, and/or 4G cellular standards, to transmit and receive data used by the above  features.  Importantly, Continental is not simply a contract manufacturer for its customers.  Instead, Continental is and has always been a leading innovator in the telematics industry, spending millions of dollars in research and development to develop  products  and  related  solutions  for  connected  vehicles  and  other  new

markets.

16.    Nokia Corporation ("Nokia Corp.") is a corporation organized and existing under the laws of Finland, having its principal place of business at Karaportti 3, 02610 Espoo, Finland.

17.    Nokia of America Corporation ("Nokia America") is a corporation organized under the laws of Delaware, having its principal place of business at 600 Mountain Avenue, Murray Hill, New Jersey 07974.  Nokia America is a wholly-owned subsidiary of Nokia Corp.

18.    Nokia Solutions and Networks Oy ("Nokia Solutions") is a corporation organized and existing under the laws of Finland, having its principal place of business at Karaportti 3, 02610 Espoo, Finland.  Nokia Solutions is a wholly owned subsidiary of Nokia Corp.

19.    Nokia Technologies Oy ("Nokia Technologies") is a corporation organized and existing under the laws of Finland, having its principal place of business at Karaportti 3, 02610 Espoo, Finland.  Nokia Technologies is a wholly owned subsidiary of Nokia Corp.

20.    Nokia America, Nokia Solutions, and Nokia Technologies are all wholly-owned direct or indirect subsidiaries of Nokia Corp.  Nokia Corp., Nokia America, Nokia Solutions, and Nokia Technologies (collectively "Nokia") act as a common, unified economic enterprise with respect to Nokia's SEP licensing

business.

21.    This Court has personal jurisdiction over each Defendant based on their relevant contacts with this judicial district pursuant to Delaware's long-arm statute, 10 Del. C. § 3104(c), and also based on their consent.  Upon information and belief, each Defendant has conducted and continues to conduct business in this judicial district, has engaged in continuous and systematic activities in this judicial district, and/or has otherwise subjected themselves to the jurisdiction of this Court as it relates to the subject matter of this lawsuit.

22.    Nokia has used the Delaware courts to resolve disputes related to FRAND, its SEPs, and the SEPs of others.  Notably, when Nokia was seeking a license to Qualcomm's alleged SEPs, it sued Qualcomm for breach of FRAND in this very Court, and the case was heavily litigated for several years.  Many of the positions that will be advanced by Continental in this case are the same as positions advanced by Nokia in its prior case against Qualcomm.  That case resulted in a license agreement between Qualcomm and Nokia that included a promise by Nokia that it would not sue Qualcomm for patent infringement based on Qualcomm's manufacture and sale of chips, including the chips that Qualcomm sells to Continental.  In addition, as part of that agreement, Nokia promised to offer certain royalty rates to Qualcomm's customers.  Continental is a third-party beneficiary of that agreement and entitled to enforce its rights thereunder, yet in its negotiations

with Continental, Nokia has failed to live up to its obligations under its agreement with Qualcomm, including failing to acknowledge that its patents are exhausted for products that incorporate Qualcomm chipsets, and failing to otherwise offer Continental a license at the rates agreed to in the license that resolved Nokia's litigation with Qualcomm in this Court. Nokia expressly consented to jurisdiction in the Court of Chancery in its agreement with Qualcomm, as well as the application of Delaware law.

23.    Nokia also sued Apple in Delaware in a FRAND dispute regarding Nokia's 2G, 3G and 4G patents. In that case, Nokia asserted ten patents against Apple and sought a declaration that it complied with its FRAND obligation pursuant to the ETSI IPR Policy. Nokia has otherwise regularly litigated patent disputes in Delaware (both as plaintiff and defendant), including patents alleged to be essential to the 2G, 3G and/or 4G standards. When attempting to defeat a motion to transfer in one of those cases, Nokia referred to Delaware as its "corporate home in the United States."

24.    Nokia has a variety of other contacts with Delaware related to the parties' disputes, including upon information and belief selling products that are compliant with the 2G, 3G and/or 4G standards in Delaware. Nokia also derives substantial revenue by licensing companies that sell standard-compliant products in Delaware, including many companies that reside in Delaware and sell products that

comply with the 2G, 3G and/or 4G standards in Delaware.

25.    Nokia America is a member of ETSI and has submitted IPR declarations to ETSI (and related SSOs in the United States) for the patents at issue in this lawsuit.  Upon information and belief, Nokia America has engaged the foreign Nokia entities to act as Nokia America's licensing agent for the 2G, 3G and/or 4G SEPs that Nokia America owns.  The foreign Nokia entities have been granted the right and ability to license Nokia America's 2G, 3G and/or 4G SEPs, and regularly do so.

## FACTUAL ALLEGATIONS

26.    As explained below, Continental brings this action for equitable relief because of Nokia's unlawful failure and refusal to offer a direct license on FRAND terms and conditions to Continental for TCUs, NADs, and its other connectivity products with respect to Nokia's patents asserted to be essential to the 2G, 3G, and 4G cellular standards.

### Overview of Standard Setting Organizations and the Relevant Standards

27.    Cellular communications depend on widely distributed networks that implement cellular communications standards.  These standards promote availability and interoperability of standardized products regardless of geographic boundary. Cellular standards have evolved over generations, beginning with the "first generation"—or "1G"—standards developed in the 1980s.  Second, third, and fourth

generation standards followed.

28.    Industry groups called standard-setting organizations, or SSOs, have emerged to develop and manage the relevant cellular standards.  SSOs are voluntary membership organizations whose participants engage in the selection and development of industry technical standards, such as cellular communication standards, which provide important benefits by resolving interoperability problems. Common SSOs in the cellular communications field are the European Telecommunications Standards Institute (ETSI), the Telecommunications Industry Association (TIA), the Alliance for Telecommunications Industry Solutions (ATIS), T1P1, the Association of Radio Industries and Businesses (ARIB), the Telecommunications Technology Committee (TTC), and the China Communications Standards Association (CCSA).

29.    As work began on third generation—or "3G"—cellular communication standards, collaborations of SSOs formed to ensure global standardization.  One such collaboration is the Third Generation Partnership Project (3GPP).  As 4G technology emerged, 3GPP also developed the 4G LTE family of standards. Another collaboration, the Third Generation Partnership Project 2 (3GPP2), focused its 3G standardization efforts on the CDMA2000 standard.

30.    Individual member SSOs of 3GPP and 3GPP2 are known as Organizational Partners.  An Organizational Partner approves and maintains the

3GPP or 3GPP2 scope and transposes 3GPP or 3GPP2 technical specifications into the Organizational Partner's own standards. ETSI, ATIS, ARIB, TTC, and CCSA are all organizational partners of 3GPP. TIA, ARIB, and TTC are all organizational partners of 3GPP2.

31.    Prior to the adoption of 2G standards, 1G cellular connectivity offered relatively basic functionality, supporting just a few analog signals (as opposed to the digital signals used today). In the late 1980s, the cellular industry began moving towards 2G and considered a number of different standards, including the Global System for Mobile communications (GSM), the Generalized Packet Radio System (GPRS), Enhanced GPRS (EDGE), and Code Division Multiple Access (CDMA). Ultimately GSM and CDMA became the primary standards in 2G cellular communications. The two 2G standards were not interoperable; thus a device configured for one network would not operate on the other.

32.    In the late 1990s, the cellular industry pushed towards 3G, which offered higher transmission speeds, ability to support more users, and improved reliability. The leading 3G standards families were CDMA2000 and the Universal Terrestrial Radio Access (UTRA), which operated in various modes around the world, including Wideband CDMA (WCDMA) and Time Division Synchronous Code Division Multiple Access (TD-SCDMA). The WCDMA standard was also known as Universal Mobile Telecommunications System (UMTS), with High Speed

Packet Access (HSPA) which utilized at least two protocols:  High Speed Downlink Packet Access (HSDPA) and High Speed Uplink Packet Access (HSUPA).  Once again, the two main 3G standards were not interoperable, and thus a device configured for a CDMA2000 network would not function on a UMTS network.

33.    In the late 2000s, the cellular industry came together for 4G to develop a single standard:  Evolved UTRA (E-UTRA), more commonly referred to as Long Term Evolution (LTE).  LTE was adopted almost universally as the 4G cellular communication standard.

### The Importance of FRAND Commitments in the Context of Voluntary Standard Setting

34.    Although standards deliver economic benefits, they can also present anticompetitive risks that potentially impose excessive and unfair costs on users of the standards, and even hinder broad implementation of the standards.  Nokia itself argued at length about these very risks and concerns, as detailed below, when Nokia was a licensee of Qualcomm's patents and sued Qualcomm in this Court based on Qualcomm's breach of its FRAND promise.

35.    Prior to adoption of a standard, there are generally multiple alternative technology solutions competing to perform any given functionality.  During the standard setting process, SSO participants evaluate and then select the appropriate technology, among alternatives, to fulfill each individual function required to

practice the relevant standard. For example, with respect to much of the functionality within the 3G UMTS and LTE standards, alternative technologies prior to standardization (*e.g.*, tDocs or technical submissions) were and are regularly proposed to the SSOs.

36.     Subsequent to standardization, however, other technological alternatives no longer compete with the standardized technology, which by definition was adopted over the alternatives. Accordingly, standards implementers, including Continental, could no longer substitute the adopted technologies with any other alternatives. As a result, those who claim to own patents essential to complying with the standard, like Nokia, possess monopoly power over the standard. This creates a potential for market-distorting behavior whereby the owners of SEPs attempt to capture not only the incremental value of their patented technology, but also the value of standardization itself, as well as the value of technologies outside the scope of the SEPs. Such behavior could involve refusing to license certain users of the standards, demanding *supra*-FRAND royalties that are disproportionate to the incremental value of the essential technology at issue, or trying to exclude market participants through injunctions because the market participant using the standard regards the patent owner's royalty demand as not FRAND. Such exploitation of SEPs in an effort to extract unreasonable or discriminatory royalties is often referred to as patent "hold-up."

37.     In order to prevent SEP holders from blocking or otherwise inhibiting implementation of a given standard, including through hold-up, the relevant cellular SSOs maintain IPR policies which impose certain duties.  For example, such policies require and/or strongly encourage each party that participates in the standard-development process to disclose on a timely, bona fide basis, all intellectual property rights they are aware of and believe may be essential to a proposed standard.  *See, e.g.*, ETSI IPR Policy, § 4.1; TIA IPR Policy, § 3.1.2; ATIS Operating Procedure, § 10.4.2 at 10.

38.     The relevant SSO IPR policies additionally encourage members who wish to voluntarily contribute essential IPR to the standards to commit to license their asserted SEPs to firms implementing the standard on FRAND terms and conditions.  *See, e.g.*, ETSI IPR Policy, § 6.1; TIA IPR Policy, § 3.1.1; ATIS Operating Procedure, § 10.4.2 at 10, 11.   These FRAND commitments are recognized as encumbrances that bind all successors-in-interest to such asserted SEPs. *See, e.g.*, ETSI IPR Policy, § 6.1bis; TIA IPR Policy, § 3.1.1; ATIS Operating Procedure, § 10.4.2 at 11.  Accordingly, alleged SEP owners like Nokia that have submitted a FRAND commitment have a duty to license users of relevant cellular standards within the automotive supply chain, including component suppliers like Continental, regardless of their position within that supply chain.  This has been confirmed, for example, by the Director General of ETSI who oversaw development

of the ETSI FRAND policy, who has explained that "[t]he whole idea [of the ETSI Patent Policy] was that if a FRAND promise was made, everyone was entitled to a FRAND license."  Karl Heinz Rosenbrock, *Licensing At All Levels Is The Rule Under The ETSI IPR Policy*, (Nov. 3, 2017), at 8-9, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3064894.

39.     When SEPs are not available for FRAND licensing, the relevant SSOs have an obligation to reassess, and then revise or even abandon the portions of their standards that rely on such essential proprietary technologies.  For example, under the ETSI IPR Policy, "[w]here prior to the publication of a STANDARD or a TECHNICAL SPECIFICATION, an IPR owner informs ETSI that it is not prepared to license an IPR" on FRAND terms pursuant to the policy, ETSI is required to select another "viable alternative technology" solution "which is not blocked by that IPR and satisfies ETSI's requirements."  *Id.*, § 8.1.1.  If no such viable solution exists, then work on the standard "shall cease[.]"  The TIA IPR Policy similarly provides that in the absence of the required FRAND commitment, the standard is to be "referred back to the Formulating Group for further consideration[,]" TIA IPR Policy § 4 at 11-12, and may be withdrawn by TIA, *id.* § 3.1.3 at 9-10.  Other relevant SSOs have policies similar to the policies at ETSI and TIA.  Thus, by making an affirmative and voluntary FRAND commitment, an SEP holder intentionally displaces the process within the SSOs whereby SSO members are duty-bound to re-

evaluate their technical specifications when the unavailability of an essential technology under consideration is timely brought to their attention.

40.   By voluntarily undertaking FRAND licensing commitments, SEP holders benefit from the broad implementation of their patented technologies as a result of standardization, which significantly expands the pool of licensees who must practice any essential patents to all those who produce and sell standard-compliant products.   In exchange, the SEP holders agree not to abuse the market power resulting from the patent's incorporation into the standard to the exclusion of other alternatives (although in practice SEP holders often fail to live up to their commitments, as demonstrated here with Nokia).   The relevant SSOs require FRAND commitments from SEP holders precisely to impose a limit on the exercise of otherwise unchecked monopoly power that results from standard setting.

41.   These FRAND commitments provide firms that implement the standard—such as component suppliers like Continental— the assurance that they will always be able to implement the standardized technology and will not be disadvantaged relative to others if they invest in implementing the standard or developing innovative products that may operate with the standard.  Unfortunately, despite SSOs adopting IPR policies incorporating FRAND commitments, some SEP owners, including Nokia, abuse their monopoly power arising from the standardization process to exclude certain implementers from lawfully practicing the

standards and extract supra-competitive royalty rates after companies are locked into the standardized technology.

## Nokia's FRAND Commitments to SSOs

42.     Nokia has participated in the cellular standard setting process through membership in various SSOs, including ETSI, TIA, and ATIS.  Nokia has declared that certain of its patents or patent applications may be or may become essential to cellular standards under consideration by such SSOs, and committed to grant licenses to the disclosed patents on FRAND terms and conditions.  As a result, Nokia is obligated to license its SEPs on FRAND terms and conditions by virtue of the declarations it made to the SSOs.

43.     Nokia made these declarations to ensure that the cellular standards incorporated Nokia's technologies to the exclusion of alternatives, such that manufacturers of standard-compliant devices would require a license to Nokia's alleged SEPs.  The SSOs, in turn, relied on Nokia's FRAND licensing commitments in adopting the technology into the standards.  While making such declarations to the relevant SSOs, Nokia concealed its intent to, among other things, refuse to license certain users of the standards in a given supply chain, charge supra-competitive royalty rates, and demand discriminatory terms and conditions for a license to its alleged SEPs.  The intent of this concealment was to deceive and induce the relevant SSOs to adopt technologies Nokia declared to be essential to the

standards.

## The Automotive Industry Supply Chain

44.     In the automotive industry, there is a well-established "division of labor" at least between the OEMs (*i.e.*, automobile manufacturers) and their Tier 1 suppliers (*e.g.*, Continental).   Suppliers like Continental are much more than manufacturing companies.  Rather, they are innovation and technology companies and have the in-depth know-how and expertise to manufacture and constantly research and develop (and re-develop) a large number of complex components that must be implemented in different vehicles manufactured by different OEMs. Automotive OEMs then assemble the various components obtained from their various Tier 1 suppliers and combine them into the final vehicle.  In this sense, Tier 1 suppliers are one of the driving forces in the technological development of the automotive industry.   For example, in the TCU context, Tier 1 suppliers must determine the sub-components necessary for cellular connectivity and have the expertise to design a product that not only fits into the OEM's vehicle, but also seamlessly integrates with the vehicle's existing user interface.

45.     Tier 1 suppliers usually source components and subsystems, such as NADs, necessary for the products they manufacture from Tier 2 suppliers. Sometimes, however, Tier 1 suppliers also build their own NADs, or sell NADs to other Tier 1 suppliers (in these instances, also acting as a Tier 2 supplier).

Continental, at times, does both.  Tier 2 suppliers source the components necessary for their products from Tier 3 suppliers (manufacturers of the baseband processor or "chipset").  The manufacturers of the baseband processors provide their reference design to the Tier 2 suppliers in order to facilitate the making of a tested and functional NAD for later use in the TCU.

46.     Automotive OEMs exercise significant buyer power.   Automotive OEMs often initiate fierce bidding competitions in so-called "Request for Quotes" (RFQs).  Often, the winning bid is the supplier with the ability to provide a product meeting the OEM's specifications at the lowest price.  Additionally, this significant buyer power allows OEMs to traditionally require their suppliers to deliver components "free of (third party) rights."  Specifically, such requirements typically include assurances that the products supplied to the OEM do not violate patents or other intellectual property rights, as well as indemnification clauses obliging the supplier to indemnify the respective OEM for any royalties the OEM might pay for using and/or selling the product as part of a vehicle.  In today's environment, with Nokia and other SEP owners aggressively pursuing OEMs with SEP infringement claims related to the cellular standards, OEMs regularly insist that suppliers like Continental attest that they have, or commit to obtain, all necessary cellular SEP licenses as a condition of winning future business.

47.     Accordingly, Continental has a strong interest in obtaining adequate

licenses to patents that may cover cellular standards implemented by the products it supplies to automotive OEMs.  Absent a license, Continental is forced to choose between continuing to make and sell products that are alleged to infringe Nokia's patents, or foregoing such business activity and the associated profits.  Continental is also impaired in its ability and incentive to invest in new products and markets, as well as win new business, if it cannot supply its customers with licensed products, such that Nokia's patent rights are exhausted.  However, Continental has not been able to obtain such a license because Nokia has failed and refused to grant a license to Continental on FRAND terms.  Continental nevertheless bears the cost of Nokia's supra-competitive and non-FRAND royalties as alleged herein, and has received demands for indemnity from multiple OEMs relating to Nokia's conduct.

## Nokia Has Sought to Hold-Up the Automotive Industry While Denying Continental a License on FRAND Terms and Conditions

48.     Since at least 2017, Nokia has been targeting Continental customers (automobile OEMs), asserting that their connected cars practice the cellular standards purportedly covered by Nokia alleged SEPs, and offering a license to the alleged SEPs.  In so doing, Nokia has demanded non-FRAND rates, and threatened patent infringement lawsuits and injunctions against the OEMs that would halt production of their cars simply because they contain a small telematics component which Nokia is demanding be licensed on non-FRAND terms and conditions.  In at

least one instance, Nokia has succeeded in obtaining injunctions against one of Continental's customers based on that customer's use of Continental products, and has otherwise continued to threaten numerous other customers with patent infringement lawsuits and injunctions. Nokia's campaign of trying to coerce OEMs to enter into licenses by threatening patent injunctions is directly contrary to its prior advocacy when it was a plaintiff in this Court seeking a license to Qualcomm's patents.

49.    Continental learned from its customers that they were being targeted by Nokia. Understanding that the automobiles sold by its customers connect to the various cellular networks through the TCUs and NADs provided by Continental (with the actual practice of the cellular standards occurring at the level of the baseband processor), Continental knew it would be in a better position than its customers to negotiate a license to the alleged cellular SEPs. Indeed, patents declared as essential to cellular standards are often highly technical. Understanding such patents in a way that promotes productive licensing negotiations requires knowledge beyond the scope required by car OEMs, who often simply assemble cars with the components or subsystems that include cellular functionality. While the baseband processor suppliers (such as Qualcomm or MediaTek) are best situated to engage in such negotiations, Continental has a better understanding of the cellular technology standards implemented by its products than do its OEM customers.

50.    Continental contacted Nokia in 2017 in an attempt to negotiate a FRAND license to the alleged SEPs asserted against its customers.  However, all of Continental's attempts to obtain a FRAND license have failed due to Nokia's misbehavior.  For years, Nokia refused to provide Continental with a direct license, whereby Continental itself would be fully licensed to Nokia's SEPs.  Instead, Nokia insisted that it would only license its patents at the OEM level.  Notably, this was contrary to Nokia's own historical practices (wherein Nokia had licensed component makers in the past), and its own historical advocacy in various litigation and investigations (wherein it and its representatives had argued in favor of licenses being offered to all willing licensees, including at the component level).

51.    Recognizing that its refusal to license component suppliers like Continental was not credible, and wanting to avoid regulatory intervention, Nokia attempted various half-measures in an effort to create the misleading impression that it was willing to deal with Continental and other suppliers.  In reality, though, Nokia's proposals all stopped well short of offering Continental the full direct license which the law requires, and which Continental needs to make and sell products which are alleged to practice Nokia's alleged SEPs.  During this same time period, Continental proactively made a license offer to Nokia, which would have afforded it a direct license on FRAND terms and conditions, but Nokia rejected the offer.

52.     In September 2020, for the first time, Nokia finally offered Continental a partial direct license to Nokia's SEPs.  However, the offer was still deficient and non-FRAND in numerous respects.  For example, Nokia's offer incorporates royalty rates and other terms that are still not close to being FRAND, and includes other material limitations that render the offer non-FRAND.

53.     Courts, regulators, and other commentators have all explained that FRAND principles are only effective when, at least, royalties for essential technology are limited to the incremental value of the alleged SEPs when they still competed with other alternatives for inclusion in the standard, and exclude the additional value the technology gains from being adopted into standards (*i.e.*, the royalties must capture only the incremental value of the patented technology, not the value of the standard).  Additionally, patent damages law is clear that Nokia is only entitled to the incremental value of its own inventions, and not any value flowing from other aspects of the accused product which Nokia did not invent.  Nokia has previously advanced these same principles, including when it sought a license to Qualcomm's alleged SEPs in this Court.

54.     A common and widely-accepted way to calculate FRAND royalty rates, which Nokia itself has previously advanced, is what is known as the "top-down" methodology.  The top-down methodology starts with the premise that there needs to be a reasonable, maximum aggregate royalty rate for a license to all SEPs.  This

cumulative royalty burden, otherwise known as a "royalty stack," needs to be reasonable. Otherwise, companies whose products implement the standards will not be able to afford the royalties, and will lack the incentive and ability to develop such products, which ultimately harms consumers.

55.     For example, Nokia previously advocated for a 5% aggregate royalty burden for 3G devices, and a "single digit" percentage royalty burden for 4G devices. These statements were made around the time the standards were being developed and adopted, in an effort to ease market concerns about the aggregate royalty burden and thereby encourage companies to adopt the standards.

56.     The second step of a top-down approach is to give each SEP owner a royalty that is reflective of its proportional share of the cumulative royalty burden, as determined by its proportional share of all relevant SEPs.   In effect, one determines the total size of the pie (the reasonable aggregate royalty burden), and then gives each patent owner an appropriate-sized slice of that pie (the proportional share).  Again, for many years Nokia endorsed this approach to calculating FRAND royalty rates, including in its litigation against Qualcomm in this Court.

57.     Unfortunately, the royalty rates and other terms being demanded by Nokia in the automotive industry are not FRAND, and are completely out of step with any reasonable application of the top-down methodology.  Instead, the rates are multiples too high, and imply a cumulative royalty burden that is grossly excessive

and unsustainable relative to the market price of the goods that implement the cellular standards, *i.e.*, the baseband processor in the first instance, then the NAD, and finally the TCU.  Continental has repeatedly asked Nokia to explain in detail how it calculated or otherwise determined its demanded royalty rates, but Nokia has thus far refused to answer with a reasonable level of detail, presumably because Nokia knows its royalty rates are inconsistent with the very methodology it used to advance.  At most, the explanations offered reflect Nokia explicitly trying to capture the purported value of the standards (and doing so in a manner that is not reliable), as opposed to the incremental value of its own patented technology in the devices which actually implement the standards.  There is simply no reasonable economic, technical, or other justification for the high royalty rates being demanded by Nokia.

58.     Not surprisingly, the automotive industry has largely rejected Nokia's demanded royalty rates.  Despite Nokia engaging in licensing discussions with numerous OEMs and Tier 1 suppliers, Continental is informed and believes that not a single OEM or Tier 1 supplier is directly licensed to Nokia's patents.  At most, several OEMs (a very small minority of all OEMs worldwide) are indirectly licensed to Nokia's patents through a patent pool that is targeting the automotive industry.  Continental is informed and believes that those OEMs, some of which are Continental customers, took the pool license because of the coercive fear of a patent injunction.  Those OEM customers, in turn, are now trying to force Continental to

indemnify them for the non-FRAND royalty rates paid to the pool, including for the benefit of Nokia.

59.     Even though Continental and numerous others in the automotive industry have recognized that Nokia's demands are far too high, and have conveyed this to Nokia, Nokia has refused to lower its rates to a reasonable level in accordance with its FRAND commitment.  Instead, it continues to pursue its efforts to hold-up the automotive industry through threatened patent injunctions, in so doing contradicting all of its prior advocacy when Nokia was seeking a license to Qualcomm's patents in this Court.

**Nokia Continues to Demand Royalties From Continental Despite its Patents Being Exhausted By the Qualcomm Agreement and Has Failed to Offer Continental Royalty Rates Consistent with the Qualcomm Agreement**

60.     Nokia's demands to Continental are non-FRAND in at least one other respect.  Continental is informed and believes that when Nokia resolved its litigation with Qualcomm in this Court, the resulting agreement included terms for the benefit of those who use Qualcomm chips (like Continental), such that Continental is a third-party beneficiary of the agreement.  A publicly-filed version of this agreement is attached hereto as **Exhibit 1**.

61.     For example, Continental is informed and believes that Nokia gave Qualcomm the right to practice Nokia's patents, which in turn would exhaust

Nokia's patent rights in Qualcomm products sold downstream (such that Continental should not owe any royalties to Nokia when it uses a Qualcomm chipset).   In addition, Nokia also agreed to cap the royalty rates it would demand from Qualcomm's customers like Continental, albeit at rates that are still in excess of a true FRAND rate.

62.     Continental has sought the benefit of these rights in its negotiations with Nokia, given that Continental uses Qualcomm chips and otherwise sells products that are covered by the agreement between Nokia and Qualcomm.  However, Nokia has denied and/or refused to honor those rights in its license offers to Continental, including by denying any patent exhaustion where Qualcomm chips are used, refusing to offer Continental the rates set forth in its agreement with Qualcomm, and instead demanding rates far in excess of the rates set forth in its agreement with Qualcomm.

## FIRST CAUSE OF ACTION

### Breach of Contract – FRAND Commitment

63.     Continental re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

64.     Nokia entered into, or is bound by, contractual commitments it made to the relevant SSOs, such as ETSI, TIA, and/or ATIS, and their respective members, participants, and implementers relating to the 2G, 3G, and 4G standards.  To comply with the IPR Policies of the relevant SSOs, Nokia either made or is encumbered by

a binding commitment to those SSOs, their members, and third-party implementers to grant irrevocable licenses to any such user of cellular standards purportedly covered by Nokia's alleged SEPs on FRAND terms and conditions.

65.   The declarations made pursuant to such IPR Policies created an express and/or implied contract with those SSOs and their members, including an agreement that Nokia would license those patents on FRAND terms and conditions.  The IPR Policies of ETSI, TIA, and ATIS, among other relevant SSOs, do not limit the right to obtain a license on FRAND terms and conditions to their members; third parties that are not members also have the right to be granted licenses under those patents on FRAND terms and conditions.  Each and every party with products that implement the 2G, 3G, and 4G standards promulgated by such SSOs is an intended third-party beneficiary of Nokia's contractual commitments, including Continental, its suppliers, and its customers.

66.   Despite Continental's good faith efforts to negotiate a license to Nokia's alleged SEPs, Nokia has failed and refused to license Continental on FRAND terms and conditions, including refusing to license all of Continental's relevant products, demanding royalty rates that are not FRAND, and demanding royalties even when Nokia's patent rights are exhausted.

67.   Therefore, Nokia has breached its obligations to relevant SSOs such as ETSI, TIA, and/or ATIS by refusing to license to all users of cellular standards

allegedly covered by Nokia's declared patents, namely Continental.

68.     These behaviors constitute a breach of Nokia's FRAND obligations, of which Continental is an intended third-party beneficiary.

69.     As a result of Nokia's contractual breaches, Continental has been injured in its business or property and is threatened by imminent loss of profits, loss of customers and potential customers, and the imposition of non-FRAND terms and conditions (including via Continental's contractual indemnity obligations to its OEM customers).

70.     Continental has suffered and will continue to suffer irreparable injury by reason of the acts, practices, and conduct of Nokia alleged above until and unless the Court enjoins such acts, practices, and conduct.  Namely, Continental requests (1) that this Court order Nokia to offer a license on FRAND terms and conditions to Continental, and (2) an adjudication of the FRAND terms and conditions for such a license.

## SECOND CAUSE OF ACTION
### Breach of Contract – Qualcomm/Nokia Agreement

71.     Continental re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

72.     Nokia and Qualcomm entered into an agreement whereby Nokia granted certain rights to its patents to Qualcomm, which in turn exhausted Nokia's patent rights for products that utilize a Qualcomm chipset.  In that agreement, Nokia

also agreed to offer licenses to Qualcomm's customers like Continental at specified rates when selling certain products covered by the agreement.

73.    Continental is a third-party beneficiary of the agreement between Qualcomm and Nokia, and sells products covered by the agreement.  Per the terms of the agreement, Continental has the right to enforce the agreement against Nokia, specifically in this Court.  In particular, Nokia has sued Continental's customer for alleged infringement of an alleged Nokia SEP based on the customer's use of Continental's covered product, and yet Continental is unable to enforce its rights under Nokia's agreement with Qualcomm as a defense or counterclaim in that other action.  Per the terms of the agreement between Nokia and Qualcomm, Continental thus has the express right to enforce its rights here in this Court.

74.    Nokia has failed to offer Continental a license to its patents at rates consistent with the agreement, and also failed to provide and offer a license that takes into account that its patents are exhausted by virtue of the agreement, all in breach of its contract with Qualcomm.

75.    As a result of Nokia's breach, Continental has been injured in its business or property and is threatened by imminent loss of profits, loss of customers and potential customers, and the imposition of rates that are inconsistent with Nokia's patents being exhausted when Continental uses Qualcomm chips, and/or far higher than the rates set forth in Nokia's agreement with Qualcomm.

76.     Continental has suffered and will continue to suffer irreparable injury by reason of the acts, practices, and conduct of Nokia alleged above until and unless the Court enjoins such acts, practices, and conduct.  Continental requests that this Court order and declare that Nokia must provide a license to Continental that (1) confirms that Nokia's patents are exhausted by virtue of the Qualcomm agreement such that no royalties are owed for products sold by Continental that incorporate Qualcomm chipsets, and/or (2) orders and declares that Nokia must provide Continental a license at rates no greater than the agreed-upon rates in Nokia's agreement with Qualcomm.  For the sake of clarity, Continental asserts that a true FRAND royalty rate is less than the rates set forth in the agreement between Nokia and Qualcomm, and thus seeks a lower ultimate royalty rate in connection with the other claims asserted herein.

## THIRD CAUSE OF ACTION

### Declaratory Judgment

77.     Continental re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

78.     Nokia is obligated to license its 2G, 3G, and 4G alleged SEPs on FRAND terms and conditions.  As a result of the acts described in the foregoing paragraphs, there exists a definite and concrete, real and substantial, justiciable controversy between Continental and Nokia regarding (1) whether Continental and other suppliers in the automotive supply chain are entitled to a direct license to

Nokia's 2G, 3G, and 4G SEPs on FRAND terms and conditions consistent with Nokia's irrevocable commitments in its obligations, membership, and or declarations with relevant SSOs, including ETSI, TIA, and/or ATIS, (2) whether Nokia's patent rights are exhausted when Continental uses a Qualcomm chip, by virtue of Nokia's agreement with Qualcomm, (3) whether Continental is entitled to rates no greater than the rates set forth in Nokia's agreement with Qualcomm, and (4) what constitutes FRAND terms and conditions for a license to Nokia's 2G, 3G, and 4G SEPs. This dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

79.    Continental is entitled to a declaratory judgment with respect to (1) Continental and other suppliers' entitlement to a direct license to Nokia's 2G, 3G, and 4G SEPs on FRAND terms and conditions; (2) a determination that Nokia has not offered Continental a direct license to their alleged 2G, 3G, and 4G SEPs on FRAND terms and conditions; (3) a determination of what constitutes FRAND terms and conditions for a license to Nokia's 2G, 3G, and 4G SEPs, with those terms and conditions being imposed on the parties; (4) a determination that the FRAND terms and conditions must be consistent with well-established apportionment principles (*e.g.*, the smallest salable patent practicing unit rule); (5) a determination that Nokia's patent rights are exhausted when Continental uses a Qualcomm chip, by virtue of Nokia's agreement with Qualcomm; and (6) a determination that

Continental is entitled to rates no greater than the rates set forth in Nokia's agreement with Qualcomm.

## **PRAYER**

WHEREFORE, Continental prays for judgment as follows:

A.    Adjudge and decree that Nokia is liable for breach of its contractual commitments to the relevant SSOs, including ETSI, TIA, and/or ATIS, by failing to offer FRAND terms and conditions for a license to its alleged 2G, 3G, and/or 4G SEPs to Continental;

B.    Adjudge and decree that Nokia is liable for breach of its agreement with Qualcomm by insisting on royalties whenever Continental uses a Qualcomm chipset despite its patent rights being exhausted, and also by demanding royalties greater than the royalties set forth in the agreement when Continental uses a Qualcomm chipset;

C.    Adjudge and decree that Continental is entitled to a license from Nokia for any and all patents Nokia deems "essential" and/or which Nokia has declared as "essential" to the 2G, 3G, and 4G standards under FRAND terms and conditions pursuant to Nokia's obligations to the relevant SSOs, including ETSI, TIA, and/or ATIS;

D.    Adjudge, decree, and set the FRAND terms and conditions that Continental is entitled to under Nokia's obligations to the relevant SSOs, including

ETSI, TIA, and/or ATIS, for a license to Nokia's 2G, 3G, and 4G SEPs;

      E.      Adjudge and decree that Nokia has not offered a license to its alleged 2G, 3G, and 4G SEPs to Continental on FRAND terms and conditions;

      F.      Adjudge and decree that Nokia's patents are subject to license and patent exhaustion for products incorporating Qualcomm chipsets due to Nokia's agreement with Qualcomm;

      G.      Adjudge and decree that Continental is entitled to rates no greater than the rates set forth in Nokia's agreement with Qualcomm when Continental uses a Qualcomm chipset;

      H.      Enjoin Nokia from demanding excessive royalties from Continental and its customers, to the extent those customers are using Continental products, that are not consistent with Nokia's FRAND obligations to the relevant SSOs, including ETSI, TIA, and/or ATIS;

      I.      Enjoin Nokia from demanding royalties from Continental and its customers, to the extent those customers are using Continental products, that are inconsistent with the fact that Nokia's patent rights are exhausted whenever a Qualcomm chipset is used;

      J.      Enjoin Nokia from demanding excessive royalties that are greater than the rates set forth in Nokia's agreement with Qualcomm when Continental uses a Qualcomm chipset;

K.     Order Nokia to offer a license to Continental on the FRAND terms and
conditions set by the Court;

L.     Enter judgment awarding Continental its expenses, costs, and
attorneys' fees under applicable laws; and

M.     For such other and further relief as the Court deems just and proper.

Dated:  January 25, 2021

OF COUNSEL:

Stephen S. Korniczky
Martin R. Bader
Matthew W. Holder
SHEPPARD, MULLIN, RICHTER &
HAMPTON, LLP
12275 El Camino Real, Suite 200
San Diego, CA 92130
(858) 720-8900

Michael W. Scarborough
Mona Solouki
SHEPPARD, MULLIN, RICHTER &
HAMPTON, LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111
(415) 434-9100

POTTER ANDERSON & CORROON
LLP

By:   */s/  Philip A. Rovner*
        Philip A. Rovner (#3215)
        Jonathan A. Choa (#5319)
        Hercules Plaza
        P.O. Box 951
        Wilmington, DE  19899
        (302) 984-6000
        provner@potteranderson.com
        jchoa@potteranderson.com

*Attorneys for Plaintiff*
*Continental Automotive Systems, Inc.*

**EFiled: Jan 25 2021 02:17PM EST**
**Transaction ID 66281178**
**Case No. 2021-0066-**

# EXHIBIT 1

## SUBSCRIBER EQUIPMENT AND INFRASTRUCTURE EQUIPMENT LICENSE AGREEMENT

This Subscriber Equipment and Infrastructure Equipment License Agreement (the "Agreement") is entered into effective as of July 22, 2008 (the "Effective Date") by and between Qualcomm Incorporated, a Delaware corporation, and Nokia Corporation, a Finnish corporation.

### RECITALS

WHEREAS, Qualcomm and Nokia have previously entered into a Subscriber Unit License Agreement dated April 9, 1992, which was later amended and restated by the Subscriber Unit and Infrastructure Equipment License Agreement dated July 2, 2001 (the "2001 SULA");

WHEREAS, the Parties desire to terminate the 2001 SULA in its entirety (except as expressly provided in Sections 11.1 and 11.2 of this Agreement) and to enter into this new Subscriber Equipment and Infrastructure Equipment License Agreement;

WHEREAS, the Parties intend and desire that this Agreement will fully supersede and replace the 2001 SULA (except as expressly provided in Sections 11.1 and 11.2 of this Agreement) as of the Effective Date; and

WHEREAS, the Parties have entered into a Settlement Agreement and binding Term Sheet dated July 22, 2008 ("Term Sheet") to resolve their outstanding litigation and this Agreement, once executed, is intended to supersede and replace said Term Sheet, but not the Settlement Agreement.

### AGREEMENT

NOW THEREFORE, the Parties hereby agree as follows:

### 1.    HEADINGS, CONSTRUCTION, AND DEFINITIONS

All headings used in this Agreement are inserted for convenience only and are not intended to affect the meaning or interpretation of this Agreement or any clause.

For the purpose of interpretation of this Agreement (including the attached exhibits, which are part of this Agreement), the words "include," "includes," and "including" mean "including without limitation" and the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole. Unless expressly stated otherwise herein, references to a Section of this Agreement include all subsections (e.g., references to Section 4.1 include Sections 4.1.1 and 4.1.2, and references to Section 4 include Sections 4.1, 4.2, 4.3, 4.4, 4.5, 4.6, and 4.7 as well as their respective sub-Sections). The definitions of "CDMA2000 Standard" and "WCDMA Standard" are intended to be mutually exclusive and the definitions of "CDMA Standard", "GSM Standard", "OFDM Standard", "Content Broadcast Standard", and "Local Area Network Standard" are intended to be mutually exclusive. Further, the definitions of "Subscriber Terminal", "Broadcast Device", "Local Area Network Device", "Component", "M2M Module", "Infrastructure Equipment", and "Modem Card" are intended to be mutually exclusive.

For the purpose of this Agreement, the following definitions apply:

"Accessories" means products and equipment that are: (i) not required to enable a Subscriber Terminal, M2M Module, or a Modem Card to initiate and/or receive wireless transmissions; and (ii) Sold together or

Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QICE 00004218
Q2017MDL10_00081203

CX7728-001
JX0046-001

A-43

in combination with, whether or not in the same box or package as, a Subscriber Terminal, a Modem Card, or an M2M Module, as accessories to be used with Subscriber Terminals, Modem Cards, or M2M Modules (i.e., not integrated into, embedded within or attached (other than attached by an end user via a physical or wireless interface) to the Subscriber Terminal, Modem Card, or M2M Module). "Accessories" include AC adapters/chargers, spare batteries (but not the first battery, which by definition is part of the Subscriber Terminal), bands free kits, exchangeable covers (but not the first cover, which by definition is part of the Subscriber Terminal), and consumer removable memory cards.

"Affiliate" of any corporation or other legal entity means any other corporation or legal entity that controls, is controlled by, or is under common control with the first mentioned corporation or entity, where the term "control" means the direct or indirect ownership or control of more than fifty per cent (50%) of the voting power represented by: (i) shares or other securities entitled to vote for election of directors (or other managing authority) in such corporation or entity; or (ii) any other equity interest in such corporation or entity, but in each case only for so long as such ownership or control exists.

"Affiliated Purchaser" means any person or entity: (i) that is not a Purchaser; (ii) that is not within the definition of Nokia; and (iii) to whom Nokia Sells a Royalty-Bearing Licensed Product.

"Broadcast Component" means application specific integrated circuits (ASICs), multi-chip modules, integrated circuits, system in package (SiP), system on chip (SoC), and/or families of such devices (including firmware thereon and software that runs on such devices) that are for use in Broadcast Devices.

"Broadcast Device" means a complete end-user terminal (including firmware thereon and software that runs on such a terminal) that: (i) can be utilized, without any additional equipment or components being attached thereto (other than an authentication card, a battery or other like item routinely connected to the device by end-users when taking the terminal into use), to receive wireless communications in accordance with one or more of the Content Broadcast Standards; and (ii) does not implement wireless communication capability in accordance with any one or more of the CDMA Standards, GSM Standards, and/or OFDM Standards.

"CDMA2000 Infrastructure Equipment" means Infrastructure Equipment that implements wireless communication capability in accordance with one or more CDMA2000 Standards.  For clarity, "CDMA2000 Infrastructure Equipment" does not mean Infrastructure Equipment that (a) interoperates with Infrastructure Equipment that implements one or more CDMA2000 Standards, but (b) itself does not implement wireless communication capability in accordance with one or more CDMA2000 Standards.

"CDMA2000/OFDM Products" means: (i) CDMA2000 Subscriber Terminals; (ii) CDMA2000 Modem Cards; and (iii) CDMA2000 M2M Modules, in each case that also implement a wireless air interface in accordance with one or more OFDM Standards; provided, however, that CDMA2000/OFDM Products do not include any product that: (a) is Sold to an operator at a time when such operator is not operating any commercial wireless network that utilizes any OFDM Standard implemented in such product; or (b) as to which it is objectively determinable that such product is sold to subscribers of an operator that at the time of sale is not operating any commercial wireless network that utilizes any OFDM Standard implemented in such product.

"CDMA2000 M2M Module" means an M2M Module that implements a code division multiple access wireless air interface in accordance with one or more CDMA2000 Standards. Notwithstanding the foregoing, M2M Modules implementing wireless air interfaces both in accordance with any WCDMA Standard and in accordance with any CDMA2000 Standard will constitute either "CDMA2000 M2M Modules" or "WCDMA M2M Modules" as set forth in Section 4.2.4.

2     Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

"CDMA2000 Modem Card" means a Modem Card that implements a code division multiple access wireless air interface in accordance with one or more CDMA2000 Standards. Notwithstanding the foregoing, Modem Cards implementing wireless air interfaces both in accordance with any WCDMA Standard and in accordance with any CDMA2000 Standard will constitute either "CDMA2000 Modem Cards" or "WCDMA Modem Cards" as set forth in Section 4.2.4.

"CDMA2000 Standards" means the CDMA-based CDMA2000 family of standards, including 1xRTT, 1x-EVDO, 1x-EVDO Rev. A, 1x-EVDO Rev. B, BCMCS, and any 2.xG or 3.xG updates or revisions to any of the foregoing standards, in each case irrespective of the transmission medium or frequency band. For clarity, to the extent that any evolutions to the CDMA2000 family of standards include any OFDM or OFDMA based wireless air interface, such OFDM or OFDMA portion will not be considered a "CDMA2000 Standard" for purposes of this Agreement.

"CDMA2000 Subscriber Terminal" means a Subscriber Terminal that implements a code division multiple access wireless air interface in accordance with one or more CDMA2000 Standards. Notwithstanding the foregoing, Subscriber Terminals implementing wireless air interfaces both in accordance with any WCDMA Standard and in accordance with any CDMA2000 Standard will constitute either "CDMA2000 Subscriber Terminals" or "WCDMA Subscriber Terminals" as set forth in Section 4.2.4.

"CDMA Standards" means the CDMA2000 Standards and WCDMA Standards.

"Components" means application specific integrated circuits (ASICs), multi-chip modules, Embedded Modules, integrated circuits, system in package (SiP), system on chip (SoC), and/or families of such devices (including firmware thereon and software that runs on such devices) that are for use in Subscriber Terminals, Modem Cards, Embedded Modules, M2M Modules, and/or Infrastructure Equipment.

"Content Broadcast Standard" means any forward link-only content broadcast standard, including FLO, DVB, DMB, ISDB-T (1SEG), SBTVD, and ATSC, in each case irrespective of the transmission medium or frequency band. For clarity, the term "Content Broadcast Standard" excludes any two-way wireless communications standards operating between a wireless subscriber device and a wireless network, including the CDMA Standards, GSM Standards, and OFDM Standards.

"Costs" means the labor, material, and other direct costs, expenses, and associated burdens, including overhead and general and administrative expenses consistently applied in accordance with NAS.

"Covered Products" means: (i) Nokia-Branded WCDMA Subscriber Terminals; (ii) Nokia-Branded WCDMA Modem Cards; (iii) Nokia-Branded WCDMA M2M Modules; (iv) Nokia-Branded OFDM Subscriber Terminals; (v) Nokia-Branded OFDM Modem Cards; (vi) Nokia-Branded OFDM M2M Modules; and (vii) those Nokia-Branded CDMA2000/OFDM Products that are included as Nokia-Branded OFDM Subscriber Terminals or Nokia-Branded OFDM Modem Cards for royalty purposes under the last paragraph of Section 4.2.2.

"Covered Product Revenue" means the net revenue (i.e., gross revenue less trade discounts) charged by Nokia for Covered Products in the form in which they are Sold (whether or not assembled and without excluding any Components or subassemblies thereof). If needed, wording will be adjusted to reflect the definitions in Nokia Accounting Standards. The intent of this "Covered Product Revenue" definition is to ensure that the methodology used to calculate Covered Product Revenue: (a) provides a consistent measure that provides an accurate comparison year-to-year; and (b) does not allow Nokia to shift net revenue from Covered Products to net revenue for services, software, content and/or Accessories. The

3                Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

"Covered Product Revenue" will be calculated and reported in U.S. dollars so that net sales from Covered Products will be converted to U.S. dollars pursuant to Exhibit E hereto.

For clarity and without limitation, when a Covered Product is Sold together with or in combination with (1) services (including navigation and OVI), (2) software that is not loaded on such Covered Product at or prior to the time of Sale, (3) content (including music and games) that is not loaded on such Covered Product at or prior to the time of Sale, and/or (4) Accessories (a "Combined Sale"), the aggregate revenue for such Combined Sale may be allocated amongst such elements of the Combined Sale based on the fair value of such Covered Product, such services, such software, such content, and/or such Accessories that are part of the Combined Sale, but only to the extent:

(a)    such services, such software, such content, and/or such Accessories have an independent value (i.e., when not provided as part of the Combined Sale) that can be reasonably determined, established, and documented; and

(b)    that the portion of such combined revenue that is allocated to such services, such software, such content, and/or such Accessories is recorded separately (i.e., not as part of the net sales for Covered Products) into Nokia's books and records compliant with NAS (which in turn are compliant with IFRS).

Sales of Covered Products by an entity that becomes a Subsidiary of Nokia after the Effective Date will not be included in determining the Covered Product Revenue to the extent such Sales take place prior to the date on which such entity becomes a Subsidiary of Nokia. To the extent the fiscal year of Nokia is not the same as the corresponding calendar year, the Covered Product Revenue for such calendar year will be the Covered Product Revenue for such Nokia fiscal year adjusted to reflect the difference in the number of days between such calendar year and fiscal year, on a prorated basis (e.g., if the Nokia fiscal year is 367 days, the adjustment will be made by multiplying the Covered Product Revenue for such fiscal year by 365/367 (where 365 is the number of days during the corresponding calendar year), and if the Nokia fiscal year is 363 days, the adjustment will be made by multiplying the Covered Product Revenue for such fiscal year by 365/363 (where 365 is the number of days during the corresponding calendar year)). For the purposes of this definition of Covered Product Revenue, each successive fiscal year will commence immediately following the end of the previous fiscal year (i.e. there will be no unreported days or days reported twice). However, notwithstanding the foregoing, if, in any calendar year, Nokia's fiscal year ends more than fifteen (15) days before or after December 31, then for purposes of determining the Covered Product Revenue for such calendar year, Covered Product Revenue will be calculated for such calendar year using the actual Covered Product Revenue for such calendar year instead of using the Covered Product Revenue for such fiscal year and adjusting it in accordance with the foregoing formula to approximate the actual Covered Product Revenue for such calendar year.

"Embedded Module" means a module containing multiple integrated circuits (including firmware thereon and software that runs on such integrated circuits) mounted on a circuit board or the like, which module is capable of being used to implement wireless communication capability in accordance with one or more GSM Standards, CDMA Standards, and/or OFDM Standards when embedded within the complete end user product for which it is intended.

"Execution Date" has the meaning given to such term in the sentence immediately preceding the signature blocks for this Agreement.

4                      Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QICE 00004221
Q2017MDL10_00081206

CX7728-004
A-46                                          JX0046-004

"GSM Standard" means the TDMA-based GSM family of standards (including GSM, GPRS, and EDGE) and any 2.xG updates or revisions to the foregoing standards, in each case irrespective of the transmission medium or frequency band.

"IFRS" means the then-current International Financial Reporting Standards (or its successor) as issued by the International Accounting Standards Board (or its successor).

"Infrastructure Equipment" means: (i) fixed network infrastructure equipment, including access equipment, controlling equipment, transmission equipment, management equipment, servers, expansion cards, routers, switches, and gateways for such fixed networks; and (ii) wireless network infrastructure equipment, including base stations, RF units for base stations, channel cards for base stations, base station controllers, system switches and elements of the core network; in each case for use in any wireless network that operates using one or more of the GSM Standards, OFDM Standards, and/or CDMA Standards.

"InterDigital" means InterDigital Communications Corporation, InterDigital Patents Corporation, and/or InterDigital Technology Corporation.

"InterDigital Patents" means U.S. Patents Nos. 5,228,056; 5,166,951; 5,093,840; 5,119,375; and 5,179,571 and any continuation, continuation-in-part, and divisional application based on such patents, and any foreign counterparts of such patents, continuations, continuations-in-part, or divisional applications.

"Licensed Products" means Nokia-Branded Subscriber Terminals, Nokia-Branded Modem Cards, Nokia-Branded M2M Modules, and Nokia-Branded Infrastructure Equipment (other than CDMA2000 Infrastructure Equipment, which is not licensed under this Agreement unless Nokia Siemens Networks exercises its option set forth in Section 4.1.1).

To "Litigate" means to commence or prosecute patent infringement Litigation (whether by claim, counterclaim, or otherwise).

"Litigation" means any administrative, court, judicial, arbitral or other similar procedure for the resolution of a controversy whether based on a claim, a counterclaim, defense or other like demand, including any proceeding before the United States International Trade Commission ("ITC") and any similar proceeding brought in any other jurisdiction throughout the world.

"Local Area Network Components" means application specific integrated circuits (ASICs), multi-chip modules, integrated circuits, system in package (SiP), system on chip (SoC), and/or families of such devices (including firmware thereon and software that runs on such devices) that are for use in Local Area Network Devices.

"Local Area Network Device" means a complete end-user terminal (including firmware thereon and software that runs on such a terminal) that: (i) can be utilized, without any additional equipment or components being attached thereto (other than an authentication card, a battery or other like item routinely connected to the device by end-users when taking the terminal into use), to initiate and/or receive wireless communications in accordance with one or more of the Local Area Network Standards; and (ii) does not implement wireless communication capability in accordance with one or more of the CDMA Standards, GSM Standards, and/or OFDM Standards.

"Local Area Network Standard" means any local area or close proximity wireless standard, which (except for ultra wideband technologies) operates in unlicensed spectrum, including: (i) IEEE 802.11a, 802.11b,

5                   Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

802.11g, and 802.11n; (ii) Bluetooth; and (iii) Wireless USB, in each case irrespective of the transmission medium and including any revisions or updates to such standards. For clarity, "Local Area Network Standard" does not include any wireless wide area standards, including the GSM Standards, CDMA Standards or OFDM Standards.

"M2M Module" means a data-only communications module containing multiple integrated circuits mounted on a circuit board or the like that: (i) does not provide or incorporate any direct connectors or pins which can be used for audio input or output; (ii) does not provide a microphone or a means of interfacing a microphone (whether by wire or wireless connection) to such embedded module; (iii) does not implement a vocoder function; and (iv) is intended to be connected to or incorporated into other devices, including utility meters, vending machines, cargo containers, home security systems, and industrial security systems, and (v) is capable of being used to implement machine-to-machine wireless communication capability in accordance with one or more GSM Standards, CDMA Standards, and/or OFDM Standards when connected to another device.

"Modem Card" means a complete end user modem card that is capable of being used to implement wireless communication capability in accordance with one or more GSM Standards, CDMA Standards, and/or OFDM Standards when connected to another device by an end user by means of a physical or wireless consumer interface (i.e., is not for use in embedded applications).

"NAS" means the then-current Nokia Accounting Standards (or its successor) compliant with the IFRS.

"Net Selling Price" means, with respect to each Royalty-Bearing Licensed Product Sold by Nokia, one of the following:

(a) When Sold to a Purchaser for use by such Purchaser or for resale by such Purchaser other than directly or indirectly to an Affiliated Purchaser, the Net Selling Price is the Selling Price for such Royalty-Bearing Licensed Product.

(b) When Sold directly or indirectly to an Affiliated Purchaser, the Net Selling Price is the Selling Price for such Royalty-Bearing Licensed Product; provided, however, that the Net Selling Price for such product Sold to an Affiliated Purchaser will not be less than the average Net Selling Price for Purchasers for the Sale of such Royalty-Bearing Licensed Products (of the same or substantially the same quality and quantity) in the same or most recent previous calendar quarter in which such a Sale was made, and, if no such Royalty-Bearing Licensed Products have been Sold to a Purchaser to permit the fair determination of an arm's length price, then the Net Selling Price for such Royalty-Bearing Licensed Products Sold to such Affiliated Purchasers will not be less than Nokia's Costs to produce (or buy) and Sell each such Royalty-Bearing Licensed Product plus a fee equal to fifteen per cent (15%) of such Costs. The Sale by Nokia to an Affiliated Purchaser will be deemed a Sale hereunder for purposes of calculating royalties payable to Qualcomm and the resale of any such Royalty-Bearing Licensed Product by the Affiliated Purchaser will be deemed not to be a Sale hereunder by Nokia for purposes of calculating royalties payable to Qualcomm.

"Nokia" means Nokia Corporation and all present or future Subsidiaries of Nokia Corporation. For clarity, if an entity that is a Subsidiary of Nokia Corporation ceases to be a Subsidiary of Nokia Corporation, then beginning on the date on which it ceases to be a Subsidiary of Nokia Corporation, it will no longer be included in the term Nokia and the licenses to and the non-Litigation covenants protecting such entity hereunder will terminate, but only in relation to such entity, beginning on the sixtieth (60th) day after such entity ceases to be a Subsidiary of Nokia Corporation. Similarly, if an entity is not currently a Subsidiary of Nokia Corporation, but later becomes one, it will be included in the term Nokia only when and beginning on the date on which it becomes a Subsidiary of Nokia Corporation.

6        Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QICE 00004223
Q2017MDL10_00081208
CX7728-006

JX0046-006

Notwithstanding the above, Nokia Siemens Networks is subject to the more detailed rules set forth in Section 4.1.1 below and, until the occurrence of the Assignment Event as provided in Section 4.1.1, will be deemed a Subsidiary of Nokia irrespective of Nokia's ownership or control thereof.

"Nokia-Branded" means that the product in question is either: (a) substantially designed by Nokia; or (b) branded with at least one trademark or other brand owned by Nokia, and is in each case to be subsequently Sold by Nokia.

"Nokia Patents" means those patents and patent applications in any country of the world that Nokia, at any time during the Term, owns or otherwise has the right to license to Qualcomm without payment of any monetary consideration to any Third Party (unless Qualcomm agrees to reimburse Nokia for such consideration).

"Nokia Siemens Networks" means Nokia Siemens Networks B.V., Netherlands, and its Subsidiaries.

"Nokia Standards Patents" means any Nokia Patents as to which it is, or is claimed by Nokia to be, not possible on technical (but not commercial) grounds taking into account normal technical practice and the state of the art generally available at the time of standardization of the relevant GSM Standard, CDMA Standard, and/or OFDM Standard, to make, sell, lease, otherwise dispose of, repair, use, or operate equipment or methods which comply with such GSM Standard, CDMA Standard, and/or OFDM Standard without infringing such patent.

"OFDM M2M Module" means an M2M Module that: (a) does not implement any code division multiple access wireless air interface in accordance with any CDMA Standard; and (b) implements a wireless air interface in accordance with one or more OFDM Standards.

"OFDM Modem Card" means a Modem Card that: (a) does not implement any code division multiple access wireless air interface in accordance with any CDMA Standard; and (b) implements a wireless air interface in accordance with one or more OFDM Standards.

"OFDM Standard" means: (i) any broadband wireless wide area standard that operates using any form of orthogonal frequency division multiplexing (OFDM) technology and/or any form of orthogonal frequency division multiple access (OFDMA) technology, including LTE, WiMAX, WiBRO, IEEE 802.16e, IEEE 802.16m, UMB, and IEEE 802.20, and any updates or revisions to the foregoing standards; and (ii) FLASH-OFDM solely to the extent detailed specifications for FLASH-OFDM are published and made available to Nokia Siemens Networks in a form and detail that enables independent implementation of the specifications, in each case irrespective of the transmission medium or frequency band. For clarity, OFDM Standards does not include Content Broadcast Standards or Local Area Network Standards.

"OFDM Subscriber Terminal" means a Subscriber Terminal that: (i) does not implement any code division multiple access wireless air interface in accordance with any CDMA Standard; and (ii) implements a wireless air interface in accordance with one or more OFDM Standards.

"Party" individually means Qualcomm or Nokia and the term "Parties" collectively means Qualcomm and Nokia.

"Patent Family" means a group of patents (which may include patent applications as well), in which each patent (or patent application), except the earliest priority patent(s) or application(s) in such group, contains at least one claim which claims priority from another patent (or patent application) in the same group.

7          Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

"Purchaser" means a person or entity, other than Nokia, to whom Nokia Sells a Royalty-Bearing Licensed Product and: (a) that does not directly or indirectly own or control a majority (more than fifty per cent) of the shares or other securities entitled to vote for the election of directors (or other managing authority) of Nokia Corporation; (b) the majority (more than fifty per cent) of whose shares or other securities entitled to vote for the election of directors (or other managing authority) is not owned or controlled by a person or entity that also directly or indirectly owns or controls a majority (more than fifty per cent) of the shares or other securities entitled to vote for the election of directors (or other managing authority) of Nokia Corporation; and (c) that is not Controlled by Nokia, where the term "Controlled" for purposes of clause (c) means the direct or indirect ownership or control of more than twenty-five per cent (25%) of the shares or other securities entitled to vote for the election of directors (or other managing authority).

"Qualcomm" means Qualcomm Incorporated and all present or future Subsidiaries of Qualcomm Incorporated. For clarity, if an entity that is a Subsidiary of Qualcomm Incorporated ceases to be a Subsidiary of Qualcomm Incorporated, then beginning on the date on which it ceases to be a Subsidiary of Qualcomm Incorporated, it will no longer be included in the term Qualcomm and the non-Litigation covenants protecting such entity will terminate, but only in relation to such entity, beginning on the sixtieth (60th) day after such entity ceases to be a Subsidiary of Qualcomm Incorporated. Similarly, if an entity is not currently a Subsidiary of Qualcomm Incorporated but later becomes one, it will be included in the term Qualcomm only when and beginning on the date on which it becomes a Subsidiary of Qualcomm Incorporated.

"Qualcomm-Branded" means that the product in question is either: (a) substantially designed by Qualcomm; or (b) branded with at least one trademark or other brand owned by Qualcomm, and is in each case to be subsequently Sold by Qualcomm.

"Qualcomm Patents" means those patents and patent applications in any country of the world that Qualcomm, at any time during the Term, owns or otherwise has the right to license to Nokia without payment of any monetary consideration to any third party (unless Nokia agrees to reimburse Qualcomm for such consideration).

"Royalty-Bearing Licensed Products" means: (i) Nokia-Branded CDMA2000 Subscriber Terminals; (ii) Nokia-Branded CDMA2000 Modem Cards; (iii) Nokia-Branded CDMA2000 M2M Modules; (iv) Nokia-Branded WCDMA Subscriber Terminals; (v) Nokia-Branded WCDMA Modem Cards; (vi) Nokia-Branded WCDMA M2M Modules; (vii) Nokia-Branded OFDM Subscriber Terminals; (viii) Nokia-Branded OFDM Modem Cards; and (ix) Nokia-Branded OFDM M2M Modules.

"Selling Price" means the gross selling price and the value of any other consideration charged by Nokia for complete Royalty-Bearing Licensed Products in the form in which they are Sold (whether or not assembled and without excluding any Components or subassemblies thereof), less only trade discounts allowed by Nokia to its customers that are, in fact, taken by its customers, based on a written agreement or are otherwise documented by Nokia in the ordinary course of business, as evidenced by Nokia's books and records, as well as the following items incurred upon the Sale or importation of such Royalty-Bearing Licensed Product to the extent that Nokia does not charge separately for such items and they are relevant for each such unit: (i) costs of packing the complete Royalty-Bearing Licensed Product for shipment to Nokia's customer, as evidenced by Nokia's books and records, (ii) costs of insurance and transportation to ship the complete Royalty-Bearing Licensed Product to Nokia's customer, as evidenced by Nokia's books and records, (iii) import, export, excise, sales, and value added taxes and custom duties levied or imposed on Royalty-Bearing Licensed Product that Nokia remits to the government body levying or imposing such taxes or duties, as evidenced by Nokia's books and records, and (iv) copyright levies that are imposed on Royalty-Bearing Licensed Products by virtue of laws or regulations and paid by Nokia to the relevant body/agency authorized by applicable laws to collect such levies, as evidenced by Nokia's books and

8          Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

records, to the extent that such levies are not reimbursed or otherwise paid to Nokia. In addition, if Accessories are Sold together or in combination with a Royalty-Bearing Licensed Product, the Fair Market Value (as defined and subject to the limitations set forth below) of the Accessories may further be deducted from the combined gross selling price of the Royalty-Bearing Licensed Product and the Accessories Sold together or in combination with such Royalty-Bearing Licensed Product. As used above, "Fair Market Value" of Accessories will not be greater than Nokia's Costs, as evidenced by Nokia's books and records, to produce or buy such Accessories plus an amount equal to the same percentage of such Costs by which the Selling Price (before the deductions for Accessories have been made) exceeds the Costs, as evidenced by Nokia's books and records, to produce or buy the Royalty-Bearing Licensed Product and such Accessories as a whole. For example, if a Royalty-Bearing Licensed Product is Sold with Accessories such that the combined Selling Price (without taking any deduction for the Fair Market Value of the Accessories) for the Royalty-Bearing Licensed Product and the Accessories is $110, Nokia's Costs to produce or buy such Accessories are $20, and Nokia's Costs to produce or buy the Royalty-Bearing Licensed Product (excluding the Accessories) are $60, then the Fair Market Value of the Accessories (which Nokia may deduct from the combined $110 Selling Price of the Royalty-Bearing Licensed Product and its Accessories) would be $27.50 ($20 plus 0.375 multiplied by $20; where 0.375 is determined by the ratio of (110-80)/80)).

"Sherbrooke Patents" means U.S. Patent Nos. 5,444,816; 5,754,976; and 5,701,392 (including all foreign counterparts and any reissues, continuations, continuations-in-part, and divisional applications) and any claims of any patents claiming priority from any of the foregoing.

"Sold" (and variations of the word "Sold" such as "Sale" and "Sell") means sold, leased, or otherwise transferred, and a Sale will be deemed to have occurred when recorded in Nokia's books and records, however in no event later than the calendar quarter immediately following the calendar quarter in which the first shipment or invoicing occurred. For clarity, if an article is returned and Nokia reimburses its customer for some or all of the sales price, then Nokia will not be obligated to pay royalties on the portion of the sales price reimbursed by Nokia (or if Nokia has already paid royalties to Qualcomm for such Sale of such Royalty-Bearing Licensed Product, then Nokia will be entitled to apply the reimbursed amount of such sales price as a credit to Sales for the fiscal quarter when the return occurred). For clarity, products, including prototypes and test phones, taken into use by Nokia and/or its personnel will not be deemed to have been "Sold" for the purposes of this Agreement.

"Subscriber Terminal" means a complete end-user terminal that can be utilized, without any additional equipment or components (other than a SIM card, a battery or other like item routinely connected to the device by end-users when taking the terminal into use) being attached thereto, to initiate and/or receive wireless communications in accordance with one or more of the CDMA Standards, GSM Standards, and/or OFDM Standards. For clarity, if a device requires connection to a battery or other like item to initiate or receive wireless communications, then such articles are part of the Subscriber Terminal.

"Subsidiary" of a Party means any corporation or other legal entity: (i) the majority (more than fifty per cent) of whose shares or other securities entitled to vote for election of directors (or other managing authority) is now or hereafter owned or controlled by such Party either directly or indirectly; or (ii) that does not have outstanding shares or securities but the majority (more than fifty per cent) of the equity interest in which is now or hereafter owned or controlled by such Party either directly or indirectly, but only for so long as such ownership or control exists in (i) or (ii) above.

"Term" means the term of this Agreement as set forth in Section 2 and subject to Section 12.

"Third Party" means any person or entity that is not a Party.

Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QICE 00004226
Q2017MDL10_00081211
CX7728-009
JX0046-009

A-51

"VoiceCraft Patents" means U.S. Patent No. 4,969,192 (including all foreign counterparts and any reissues, continuation-in-part, and divisional applications) and any claims of any patent claiming priority from any of the foregoing.

"WCDMA M2M Module" means an M2M Module that implements a code division multiple access wireless air interface in accordance with one or more WCDMA Standards. Notwithstanding the foregoing, M2M Modules implementing wireless air interfaces both in accordance with any WCDMA Standard and in accordance with any CDMA2000 Standard will constitute either "WCDMA M2M Modules" or "CDMA2000 M2M Modules" as set forth in Section 4.2.4.

"WCDMA Modem Card" means a Modem Card that implements a code division multiple access wireless air interface in accordance with one or more WCDMA Standards. Notwithstanding the foregoing, Modem Cards implementing wireless air interfaces both in accordance with any WCDMA Standard and in accordance with any CDMA2000 Standard will constitute either "WCDMA Modem Cards" or "CDMA2000 Modem Cards" as set forth in Section 4.2.4.

"WCDMA Standard" means: (i) any wireless wide area standard with an air interface and/or communications protocol that is based upon or implements any form of WCDMA (including UMTS, HSDPA, HSUPA, HSPA+, MBMS, and TD-CDMA); (ii) TD-SCDMA; and (iii) any 3.xG updates or revisions to any of the foregoing, in each case irrespective of the transmission medium or frequency band. For clarity, to the extent that any evolutions to the WCDMA Standards include any OFDM or OFDMA based wireless air interface, such OFDM or OFDMA portion will not be considered a "WCDMA Standard" for purposes of this Agreement.

"WCDMA Subscriber Terminal" means a Subscriber Terminal that implements a code division multiple access wireless air interface in accordance with one or more WCDMA Standards. Notwithstanding the foregoing, Subscriber Terminals implementing wireless air interfaces both in accordance with any WCDMA Standard and in accordance with any CDMA2000 Standard will constitute either "WCDMA Subscriber Terminals" or "CDMA2000 Subscriber Terminals" as set forth in Section 4.2.4.

## 2. TERM OF AGREEMENT

This Agreement is effective as of the Effective Date and will continue in full force and effect until (and including) December 31, 2022, subject to Section 12 below.

## 3. LUMP SUM PAYMENT TO QUALCOMM

On October 13, 2008, Nokia shall make a non-refundable one-time payment to Qualcomm ██████████████ (the "Lump Sum Fee") in partial consideration for: (i) royalties payable for certain Licensed Products Sold in 2007 and 2008; (ii) pre-paid royalties for Sales of Covered Products during the Term of this Agreement; and (iii) a fully paid-up license for Licensed Products that constitute Infrastructure Equipment Sold by Nokia (or, if the Infrastructure Equipment Rights are assigned to Nokia Siemens Networks pursuant to Section 4.1.1, by Nokia Siemens Networks) during the Term of this Agreement. For clarity, the payment of the Lump Sum Fee may be made in several installments, if the transfer of the entire amount is not feasible in one installment and provided that the Lump Sum Fee is paid in full and on time.

For clarity, the Lump Sum Fee is in addition to the royalties payable under Sections 4.2 and 4.3.

In each instance (if any) within three (3) years after the Effective Date that:

10                    Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QICE 00004227
Q2017MDL10_00081212

CX7728-010
JX0046-010

A-52

(a)    Nokia acquires (by means of a consolidation, merger, purchase of stock, purchase of assets, or any other type of transaction) a company or a business that subsequently becomes a Subsidiary of Nokia Corporation or part of Nokia and the combined total revenue arising from sales of products corresponding to Covered Products (i.e., products that would have been Covered Products if they were Nokia-Branded and were sold by Nokia) by the acquired company or business during Nokia's four fiscal quarters immediately preceding the quarter in which the acquisition was completed exceeds ▮▮▮▮▮ of the revenue of Nokia arising from Sales of Covered Products by Nokia during the same four Nokia fiscal quarters immediately preceding the fiscal quarter in which the acquisition was completed; or

(b)    Nokia enters into a joint venture with a Third Party to manufacture and/or sell Covered Products such that (i) the joint venture entity is a Subsidiary of Nokia Corporation, (ii) such Third Party is a manufacturer of Covered Products (as such term would be applied if such Third Party were a Subsidiary of Nokia Corporation) with sales of handsets and other subscriber terminals amounting to ▮▮▮▮▮ of the global sales volume of all handsets and other subscriber terminals, (iii) such Third Party has more than ▮▮▮▮▮ ownership interest in the joint venture entity, and (iv) the total revenue of the joint venture entity from the Sale of Covered Products in the four Nokia fiscal quarters immediately following the quarter in which the formation of the joint venture was completed exceeds ▮▮▮▮▮ of the combined total revenue of Nokia (including such joint venture) from the Sale of Covered Products in the same four Nokia fiscal quarters;

then Nokia shall owe an additional non-refundable, one-time payment (an "Additional Payment") to Qualcomm. Nokia shall promptly notify Qualcomm in writing whenever any such acquisition takes place or after the fourth calendar quarter following the formation of the joint venture. The Parties shall promptly meet to negotiate in good faith the amount of such Additional Payment taking into consideration, among other things, the amount of the Lump Sum Fee, such acquired business' or company's or joint venture's expected Sales of Covered Products during the Term of the Agreement, and the number of years remaining on the Term of this Agreement as of the date of such acquisition or joint venture. For clarity, (i) each Additional Payment (if any) will be in addition to, and will not in any way reduce, the royalties payable under Sections 4.2 and 4.3; and (ii) no Additional Payment will be due as a result of any acquisition or joint venture that is consummated more than three (3) years after the Effective Date.

## 4.    LICENSE FROM QUALCOMM TO NOKIA AND ROYALTIES

### 4.1    Grant of License from Qualcomm

Qualcomm hereby grants to Nokia a royalty-bearing, personal, non-exclusive, worldwide license under the Qualcomm Patents to make, have made, use, import, offer to sell, sell, and otherwise dispose of Licensed Products (including Components incorporated into such Licensed Products, software provided by Nokia that runs on such Licensed Products, and, in the case of Nokia's "have made" rights, Components purchased by Nokia from a Third Party supplier for incorporation into Licensed Products to be Sold by Nokia).

For clarity, Nokia's license to Licensed Products other than Royalty-Bearing Licensed Products will be fully paid up and royalty free solely for the Term of this Agreement and royalties pursuant to Sections 4.2 and 4.3 below will be payable only for Royalty-Bearing Licensed Products.

11                 Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Notwithstanding the foregoing, Nokia's above "have made" rights with respect to Components that are not substantially designed by or for Nokia do not cover any Third Party supplier that: (i) derives fifty per cent (50%) or more of its annual total revenue from sales to Nokia; and (ii) has first Litigated, through itself or any of its Affiliates, against Qualcomm; and (iii) is seeking injunctive relief or a ban on the importation of any Qualcomm products, until such litigation is settled or resolved. For clarity, should such supplier cease to Litigate against Qualcomm, the above "have made" rights would again cover such supplier.

For the purposes of the above license, Licensed Products also include software related to Nokia-Branded Subscriber Terminals that: (a) is distributed together with or specifically for such Nokia-Branded Subscriber Terminals; (b) runs on an end-user product (such as a personal computer, but not a server) connected to such a terminal; and (c) interfaces with such terminal primarily for purposes of providing the terminal with terminal management and/or driver functionality; but solely with respect to the portions of such software that interact with such terminals. For clarity, such software will include the current version of Nokia's so-called PC Suite software.

For clarity, the foregoing license does not grant Nokia any license or other rights for: (i) Components Sold as standalone products (i.e., not incorporated into Licensed Products); or (ii) software (other than software described in the preceding paragraph) that runs on products that are not Licensed Products. However, for the purposes of the above license, Licensed Products also include Components that are sold as replacement or expansion parts for Nokia-Branded Infrastructure Equipment and that are incorporated into Nokia-Branded Infrastructure Equipment.

#### 4.1.1    Nokia Siemens Networks

The license rights granted in Section 4.1 above with respect to Nokia-Branded Infrastructure Equipment, as well as the non-Litigation covenants set forth herein, but solely to the extent such non-Litigation covenants pertain to: (a) the types of software and services provided by Nokia Siemens Networks on or prior to an assignment of such rights to Nokia Siemens Networks or (b) the management, operation, provisioning, or servicing of Infrastructure Equipment, are referred to herein as the "Infrastructure Equipment Rights".

If at any time after the Effective Date, Nokia Corporation ceases to own or control, either directly or indirectly, at least thirty per cent (30%) of the shares entitled to vote for election of directors (or other managing authority) or at least thirty per cent (30%) of the equity interest in Nokia Siemens Networks (an "Assignment Event"), then the Infrastructure Equipment Rights will be automatically assigned to Nokia Siemens Networks effective as of the date of the Assignment Event. Nokia shall notify Qualcomm of the occurrence of an Assignment Event no later than ninety (90) days after such occurrence.

Upon any such assignment by Nokia: (i) Nokia Siemens Networks will cease to be a Subsidiary of Nokia Corporation for purposes of this Agreement; (ii) Nokia Corporation and its other Subsidiaries will cease to be liable for Nokia Siemens Networks' subsequent compliance with the relevant terms of this Agreement; (iii) the term "Nokia-Branded" will be understood to mean, solely with respect to the assigned Infrastructure Equipment Rights, that the product in question must be either substantially designed, or branded with at least one trademark or other brand owned, by Nokia Siemens Networks; (iv) references to "Nokia" or "Nokia Corporation" in Section 10.2 will be understood to mean, solely with respect to the assigned Infrastructure Equipment Rights, Nokia Siemens Networks, (v) any patent or patent application in any country of the world that Nokia Siemens Networks, at any time during the Term, owns or otherwise has the right to license to Qualcomm without payment of any monetary consideration to any Third Party (unless Qualcomm agrees to reimburse Nokia Siemens Networks for such consideration) (a "Nokia Siemens Networks Patent") and that never was, and at no time during the Term becomes, a Nokia Patent,

12          Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

will be considered a Nokia Standards Patent and will be subject to Section 5.3 only if: (A) such Nokia Siemens Networks Patent would, if it were a Nokia Patent, fall within the definition of Nokia Standards Patents; and (B) such Nokia Siemens Patent is entitled to a priority date on or before the later of the date of such assignment or December 31, 2011; and (vi) the Nokia Siemens Networks Patents will be deemed to be Nokia Patents for purposes of, and will be subject to, the non-Litigation covenants and standstill provisions granted by Nokia to Qualcomm and its suppliers in Section 5. Notwithstanding the foregoing, if: (a) Nokia Siemens Networks exercises its option below in this Section 4.1.1; or (b) at any time after an assignment of the Infrastructure Equipment Rights Nokia again owns or controls, either directly or indirectly, thirty per cent (30%) or more of the shares entitled to vote for election of directors (or other managing authority) or thirty per cent (30%) or more of the equity interest in Nokia Siemens Networks, then in each case all Nokia Siemens Networks Patents will be considered Nokia Standards Patents subject to Section 5.3 for sales during the Term.

After the date on which such assignment is effective, Nokia (excluding Nokia Siemens Networks) will have a limited, personal, non-exclusive, worldwide license to make, have made, use, import, offer to sell, sell, and otherwise dispose of Nokia-Branded Infrastructure Equipment, but, as regards sales, such license will be limited in each calendar year to Nokia-Branded Infrastructure Equipment Sold by Nokia with cumulative Net Selling Prices of no more than the amount of the Annual Cap (as defined in Section 4.3.1) for such calendar year.

If Nokia Siemens Networks acquires a CDMA2000 Infrastructure Equipment business or a company engaged in such business that subsequently becomes a Subsidiary or a part of Nokia Siemens Networks, then Nokia Siemens Networks shall have the option, exercisable by providing written notice to Qualcomm within ninety (90) days after the acquisition, to include CDMA2000 Infrastructure Equipment as Licensed Products to become licensed from such acquisition onwards to Nokia Siemens Networks under Section 4.1 above, provided that Nokia Siemens Networks agrees in writing to be bound by the same running royalties (if any) that the target company had for its license for CDMA2000 Infrastructure Equipment immediately prior to such acquisition (e.g., if the target company's agreement included running royalties, Nokia Siemens Networks would be obligated to pay the same running royalties applicable to such license).

#### 4.1.2 InterDigital Patents

The license granted by Qualcomm under Section 4.1 with respect to the InterDigital Patents is further subject to the limitations imposed under the license agreement between Qualcomm and InterDigital in accordance with the following limitations:

(a) The license and non-Litigation covenants granted by Qualcomm will extend only to the following products that are also Licensed Products: (i) CDMA2000 Subscriber Terminals, (ii) CDMA2000 Modem Cards, (iii) CDMA2000 M2M Modules, (iv) WCDMA Subscriber Terminals, (v) WCDMA Modem Cards, and (vi) WCDMA M2M Modules. For clarity, the above applies even if such products constitute (for purposes of this Agreement) CDMA2000/OFDM Products.

(b) No provision set forth herein is to be construed so as to grant any right or license under the InterDigital Patents with respect to time division multiple access (TDMA) technology; provided, however, that such limitations will not in any way limit any of the rights granted under this Agreement to utilize the InterDigital Patents to implement the CDMA (or non-TDMA) aspects of any Licensed Products, even if such Licensed Products include TDMA; provided, however, in such case only the non-TDMA use of such Licensed Product will be licensed under the InterDigital Patents.

13       Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QICE 00004230
Q2017MDL10_00081215

CX7728-013
JX0046-013

(c) If, at any time, Nokia initiates a CDMA patent infringement lawsuit against InterDigital or its affiliates (or their customers) asserting that any product manufactured and sold by InterDigital for use in non-IS-95 Applications infringes any patents and Nokia does not prevail in such lawsuit, then the license under the InterDigital Patents granted by Qualcomm to Nokia under this Agreement will immediately terminate. For purposes of this paragraph, the term "IS-95 Applications" means any and all wireless applications that are the same or substantially similar as TIA IS-95 or ANSI JSTD-008 and related standards (including IS-96, IS-98, etc.) issued in association therewith.

(d) Notwithstanding anything to the contrary, Qualcomm is granting a sublicense under the InterDigital Patents to Nokia to the fullest extent (and only the fullest extent) that Qualcomm has the right to do so as of the Effective Date.

The Parties acknowledge and agree that the licenses and non-Litigation covenants granted under this Agreement with respect to the InterDigital Patents will commence on the first day that the InterDigital Patents are no longer subject to the 2001 SULA so that there is no gap in Nokia's protection between the 2001 SULA and this Agreement.

### 4.2 Royalties

Within sixty (60) days after the end of each calendar quarter, Nokia shall pay royalties to Qualcomm, only for each Royalty-Bearing Licensed Product Sold by Nokia during each calendar quarter during the Term, as set forth below in Sections 4.2.1, 4.2.2, 4.2.3, 4.2.4, and 4.3. For the convenience of the Parties, royalties will be calculated and paid on the basis of Nokia's worldwide Sales of only Royalty-Bearing Licensed Products irrespective of whether any such Royalty-Bearing Licensed Products would infringe, absent a license, any Qualcomm Patents.

Nokia shall submit in writing to Qualcomm, within forty-five (45) days after the end of each calendar quarter (but not earlier than Nokia Corporation announces its quarterly results), a good faith non-binding estimate of the amount of royalties that Nokia expects to pay to Qualcomm for such calendar quarter.

Nokia shall furnish Qualcomm, within sixty (60) days after the end of each calendar quarter ,certificates in the form attached hereto as Exhibit C-1 reporting the royalties payable for Sales of Royalty-Bearing Licensed Products other than Covered Products during such calendar quarter.

Additionally, as regards Covered Products:

(i) Nokia shall furnish to Qualcomm, within sixty (60) days after the end of each calendar quarter, a certificate in the form attached hereto as Exhibit C-2 reporting the Covered Product Revenue for such calendar quarter;

(ii) if Nokia will pay to Qualcomm an amount that is less (before withholding any taxes allowed to be withheld pursuant to Section 4.6) than the applicable Quarterly Cap for the calendar quarter in question, then Nokia shall furnish to Qualcomm, within sixty (60) days after the end of such calendar quarter, a certificate in the form attached hereto as Exhibit C-1 reporting the royalties payable for Royalty-Bearing Licensed Products that are Covered Products Sold by Nokia during such calendar quarter; and

(iii) if Nokia is obligated to pay to Qualcomm an amount that is less (before withholding any taxes allowed to be withheld pursuant to Section 4.6) than the applicable Annual Cap for the calendar year in question, then Nokia shall furnish to Qualcomm, within sixty (60) days after the end of such calendar year, a certificate in the form attached hereto as Exhibit C-1 reporting the royalties payable for Royalty-

14                    Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Bearing Licensed Products that are Covered Products Sold by Nokia during each quarter in such calendar year for which Nokia had not previously provided such a certificate to Qualcomm.

### 4.2.1   WCDMA

Subject to Section 4.3 below, Nokia shall pay Qualcomm royalties as follows: (a) for each Nokia-Branded WCDMA Subscriber Terminal that Nokia Sells on or after the Effective Date, an amount equal to five per cent (5%) of the Net Selling Price of such Nokia-Branded WCDMA Subscriber Terminal; (b) for each Nokia-Branded WCDMA Modem Card that Nokia Sells on or after the Effective Date, an amount equal to five per cent (5%) of the Average Quarterly WCDMA Price; and (c) for each Nokia-Branded WCDMA M2M Module that Nokia Sells on or after the Effective Date, an amount equal to five per cent (5%) of the Average Quarterly WCDMA Price. The "Average Quarterly WCDMA Price" means the average of the Net Selling Prices of all WCDMA Subscriber Terminals Sold by Nokia either: (i) in the calendar quarter in which the WCDMA Modem Card or WCDMA M2M Module for which royalties are being calculated is Sold, provided that Nokia has Sold at least ▮▮▮▮▮▮▮▮▮ WCDMA Subscriber Terminals during such calendar quarter; or (ii) in the most recent prior calendar quarter in which Nokia Sold at least ▮▮▮▮▮▮▮▮▮▮▮ WCDMA Subscriber Terminals.

### 4.2.2   OFDM

Subject to Section 4.3 below, Nokia shall pay Qualcomm royalties as follows: (a) for each Nokia-Branded OFDM Subscriber Terminal that Nokia Sells on or after the Effective Date, an amount equal to ▮▮▮▮▮▮▮ of the Net Selling Price of such Nokia-Branded OFDM Subscriber Terminal; (b) for each Nokia-Branded OFDM Modem Card that Nokia Sells on or after the Effective Date, an amount equal to ▮▮▮▮▮▮▮ of the Average Quarterly OFDM Price; and (c) for each Nokia-Branded OFDM M2M Module that Nokia Sells on or after the Effective Date, an amount equal to ▮▮▮▮▮▮▮▮ of the Average Quarterly OFDM Price. The "Average Quarterly OFDM Price" means: (A) the average of the Net Selling Prices of all OFDM Subscriber Terminals Sold by Nokia either: (i) in the calendar quarter in which the OFDM Modem Card or OFDM M2M Module for which royalties are being calculated is Sold, provided that Nokia has Sold at least ▮▮▮▮▮▮▮ OFDM Subscriber Terminals during such calendar quarter; or (ii) in the most recent prior calendar quarter in which Nokia Sold at least ▮▮▮▮▮▮ OFDM Subscriber Terminals; or (iii) in the calendar quarter in which the OFDM Modem Card for which royalties are being calculated is Sold and all prior calendar quarters if Nokia has not Sold at least ▮▮▮▮▮▮▮ OFDM Subscriber Terminals in any single calendar quarter, or (B) the Average Quarterly WCDMA Price if Nokia has never Sold any OFDM Subscriber Terminals.

Starting in calendar year 2010, Nokia will be entitled to include the Specified Percentage (as defined below) of Nokia-Branded CDMA2000/OFDM Products as Nokia-Branded OFDM Subscriber Terminals or Nokia-Branded OFDM Modem Cards (as the case may be) in its royalty payments under this Section 4.2.2 (which are also subject to the Annual Cap in Section 4.3 below). Any such Nokia-Branded CDMA2000/OFDM Products for which Nokia pays royalties to Qualcomm under this Section 4.2.2 will not be subject to royalty payments under Section 4.2.3 below. The "Specified Percentage" will be ▮▮▮▮▮▮▮▮▮ in 2010, ▮▮▮▮▮▮ in 2011, and ▮▮▮▮▮▮▮▮ in 2012 and each year thereafter, and Nokia will be entitled to make the selection of CDMA2000/OFDM Products to be within the Specified Percentage at its sole discretion.

### 4.2.3   CDMA2000

Subject to the last paragraph of Section 4.2.2 above, Nokia shall pay Qualcomm royalties as follows: (a) for each Nokia-Branded CDMA2000 Subscriber Terminal that Nokia Sells on or after the

15          Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Effective Date, an amount equal to five per cent (5%) of the Net Selling Price of such Nokia-Branded CDMA2000 Subscriber Terminal, (b) for each Nokia-Branded CDMA2000 Modem Card that Nokia Sells on or after the Effective Date, an amount equal to five per cent (5%) of the Average Quarterly CDMA2000 Price; and (c) for each Nokia-Branded CDMA2000 M2M Module that Nokia Sells on or after the Effective Date, an amount equal to five per cent (5%) of the Average Quarterly CDMA2000 Price. The "Average Quarterly CDMA2000 Price" means the average of the Net Selling Prices of all Nokia-Branded CDMA2000 Subscriber Terminals Sold by Nokia either (i) in the calendar quarter in which the Nokia-Branded CDMA2000 Modem Card or Nokia-Branded CDMA2000 M2M Module for which royalties are being calculated is Sold, provided that Nokia has Sold at least ▮▮▮▮▮▮ Nokia-Branded CDMA2000 Subscriber Terminals during such calendar quarter, or (ii) in the most recent prior calendar quarter in which Nokia Sold at least ▮▮▮▮▮▮ Nokia-Branded CDMA2000 Subscriber Terminals. Solely for purposes of the definition of "Average Quarterly CDMA2000 Price" in this Section 4.2.3, "Nokia-Branded CDMA2000 Subscriber Terminals" includes any Nokia-Branded CDMA2000 Subscriber Terminals Sold to Nokia by a Third Party under a separate license agreement between Qualcomm and such Third Party that Nokia then resells during the calendar quarter in question.

For clarity, the Annual Cap and Quarterly Caps in Section 4.3 below do not apply to or limit the royalties payable by Nokia under this Section 4.2.3.

To the extent Nokia uses so-called original design manufacturers ("ODMs") licensed by Qualcomm to manufacture CDMA2000 products (other than Infrastructure Equipment) that are Royalty-Bearing Licensed Products (the "ODM Products"), Nokia will, at its sole discretion, be entitled to have such ODMs make royalty payments (if any) due under their patent license agreements with Qualcomm if such ODMs are licensed by Qualcomm to make and sell such ODM Products to Nokia or to third parties (including Nokia) that are separately licensed by Qualcomm to make and sell such products. For any ODM Product Sold by Nokia for which an ODM pays Qualcomm the full amount of the royalty owed under the ODM's patent license agreement with Qualcomm, no royalty is payable to Qualcomm by Nokia under this Agreement. For clarity, it is understood that Nokia presently desires to have such ODMs make such payments for such ODM Products, but that Nokia may change its approach in this regard one or more times during the Term and at its sole discretion. Nothing in this paragraph is intended to grant any rights (expressly, impliedly, by operation of law, or otherwise) to any ODM under any Qualcomm Patents or modify in any way any of the terms or conditions of any license agreement between Qualcomm and any ODM. Under no circumstances will both Nokia and any of its ODMs licensed by Qualcomm have an obligation to pay patent royalties to Qualcomm for the same ODM Product. Qualcomm agrees that it shall not discriminate against Nokia in the terms and conditions of its patent license agreements with ODMs (it being understood that Qualcomm may continue its general practice of licensing ODMs to sell only to third parties that are not Qualcomm licensees, and if Qualcomm makes an exception to this general practice to allow certain ODMs, but not others, to sell to companies separately licensed by Qualcomm (including Nokia) under their license agreements, that will not be considered discrimination against Nokia).

#### 4.2.4    CDMA2000/WCDMA Multi-Mode Products

M2M Modules, Modem Cards, and Subscriber Terminals that implement wireless air interfaces both in accordance with any CDMA2000 Standard and in accordance with any WCDMA Standard ("Multi-Mode Products") will be classified as (i) CDMA2000 M2M Modules, CDMA2000 Modem Cards, or CDMA2000 Subscriber Terminals, as the case may be (for which royalties are owed under Section 4.2.3 and are not subject to the royalty caps set forth in Section 4.3, subject to the last paragraph of Section 4.2.2) or (ii) WCDMA M2M Modules, WCDMA Modem Cards, or WCDMA Subscriber Terminals, as the case may be (for which royalties are owed under Section 4.2.1 and which are subject to the royalty caps set forth in Section 4.3) as follows:

16                              Nokia/Qualcomm Confidential

$\Lambda R$

$\mathfrak{DW}$

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

(a)     If the Multi-Mode Product is Sold to an operator of a network based on any CDMA2000 Standard at a time when such operator is not operating any commercial network based on any WCDMA Standard, it will be a CDMA2000 M2M Module, CDMA2000 Modem Card, or CDMA2000 Subscriber Terminal, as the case may be;

(b)     If the Multi-Mode Product is Sold to an operator of a network based on any WCDMA Standard at a time when such operator is not operating any commercial network based on any CDMA2000 Standard, it will be a WCDMA M2M Module, WCDMA Modem Card, or WCDMA Subscriber Terminal, as the case may be;

(c)     for Multi-Mode Products that are not covered by clause (a) or (b) above, if one can otherwise objectively determine that an M2M Module, Modem Card, or Subscriber Terminal is Sold to be used by subscribers either in a network based on a WCDMA Standard or in a network based on a CDMA2000 Standard, including objective determination by means of the country of sale, the sales channel, or technical means in the product limiting such subscribers' choice of network, then the product will be either a corresponding CDMA2000 product or a corresponding WCDMA product, as the case may be; and

(d)     for all other Multi-Mode Products that are not covered by clauses (a), (b) or (c) above, (i) one half (1/2) of the cumulative Net Selling Prices of such Multi-Mode Products Sold by Nokia during each calendar quarter will be treated as Sales of CDMA2000 M2M Modules, CDMA2000 Modem Cards, or CDMA2000 Subscriber Terminals, as the case may be, and (ii) the other one half (1/2) of the cumulative Net Selling Prices of such Multi-Mode Products Sold by Nokia during each calendar quarter will treated as Sales of WCDMA M2M Modules, WCDMA Modem Cards, or WCDMA Subscriber Terminals, as the case may be.

4.3     Annual and Quarterly Caps on WCDMA and OFDM Royalties

Notwithstanding anything to the contrary, the royalties payable by Nokia under Sections 4.2.1 and 4.2.2 for Sales of Covered Products during each calendar year will in no event exceed the Annual Cap (as defined below) for such calendar year and will also be subject to the Quarterly Cap provisions set forth below.

4.3.1     Amount of Annual Cap

Notwithstanding anything to the contrary, the total combined royalties (before withholding any taxes to be withheld pursuant to Section 4.6) payable by Nokia under Sections 4.2.1 and 4.2.2 for Sales of Covered Products during any calendar year will in no event exceed the Annual Cap (as defined below) for such calendar year.

The "Annual Cap" (i) will b[                                    ]n the [        ]
year 2008; and (ii) will increase or decrease in all subsequent calendar years during the Term by



17                    Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QICE 00004234
Q2017MDL10_D0081219
CX7728-017

A-59                                                    JX0046-017

### 4.3.2 Amount of Quarterly Cap

Except as a result of the true-up payments or offset for overpayment pursuant to Section 4.3.3 below, the total quarterly royalties payable by Nokia under both Sections 4.2.1 and 4.2.2 for Sales of Covered Products during each calendar quarter of 2009 and each calendar quarter thereafter during the Term will be limited to the Quarterly Cap for such calendar quarter defined below. The "Quarterly Cap" means:

(1) for Sales by Nokia of Covered Products during each of the first three (3) calendar quarters of 2009 and each of the first three (3) calendar quarters of each calendar year thereafter during the Term, one-quarter of the Annual Cap for the immediately preceding calendar year (for example, the Quarterly Cap for each of the first three calendar quarters of 2009 will be ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮d

(2) for Sales by Nokia of Covered Products during the fourth calendar quarter of 2009 and each fourth calendar quarter of each calendar year thereafter during the Term, an amount equal to the Annual Cap for such calendar year minus the sum of the royalties actually paid by Nokia to Qualcomm for Sales of Covered Products during the first three calendar quarters of such calendar year (if this amount is less than zero, then the Quarterly Cap for such quarter will be zero).

### 4.3.3 Year-End True-Up and Offset for Overpayment

Nokia shall make an additional payment (if necessary) to Qualcomm at the time of its royalty payment for Sales of Covered Products for the fourth calendar quarter of each calendar year equal to the difference between (a) the Amount Owed and (b) the Amount Paid (each as defined below) for that calendar year. The "Amount Owed" for a calendar year means the lesser of: (i) the total amount of royalties that are payable by Nokia under both Sections 4.2.1 and 4.2.2 (assuming that the Quarterly Caps in Section 4.3.2 would not apply) for Nokia's Sales of Covered Products during such calendar year; and (ii) the Annual Cap for such calendar year. The "Amount Paid" means the sum of the quarterly royalties actually paid by Nokia to Qualcomm under both Sections 4.2.1 and 4.2.2 (as limited by Sections 4.3.1 and 4.3.2) for such calendar year.

If the Amount Paid is equal to or greater than the Amount Owed for the calendar year in question, then Nokia will not owe any additional payments under this Section 4.3.3 for Sales of Covered Products during such calendar year.

If the Amount Paid is greater than the Amount Owed for a particular calendar year, then Nokia will be entitled to apply the excess Amount Paid (i.e., the portion of the Amount Paid that exceeds the Amount Owed) for such calendar year to the royalties payable by Nokia for Sales of Covered Products during the following calendar year.

18      Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QICE 00004235
Q2017MDL10_00081220
CX7728-018
JX0046-018

#### 4.3.4    Payment and Report for 2008

Notwithstanding anything to the contrary in Sections 4.2 and 4.3, Nokia shall pay to Qualcomm the amount of ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ constituting the sole payment by Nokia for any royalties it owes to Qualcomm for Sales of Covered Products during the calendar year 2008 under Sections 4.2 and 4.3. The payment will be made in two equal installments of ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ hoe on November 15, 2008, and the other on February 15, 2009. Nokia shall submit its report for the Covered Product Revenue to 2008 to Qualcomm no later than March 1, 2009.

#### 4.4    [Intentionally Omitted]

#### 4.5    Most Favored Royalty Rate

If, on or after the Effective Date, Qualcomm grants a license under all or a large portion of the Qualcomm Patents to a Third Party to manufacture and sell subscriber terminals or modem cards (defined in the Third Party license agreement in a manner that is the same as or substantially similar to the definitions of Subscriber Terminals and Modem Cards in this Agreement) at a Net Royalty Rate (the term "Net Royalty Rate" solely for the purpose of this Section 4.5 means a royalty rate that is determined by taking into account payments a Third Party makes to Qualcomm for a license to Qualcomm Patents, and payments by Qualcomm to such Third Party for: (a) a license to such Third Party's patents and (b) royalty-sharing payments based on patent royalties collected by Qualcomm) that is lower than the royalty rate payable by Nokia to Qualcomm under this Agreement for Subscriber Terminals or Modem Cards that implement the same wireless standard as the subscriber terminals or modem cards for which Qualcomm granted such lower Net Royalty Rate to such Third Party, then Qualcomm shall:

(i) if the Third Party license agreement includes a license for CDMA2000 subscriber terminals or CDMA2000 modem cards at a Net Royalty Rate that is lower than the royalty rate payable by Nokia hereunder for CDMA2000 Subscriber Terminals or CDMA2000 Modem Cards, notify Nokia of such Net Royalty Rate and all of the other terms and conditions included in such Third Party license agreement (the "Other Terms"), and Nokia will have the right to accept in writing such lower Net Royalty Rate provided that it also accepts in writing all of the Other Terms in substitution of the corresponding terms of this Agreement no later than sixty (60) days after Qualcomm notifies Nokia in writing of such lower Net Royalty Rate and Other Terms; and

(ii) if the Third Party license agreement includes a license for OFDM modem cards, OFDM subscriber terminals, WCDMA modem cards, or WCDMA subscriber terminals at a Net Royalty Rate that is lower than the royalty rate payable by Nokia hereunder for OFDM Modem Cards, OFDM Subscriber Terminals, WCDMA Modem Cards, and/or WCDMA Subscriber Terminals, notify Nokia of such lower Net Royalty Rates and other financial terms of such Third Party license agreement and Nokia will have the right to accept in writing such lower Net Royalty Rates provided that it also accepts in writing all of the other financial terms (in their entirety) in substitution for the corresponding royalty rates and the financial terms (in their entirety including the caps set forth in Section 4.3 above) of this Agreement no later than sixty (60) days after Qualcomm notifies Nokia in writing of such lower Net Royalty Rates and financial terms.

Any substitution of terms in accordance with this Section 4.5 will be effective as of the date on which they became effective in the applicable Third Party license agreement and only as to the territory, patents, products, and standards to which such Net Royalty Rates and terms apply in such Third Party license agreement.

19                          Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QICE 00004236
Q2017MDL10_00081221
CX7728-019
JX0046-019

In no event will Nokia be entitled to a refund or credit for any payments made prior to the date it accepts the terms of a Third Party license agreement under this Section 4.5, nor will Nokia be obligated to pay any additional royalties or other consideration for Sales made at any time prior to the date it accepts the terms of a Third Party license agreement under this Section. In no event will Qualcomm be required to assign any of the Designated Patents (as defined in Section 6.1) back to Nokia as a result of this Section 4.5.

For clarity, Nokia's rights under this Section 4.5 will not be triggered by: (i) a transaction in which Qualcomm acquires patents and/or patent applications from a Third Party and grants a license at a lower Net Royalty Rate only for those patents and/or patent applications (and any other patents or patent applications in the same Patent Family as any acquired patent or patent application) back to such Third Party (and/or its Affiliates); (ii) any amendments to license agreements existing prior to the Effective Date unless such amendments reduce the Net Royalty Rate payable by the applicable Third Party for a license under some or all Qualcomm Patents to manufacture and sell subscriber terminals and/or modem cards; or (iii) any license granted by Subsidiaries of Qualcomm Incorporated before they became Subsidiaries of Qualcomm Incorporated provided that such license does not cover any patents included within the definition of Qualcomm Patents before such Subsidiary became a Subsidiary of Qualcomm Incorporated.

### 4.6    Taxes

In the event sums payable under this Agreement become subject to taxes under the tax laws of any country and applicable treaties between the United States and such country, Nokia may, if and only to the extent required by law, withhold from each payment the amount of said taxes required to be withheld. Nokia shall furnish and make available to Qualcomm relevant receipts regarding the payment of any such taxes. Such tax receipts will indicate the amounts that have been withheld from the gross amounts due to Qualcomm and that the amounts withheld have been paid by Nokia. Each Party shall promptly provide the other Party upon its written request with reasonable assistance to resolve any tax disputes relating to this Agreement with any authority. Except as expressly set forth in this Section 4.6, Nokia will not be entitled to deduct or withhold any taxes, levies, charges, or fees from the payments due to Qualcomm under this Agreement. For clarity, the foregoing sentence is not intended to limit the deductions that Nokia is entitled to take for purposes of calculating the Selling Prices of Royalty-Bearing Licensed Products.

### 4.7    Method of Payment and Conversion to U.S. Dollars

The currency of this Agreement will be the U.S. dollar. All reports of royalties and Covered Product Revenues must be made in U.S. dollars and all payments to Qualcomm under this Agreement must be made in U.S. dollars by wire-transfer and at a bank to be designated by Qualcomm. The bank details to be used for making such payments are as follows and may be changed by Qualcomm in compliance with Section 20 hereof:

QUALCOMM Incorporated
Account # 12330-17914
Ref: QTL
Bank of America
San Francisco, CA
ABA #0260-0959-3 SWIFT: BOFAUS3N

Nokia shall convert all amounts to U.S. dollars pursuant to Exhibit E hereto before the payment or reporting thereof to Qualcomm.

20          Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## 5. OTHER TERMS INVOLVING PATENTS

### 5.1 Non-Litigation Covenants by Qualcomm

#### 5.1.1 Embedded Modules

Qualcomm agrees not to Litigate based on any of the Qualcomm Patents against: (a) Nokia for making, having made, using, selling, offering to sell, importing, or otherwise disposing of Nokia-Branded Embedded Modules as standalone products (i.e., not embedded within a larger product), in each case during the Term; and (b) Nokia's suppliers solely for making Nokia-Branded Embedded Modules for, and selling such Nokia-Branded Embedded Modules to, Nokia, in each case during the Term; however, the above non-Litigation covenant will in each case be solely limited to: (i) the territory of the jurisdiction(s) where act(s) covered by said non-Litigation covenant are actually performed by Nokia or its supplier (including acts constituting indirect patent infringement) or where Qualcomm attempts to Litigate against Nokia or its supplier based on an act covered by said non-Litigation covenant; and (ii) the Qualcomm Patents granted in such jurisdictions.

Notwithstanding the foregoing, Qualcomm's agreement not to Litigate based on the Qualcomm Patents against a particular supplier of Nokia with respect to making and selling Nokia-Branded Embedded Modules to Nokia during the Term will be in effect only while such supplier does not first Litigate, through itself or its Affiliates, against Qualcomm. For clarity, should such supplier cease to Litigate against Qualcomm within ninety (90) days after Qualcomm provides written notice to Nokia and such supplier of the termination of this covenant with respect to such supplier, the above non-Litigation covenant by Qualcomm would again apply for such supplier.

#### 5.1.2 Software for Third Party Subscriber Terminals, Infrastructure Equipment, Broadcast Devices, Local Area Network Devices, and Modem Cards

Qualcomm agrees not to Litigate based on any of the Qualcomm Patents against Nokia for making, having made, using, selling, offering to sell, importing, or otherwise disposing of software solely for execution in Subscriber Terminals, Infrastructure Equipment, Broadcast Devices, Local Area Network Devices, and/or Modem Cards, in each case during the Term; however, the above non-Litigation covenant will in each case be solely limited to: (i) the territory of the jurisdiction(s) where act(s) covered by said non-Litigation covenant are actually performed by Nokia (including acts constituting indirect patent infringement) or where Qualcomm attempts to Litigate against Nokia based on an act covered by said non-Litigation covenant; and (ii) the Qualcomm Patents granted in such jurisdictions.

#### 5.1.3 Broadcast Devices and Local Area Network Devices

Qualcomm agrees not to Litigate based on any of the Qualcomm Patents against: (a) Nokia for making, having made, using, selling, offering to sell, importing, or otherwise disposing of Nokia-Branded Broadcast Devices or Nokia-Branded Local Area Network Devices, in each case during the Term; and (b) Nokia's suppliers solely for making Nokia-Branded Broadcast Devices or Nokia-Branded Local Area Network Devices for, and selling such Nokia-Branded Broadcast Devices or Nokia-Branded Local Area Network Devices to, Nokia, in each case during the Term; however, the above non-Litigation covenant will in each case be solely limited to: (i) the territory of the jurisdiction(s) where act(s) covered by said non-Litigation covenant are actually performed by Nokia or its supplier (including acts constituting indirect patent infringement) or where Qualcomm attempts to Litigate against Nokia or its supplier based on an act covered by said non-Litigation covenant; and (ii) the Qualcomm Patents granted in such jurisdictions.

21                    Nokia/Qualcomm Confidential



QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Notwithstanding the foregoing, Qualcomm's agreement not to Litigate based on the Qualcomm Patents against a particular supplier of Nokia with respect to making and selling Nokia-Branded Broadcast Devices or Nokia-Branded Local Area Network Devices to Nokia during the Term will be in effect only while such supplier does not first Litigate, through itself or its Affiliate, against Qualcomm. For clarity, should such supplier cease to Litigate against Qualcomm within ninety (90) days after Qualcomm provides written notice to Nokia and such supplier of the termination of this covenant with respect to such supplier, the above non-Litigation covenant by Qualcomm would again apply for such supplier.

## 5.2 Non-Litigation Covenants by Nokia

### 5.2.1 Components, Broadcast Components, and Local Area Network Components

Nokia agrees not to Litigate based on any of the Nokia Patents against: (a) Qualcomm for making, having made, using, selling, offering to sell, importing, or otherwise disposing of Qualcomm-Branded Components, Qualcomm-Branded Broadcast Components, and/or Qualcomm-Branded Local Area Network Components, in each case (i) only as standalone products (i.e. not embedded within a larger product) and (ii) during the Term; and (b) Qualcomm's suppliers solely for making Qualcomm-Branded Components, Qualcomm-Branded Broadcast Components, and/or Qualcomm-Branded Local Area Network Components for, and selling Qualcomm-Branded Components, Qualcomm-Branded Broadcast Components, and/or Qualcomm-Branded Local Area Network Components to, Qualcomm, in each case during the Term; however, the above non-Litigation covenant will in each case be solely limited to: (i) the territory of the jurisdiction(s) where act(s) covered by said non-Litigation covenant are actually performed by Qualcomm or its supplier (including acts constituting indirect patent infringement) or where Nokia attempts to Litigate against Qualcomm or its supplier based on an act covered by said non-Litigation covenant; and (ii) the Nokia Patents granted in such jurisdictions.

For clarity, the above non-Litigation covenant will not apply to Subscriber Terminals, Broadcast Devices, Local Area Network Devices, Infrastructure Equipment, and Modem Cards.

Notwithstanding the foregoing, solely as regards Qualcomm-Branded Components that: (a) are not substantially designed by or for Qualcomm; and (b) are supplied to Qualcomm by a supplier who derives fifty per cent (50%) or more of its annual total revenue from sales to Qualcomm, Nokia's agreement not to Litigate against such Qualcomm suppliers with respect to making and selling to Qualcomm such Qualcomm-Branded Components during the Term will be in effect only while such supplier does not first Litigate, through itself or its Affiliate, against Nokia. For clarity, should such supplier cease to Litigate against Nokia within ninety (90) days after Nokia provides written notice to Qualcomm and such supplier of the termination of this covenant with respect to such supplier, the above non-Litigation covenant by Nokia would again apply for such supplier with respect to Qualcomm-Branded Components.

Notwithstanding the foregoing, solely as regards Qualcomm-Branded Broadcast Components and Qualcomm-Branded Local Area Network Components, Nokia's agreement not to Litigate based on the Nokia Patents against a particular Qualcomm supplier with respect to making and selling Qualcomm-Branded Broadcast Components or Qualcomm-Branded Local Area Network Components during the Term will be in effect only while such supplier does not first Litigate, through itself or its Affiliate, against Nokia. For clarity, should such supplier cease to Litigate against Nokia within ninety (90) days after Nokia provides written notice to Qualcomm and such supplier of the termination of this covenant with respect to such supplier, the above non-Litigation covenant by Nokia would again apply for such supplier of Qualcomm-Branded Broadcast Components and Qualcomm-Branded Local Area Network Components.

Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QICE 00004239
Q2017MDL10_00081224

CX7728-022
JX0046-022

5.2.2    Software for Third Party Subscriber Terminals, Infrastructure Equipment, Broadcast Devices, Local Area Network Devices, and Modem Cards

Nokia agrees not to Litigate based on any of the Nokia Patents against Qualcomm for making, having made, using, selling, offering to sell, importing, or otherwise disposing of software solely for execution in Subscriber Terminals, Infrastructure Equipment, Broadcast Devices, Local Area Network Devices, and/or Modem Cards, in each case during the Term; however, the above non-Litigation covenant will in each case be solely limited to: (i) the territory of the jurisdiction(s) where act(s) covered by said non-Litigation covenant are actually performed by Qualcomm (including acts constituting indirect patent infringement) or where Nokia attempts to Litigate against Qualcomm based on an act covered by said non-Litigation covenant; and (ii) the Nokia Patents granted in such jurisdictions.

5.3    Commitment to License Qualcomm Customers

The Sherbrooke Patents are not subject to this Section 5.3.

Qualcomm will be entitled to disclose information about this Section 5.3 to its Component customers only in compliance with Section 21 of this Agreement and include in any such disclosure all of the information contained in Exhibit D hereto. Qualcomm agrees that it shall not take or support the position, in any litigation or dispute (whether or not Qualcomm is a party thereto) or in its communications with its Component customers, that this Section 5.3 or any of the non-Litigation covenants in Section 5.2 (or any other provision in this Agreement) results in any exhaustion of the Nokia Patents or otherwise confers any rights (impliedly, by operation of law, or otherwise) on any Qualcomm Component customer to use any of the Nokia Patents without a separate license from Nokia to such patents.

Nokia commits to offer a license for sales during the Term under the Nokia Standards Patents to each of Qualcomm's customers who requests such a license from Nokia or whom Nokia approaches about taking such a license as follows:

(1) With respect to CDMA2000 Subscriber Terminals and CDMA2000 Modem Cards, in each case that incorporate Qualcomm-Branded Components that implement a wireless air interface in accordance with one or more CDMA2000 Standards, at a royalty rate not to exceed 0.5% of the net sales price (as such price is usually defined in Nokia's normal licensing practice) of each such Subscriber Terminal or, in respect of Modem Cards, of the "Customer Average Quarterly CDMA2000 Price". The "Customer Average Quarterly CDMA2000 Price" means the lesser of: (a) the average of the net selling prices of all CDMA2000 Subscriber Terminals Sold by the Qualcomm customer either (i) in the calendar quarter in which the CDMA2000 Modem Card for which royalties are being calculated is Sold, provided that the customer has Sold at least ███████████ CDMA2000 Subscriber Terminals during such calendar quarter, or (ii) in the most recent prior calendar quarter in which the customer Sold at least ███████████ CDMA2000 Subscriber Terminals; or (b) ███████████

(2) With respect to WCDMA Subscriber Terminals, WCDMA Modem Cards, OFDM Subscriber Terminals, and OFDM Modem Cards, in each case that incorporate Qualcomm-Branded Components that implement a wireless air interface in accordance with one or more WCDMA Standards or OFDM Standards, at a royalty rate not to exceed 1% of the net sales price (as such price is usually defined in Nokia's normal licensing practice) of each such Subscriber Terminal or, in respect of WCDMA Modem Cards, of the "Customer Average Quarterly WCDMA Price" or, in respect of OFDM Modem Cards, of the "Customer Average Quarterly OFDM Price". The "Customer Average Quarterly WCDMA Price" means the lesser of (a) the average of the net selling prices of all WCDMA Subscriber Terminals Sold by

23                         Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QICE 00004240
Q2017MDL10_00081225
CX7728-023
JX0046-023

the Qualcomm customer either  (i) in the calendar quarter in which the WCDMA Modem Card for which royalties are being calculated is Sold, provided that the customer has Sold at least ████ WCDMA Subscriber Terminals during such calendar quarter; or (ii) in the most recent prior calendar quarter in which the customer Sold at least ████████ WCDMA Subscriber Terminals; or (b)████████ The "Customer Average Quarterly OFDM Price" means the lesser of (a): the average of the net selling prices of all OFDM Subscriber Terminals Sold by the Qualcomm customer either: (i) in the calendar quarter in which the OFDM Modem Card for which royalties are being calculated is Sold, provided that the customer has Sold at least ████████ OFDM Subscriber Terminals during such calendar quarter; or (ii) in the most recent prior calendar quarter in which the customer Sold at least ████████ OFDM Subscriber Terminals; or (b)████

(3)　　The other terms of such licenses offered by Nokia (including any terms relating to any grant back licenses requested by Nokia from the Qualcomm customer) will not be materially different from the range of terms within Nokia's then-current normal licensing practice for licensing Nokia Standards Patents.

(4)　　Nokia agrees to notify the Qualcomm customer of its rights under this Section 5.3 the earlier of: (a) when offering terms for a license under the Nokia Standards Patents; or (b) prior to Litigating the Nokia Standards Patents against such Qualcomm customer. The notice provided by Nokia will include at least all of the information contained in Exhibit D.

For clarity: (i) to the extent CDMA2000 Subscriber Terminals and CDMA2000 Modem Cards are CDMA2000/OFDM Products, solely for the purpose of this Section 5.3, Nokia shall offer the same rate for such products sold after 2011 as for OFDM Subscriber Terminals and OFDM Modem Cards, and the same rate for such products sold prior to 2012 as for CDMA2000 Subscriber Terminals and CDMA2000 Modem Cards; and (ii) in respect of Subscriber Terminals and Modem Cards that implement air interfaces both in accordance with one or more WCDMA Standards and in accordance with one or more CDMA2000 Standards, such devices will constitute WCDMA Subscriber Terminals and WCDMA Modem Cards solely for the purpose of this Section 5.3.

Qualcomm's Components customers will be third party beneficiaries of this Section 5.3 with the right to enforce its terms; provided however, subject to the following paragraph, a Qualcomm Components customer will be permitted to enforce its rights as a third party beneficiary of this Section 5.3 solely as a defense or counterclaim in Litigation initiated by Nokia with such customer (or its distributors or customers for the accused product) in which Nokia Litigates based on any Nokia Standards Patent ("Nokia-Initiated Litigation"), unless the Qualcomm Components customer is unable (due to the nature and/or venue of the Nokia-Initiated Litigation) to enforce its rights as a third party beneficiary of this Section 5.3 as a defense or counterclaim in such Nokia-Initiated Litigation (in which case the Qualcomm Components customer may enforce its rights as a third party beneficiary of this Section 5.3 in accordance with the terms of the first and second paragraphs of Section 22).

If a Qualcomm Components customer has asserted its rights as a third party beneficiary of this Section 5.3 in Nokia-Initiated Litigation between such customer (or its distributors or customers for the accused product) and Nokia as provided in the preceding paragraph, then: (a) Qualcomm may, at its sole discretion, intervene in, or otherwise participate as a party to, such Nokia-Initiated Litigation to the extent such proceedings involve a dispute about this Section 5.3; and (b) Qualcomm may not otherwise separately assert a claim that Nokia has breached its obligations under this Section 5.3 solely as to such Qualcomm Components customer. Conversely, if Qualcomm has asserted a claim in Litigation against Nokia that Nokia has breached its obligations under this Section 5.3 as to a particular Qualcomm Components customer, then such Qualcomm Components customer may not separately assert its rights as

24　　　　　Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QICE 00004241
Q2017MDL10_00081226
CX7728-024
JX0046-024

A-66

a third party beneficiary of this Section 5.3 in Litigation between such customer (or its distributors or customers for the accused product) and Nokia, unless and until Qualcomm withdraws the claim it has asserted in Litigation against Nokia as to such Qualcomm Components customer, and then only in a Nokia-Initiated Litigation or as otherwise provided in the previous paragraph. For clarity, the foregoing provisions will apply on a Qualcomm customer-by-customer basis (e.g., the assertion by one Qualcomm customer of a claim regarding Section 5.3 will not prevent Qualcomm from asserting a claim in Litigation against Nokia for breach of this Section 5.3 as to a different Qualcomm customer). Subject to Qualcomm's compliance with this paragraph, Nokia hereby irrevocably consents to the jurisdiction and venue of any court in which it initiates a Nokia-Initiated Litigation against a Qualcomm Components customer (or its distributor or customer for the accused product) for purposes of an intervention or other participation by Qualcomm in such court against Nokia regarding this Section 5.3. Except as expressly set forth above, Qualcomm will not otherwise be limited in its ability to assert claims against Nokia pursuant to the terms of the first and second paragraphs of Section 22 below.

Notwithstanding the foregoing:

(i)    if: (a) after Nokia has engaged in good faith negotiations with a particular Qualcomm Components customer for a license under the applicable Nokia Standards Patents for a period that is the longer of (1) twelve (12) months after the date on which Nokia first notified such customer of such customer having a need to take a license to the Nokia Standards Patents; or (2) six (6) months after the date on which Nokia notifies such customer (in accordance with this Section 5.3) of its rights under this Section 5.3, such Qualcomm customer has not entered into a license agreement with Nokia for a license to the applicable Nokia Standards Patents on terms compliant with this Section 5.3; or (b) a particular Qualcomm Components customer (1) first Litigates (through itself or any of its Affiliates) against Nokia, or (2) Litigates (through itself or any of its Affiliates) against Nokia based on a patent that would be covered by the definition of Nokia Standards Patents if such patent were owned by Nokia and if the word "Nokia" in the definition of "Nokia Standards Patents" were replaced by such Qualcomm customer's name, then in each case such customer will no longer be entitled to benefit from Nokia's commitments to license set forth in this Section 5.3; and

(ii)    the maximum royalties defined in this commitment are net of any patent royalties charged to Nokia by the applicable Qualcomm Components customer.

If Nokia sells, assigns, or otherwise transfers any Nokia Standards Patent to any Third Party, the same terms shall transfer to such a Third Party purchaser, assignee, or other transferee of such patents and Nokia shall contractually ensure that the combined royalty rates charged by Nokia and the assignee of Nokia Standards Patents for the Nokia Standards Patents comply with the above maximum royalty rates and other terms of this Section 5.3.

In addition, Nokia agrees that it shall not charge a Qualcomm Component customer lower per unit royalties for sales during the Term for a license under the Nokia Standards Patents for Subscriber Terminals or Modem Cards that do not incorporate Qualcomm-Branded Components than for Subscriber Terminals or Modem Cards that do incorporate Qualcomm-Branded Components, in each case implementing the same wireless standards.

For clarity, this Section 5.3 will not apply to patents other than Nokia Standards Patents and will not apply to the royalties Nokia may charge for sales made by Qualcomm Components customers before or after the Term.

For clarity, if Nokia offers license terms after the Execution Date that comply with the terms of this Section 5.3 to a company that is not a Qualcomm Component customer at the time of such offer, and

25          Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QICE 00004242
Q2017MDL10_00081227

CX7728-025
JX0046-025

Nokia informs such company of the rights that the company will have under this Section 5.3 if it becomes a Qualcomm Component customer, then for the purposes of this Section such company will be deemed to have been a Qualcomm Components customer at the time Nokia made its offer, i.e. Nokia will have no obligation to make a new offer to such company if such company later becomes a Qualcomm Components customer.

### 5.4    Sherbrooke and VoiceCraft Patents

Nokia represents and warrants to Qualcomm that: (i) as of the Effective Date, Nokia has the exclusive right to sublicense to Qualcomm the Sherbrooke Patents (for sole use in the codecs for IS-95 and 3G applications, but excluding ITU codecs G.729 and its annexes or G.723.1 and its annexes) and the VoiceCraft Patents; and (ii) Nokia is agreeing under this Agreement to include the Sherbrooke Patents and the VoiceCraft Patents under the non-Litigation covenants set forth in Section 5 to the fullest extent (and only the fullest extent) that Nokia has the right to do so. Nokia agrees that Qualcomm will not be required to pay Nokia any royalties or other financial consideration for such rights with respect to activities during the Term.

The Parties acknowledge and agree that the non-Litigation covenants granted under this Agreement with respect to the Sherbrooke Patents and the VoiceCraft Patents will commence on the first day that the Sherbrooke Patents and the VoiceCraft Patents are no longer subject to the non-assert covenants under the 2001 SULA so that there is no gap in Qualcomm's protection under the non-assert or non-Litigation covenants under the Sherbrooke Patents and the VoiceCraft Patents between the 2001 SULA and this Agreement.

The Sherbrooke Patents are not subject to Section 5.3. However, Nokia agrees to offer Qualcomm Component customers a separate license to the Sherbrooke Patents such that each Qualcomm Components customer pays, as consideration for such license, no more than a reasonable portion of Nokia's total cost of acquiring and retaining its sublicensing rights (it being understood that the royalties or fees that Nokia charges for a license to the Sherbrooke Patents may be in addition to, and need not be deducted from or credited against, the royalties Nokia charges for a license to the Nokia Standards Patents). Nokia's obligation to offer licenses to the Sherbrooke Patents on the above terms to Qualcomm Components customers will terminate generally if Nokia terminates or otherwise discontinues its right to sublicense the Sherbrooke Patents to third parties, and will terminate with respect to a particular Qualcomm Components customer if: (a) after Nokia has engaged in good faith negotiations with such Qualcomm Components customer for a license under the Sherbrooke Patents for a period of twelve (12) months after the date on which Nokia first contacted such customer specifically about licensing the Sherbrooke Patents and otherwise complied with this Section 5.4 with respect to such customer, such customer has not entered into a license agreement with Nokia for a license to the Sherbrooke Patents on terms compliant with this Section 5.4; or (b) such Qualcomm Components customer Litigates (through itself or any of its Affiliates) against Nokia after Nokia has offered such customer a license to the Sherbrooke Patents on terms compliant with this Section 5.4.

Other than as set forth in this Section 5.4 and Section 5.7, the Sherbrooke Patents are not covered by this Agreement.

### 5.5    Non-Litigation Covenants for Certain Services

Qualcomm and Nokia agree not to Litigate against the other Party for making, having made, using, selling, offering to sell, importing, or otherwise disposing, hosting, or providing, in each case during the Term: (i) any content, entertainment, or application distribution, downloading, remote access or control, sharing, synchronization, storage and streaming services, including BREW or Ovi based services;

26      Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

(ii) any content broadcast services, including services based on any Content Broadcast Standard; (iii) any e-mail or other messaging services, including Eudora and IntelliSync based services; (iv) any health management services; (v) any financial or mobile commerce services; (vi) any "push to talk," "push to share," or "push to access" some other function services, including QChat services; (vii) any asset tracking or monitoring services, including Qualcomm's OmniTRACs, OmniVision and GlobalTRACs services; (viii) any widgets or information or news distribution or management services; (ix) any marketing services, advertising services, or content discovery or recommendation services; (x) any navigation, location-based, or mapping services, including GPSOne or Nokia Maps as well as Navteq based services; (xi) any social networking services, including virtual worlds, on-line gaming services, and file, photo, or video-sharing services; (xii) customer data and/or profile collection or analyzing services including Smartphone 360 services; and (xiii) any services to install, maintain, manage or operate wireless or fixed networks or Infrastructure Equipment; however, the above non-Litigation covenant will in each case be solely limited to: (a) the territory of the jurisdiction(s) where act(s) covered by said non-Litigation covenant are actually performed by Nokia or Qualcomm (as the case may be) (including acts constituting indirect patent infringement) or where Nokia or Qualcomm attempts to Litigate against the other Party based on an act covered by said non-Litigation covenant; and (b) the Nokia Patents or Qualcomm Patents (as the case may be) granted in such jurisdictions. Notwithstanding anything to the contrary above, this Section 5.5 does not and will not cover any activities of any Third Party.

5.6    Standstill

In addition to, and without in any way limiting the licenses and non-Litigation covenants set forth in this Agreement, each Party agrees that it shall not Litigate against the other Party for a period of five (5) years after the Effective Date (the "Standstill Period"); provided that such standstill will not prevent either Party, in patent infringement Litigation Litigated after the expiration of the Standstill Period, from seeking past damages based on alleged patent infringement during the Standstill Period; however, the above standstill will in each case be solely limited to: (i) the territory of the jurisdiction(s) where act(s) covered by said standstill covenant are actually performed by Nokia or Qualcomm (as the case may be) (including acts constituting indirect patent infringement) or where Nokia or Qualcomm attempts to Litigate against the other Party based on an act covered by said standstill; and (ii) the Nokia or Qualcomm Patents (as the case may be) granted in such jurisdictions.

5.7    Non-Litigation Covenants Do Not Exhaust Patents

The Parties agree and intend that the Party granting the non-Litigation covenants and standstill made under this Agreement to immunize the other Party (and in certain cases its suppliers) under any of the granting Party's patents, including those set forth in Sections 5.1.1, 5.1.2, 5.1.3, 5.2.1, 5.2.2, 5.5, and 5.6 above, is not receiving compensation from the other Party for such non-Litigation covenants and that, instead, the granting Party intends to license its relevant patents to, enforce its relevant patents in any manner against (subject to Section 5.3), and/or collect consideration for its patents from the other Party's customers and commercial end-users, in each case without said non-Litigation covenants preventing or otherwise adversely impacting such licensing, enforcement, or collection of consideration in any manner (subject to Section 5.3). The Parties further agree that the ability to seek and collect royalties or other consideration from such customers and such end-users of the other Party constitutes a material part of the consideration hereunder for the Party who is entitled to seek and collect such royalties or other consideration. Notwithstanding the above, the grantee (and in certain cases its suppliers) of the non-Litigation covenants will benefit from the non-Litigation covenants granted to it under this Agreement.

The Parties further agree and intend that the non-Litigation covenants and standstill set forth in this Agreement, including those set forth in Sections 5.1.1, 5.1.2, 5.1.3, 5.2.1, 5.2.2, 5.5, and 5.6 above: (a) may not be circumvented by any Litigation based, in whole or in part, on any theory or doctrine of extra-

27 Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QICE 00004244
Q2017MDL10_00081229
CX7728-027
A-69                                                                JX0046-027

territorial patent infringement or indirect infringement; and (b) will not, whether expressly, impliedly, by estoppel, by operation of law, or otherwise, exhaust any of the Parties' patent rights or grant or otherwise provide any Third Party (other than a Party's suppliers, as expressly provided and limited herein) with any form of consent, authorization, license, sublicense, or other right to make, have made, use, import, offer to sell, sell, or otherwise dispose of any product or service provided by a Party that is subject to such non-Litigation covenants or standstill (or any other product or service that combines or incorporates, or is based on or derived from or produced through the use of, a product or service provided by a Party), even if the product or service provided by a Party has no non-infringing use.

Except as expressly set forth below, each Party shall include, in each of its agreements entered into after the Execution Date with a customer of any tangible product (including software) not licensed hereunder, but covered by any non-Litigation covenant granted by the other Party hereunder, a notice to such customer in the form set forth in Exhibit F hereto. Each Party shall provide a notice (separately or as one of the terms of their agreements) to their respective customers in the following manner: (a) in respect of tangible products (including software) sold or licensed for use as part of or for incorporation into a larger product to manufacturers or suppliers of such larger products, the Parties shall use the language in Exhibit F, and identify the name of Nokia or Qualcomm, respectively; and (b) in respect of other customers of tangible products (including software), the Parties shall use the language in Exhibit F, naming Qualcomm or Nokia only to the same extent that they name other patent owners. The obligations in respect of notices under clause (b) above extend only to new agreements executed after the Execution Date. Notwithstanding the foregoing, neither Party will be required to provide notices to end user consumers with respect to software provided by such Party to such consumers.

If, despite the Parties' joint intent, it is adjudicated in any country or jurisdiction that any of the non-Litigation covenants or the standstill set forth in this Agreement exhausts any of the Parties' patent rights or grants or otherwise provides to any Third Party (other than a Party's suppliers, as expressly provided and limited herein), whether expressly, impliedly, by estoppel, by operation of law, or otherwise, any form of consent, authorization, license, sublicense, or other right to make, have made, use, import, offer to sell, sell, or otherwise dispose of any product or service, then such non-Litigation covenant or standstill will to such extent be deemed to be null, void, and ineffective in such country or jurisdiction from its inception, and the Parties agree to meet promptly to negotiate in good faith a mutually acceptable substitute provision for such country or jurisdiction that effectuates the Parties' above stated intent.

Further, each Party agrees that it shall not: (i) claim or assert, in any Litigation (irrespective of whether or not the other Party is a party to such Litigation), that any non-Litigation covenant granted herein would operate in a manner or have an effect conflicting with what is said above; or (ii) fund or otherwise assist the making of any such claims or assertions in any Litigation.

5.8     Access to the Technologies of the Other Party

Prior to its acquisition of Symbian Limited ("Symbian") being finalized, Nokia agrees to use reasonable efforts in order to persuade Symbian to grant R&D licenses (including commercially available software component parts reasonably necessary for Qualcomm) for the Symbian operating system to Qualcomm on terms that do not require Qualcomm to grant any licenses, rights or immunities under any Qualcomm Patents in favor of Third Parties other than Symbian itself or its Affiliates.

Qualcomm agrees to offer licenses to Nokia for the BREW client software (including commercially available software component parts reasonably necessary for Nokia) that Qualcomm makes commercially available to Third Parties on terms that are not less favorable than those of Qualcomm's other large customers, and without asking any licenses, rights or immunities under any Nokia Patents beyond this Agreement. If Qualcomm cannot obtain an R&D license for the Symbian operating system

28          Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QICE 00004245
Q2017MDL10_00081230

CX7728-028

A-70                                                          JX0046-028

from Symbian or the Symbian Foundation without Qualcomm having to grant any licenses, rights or immunities under any Qualcomm Patents in favor of Third Parties (other than Symbian or the Symbian Foundation on above described terms), then, from the next commercial release of BREW client software after the date on which Qualcomm could not obtain a license from Symbian or the Symbian Foundation without Qualcomm having to grant any licenses, rights or immunities under any Qualcomm Patents in favor of Third Parties (other than Symbian or the Symbian Foundation on the above described terms), Qualcomm will be entitled to request from Nokia, as a condition to providing future releases of BREW client software to Nokia, patent terms of equivalent scope and type as the patent terms that Symbian or the Symbian Foundation is requesting from Qualcomm for access to the Symbian operating system at that time, but only so long as either Qualcomm has agreed to such terms or Symbian or the Symbian Foundation continues to request such terms from Qualcomm. If Nokia accepts such terms requested by Qualcomm based on this Section 5.8, Qualcomm shall (if it has not already agreed to the terms sought by Symbian or the Symbian Foundation) grant licenses, rights or immunities regarding the Symbian operating system under any Qualcomm Patents in favor of Third Parties (in addition to Symbian and the Symbian Foundation on the above described terms) on the terms that Symbian or Symbian Foundation requested from Qualcomm.

Further, Qualcomm agrees that, if: (i) Nokia acquires any company or business (the "Acquired Company") such that the Acquired Company falls within the definition of Nokia; and (ii) Qualcomm has an agreement with the Acquired Company with respect to BREW software, which agreement purports to bind Nokia, whether as the parent company of the Acquired Company or otherwise, then Qualcomm shall agree to amend the agreement with such Acquired Company to remove any obligations that would purport to bind Nokia with respect to licenses, rights or immunities granted under the Nokia Patents; provided, however, that any patents or patent applications that the Acquired Company owns or has the right to license as of the date of such acquisition would continue to be subject to any licenses, rights or immunities granted in such agreement.

If Nokia desires to purchase Qualcomm-Branded Components, Qualcomm-Branded Broadcast Components, or Qualcomm-Branded Local Area Network Components from Qualcomm, Qualcomm agrees that it shall not seek, as a condition of agreeing to supply to Nokia Qualcomm-Branded Components, Qualcomm-Branded Broadcast Components, or Qualcomm-Branded Local Area Network Components, any licenses, rights, or immunities under any Nokia Patents beyond those set forth in this Agreement.

## 6.    ASSIGNMENT OF NOKIA PATENTS TO QUALCOMM

### 6.1    Selection of Designated Patents

Attached to this Agreement as Exhibit A is a list of ███████████ provided by Nokia. Within thirty (30) days after the Execution Date of this Agreement, Qualcomm shall select (by providing written notice to Nokia) ████████████ from Exhibit A. Within three (3) business days after Qualcomm provides notice of its selection (but in no case earlier than September 24, 2008), Nokia shall select (by providing written notice to Qualcomm), at its sole discretion, an additional ████████ ████ from Nokia's portfolio. The patents and patent applications included within the ████████ ████████ selected by Qualcomm and the additional ██████████ selected by Nokia are collectively referred to herein as the "Designated Patents". For clarity, Designated Patents are not included in Nokia Standards Patents for purposes of this Agreement.

29                Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QICE 00004246
Q2017MDL10_00081231

CX7728-029

A-71                                         JX0046-029

## 6.2 Assignment of Designated Patents

████████████████████████████████████████████████████

████████████████████ (a) the rights retained by Nokia as expressly provided in Section 6.3; (b) all (F)RAND ((Fair) Reasonable and Non-Discriminatory) undertakings or other like undertakings made by Nokia to any standard setting organization; (c) all non-exclusive licenses granted by Nokia; (d) all obligations to offer and/or grant non-exclusive licenses; (e) all options granted by Nokia for any Third Party to take or extend in time any non-exclusive licenses and all non-exclusive licenses to be granted as a result of the exercise of such options; (f) all non-assert covenants granted by Nokia; (g) all covenants-not-to-sue granted by Nokia; and (h) all other rights or other encumbrances applicable to such patents (other than rights or encumbrances that could require Qualcomm to provide a Third Party, or otherwise result in a Third Party having or obtaining, any ownership interest in or exclusive right to any of such patents or that could require Qualcomm to offer or grant royalty-free licenses as a result of any commitment or undertaking made to a standards-setting organization), in each case with respect to clauses (b) through (h) above only those undertakings, licenses, obligations, options, covenants, rights, and encumbrances that existed, and in the form they existed, prior to the Effective Date; and (i) Nokia's patent license agreements with Sonim Technologies, Inc. with the effective date of July 1, 2008 (the "Sonim Agreement") and Chi Mei Communications Systems, Inc. with the effective date of April 1, 2008 (the "CMCS Agreement") in the form they existed as of the Effective Date. The form of patent assignment to be executed by Nokia and delivered to Qualcomm is attached hereto as Exhibit B. Nokia represents that the information it has provided to Qualcomm with respect to the CMCS Agreement is accurate and acknowledges that Qualcomm is relying on such information in agreeing to include the CMCS Agreement in clause (i) above.

For clarity, (x) Nokia will continue to be bound by all of its definitive license agreements covering the Designated Patents that Nokia entered into before the Effective Date hereof as well as the Sonim Agreement and CMCS Agreement, in each case for the remaining term of such agreements and only as to the terms in such agreements that existed as of the Effective Date, and (y) Nokia will be entitled to continue to receive any and all benefits, including patent royalties, arising out of such patent license agreements. For clarity, the remaining term of agreements will cover potential renewal of existing patent licenses in the event a licensee exercises its unilateral option to extend the term, but solely to the extent such option to extend existed (and not in any broader form than it existed) as of the Effective Date.

## 6.3 Rights Retained by Nokia

Nokia retains perpetual, irrevocable, and royalty-free licenses and patent-exhaustive rights under each of the Designated Patents to make, have made, use, import, offer to sell, sell, and otherwise dispose of any products, software, and services. Without prejudice to the preceding sentence, Qualcomm agrees to perpetually refrain from Litigating based on any Designated Patent against Nokia, and against any of Nokia's suppliers, but solely to the extent they supply to Nokia.

## 6.4 Information Regarding Designated Patents

During the patent selection process set forth in Section 6.1 and 6.2 above (and, at Qualcomm's request, before Qualcomm makes its selection), Nokia shall provide the following information (the "Patent Information") to Qualcomm regarding the patents included in the Patent Families listed on Exhibit A as follows: (i) which of the listed patents Nokia has not expressly licensed, or otherwise granted rights, to specific companies identified by Qualcomm (provided that Qualcomm may identify no more than thirty-seven (37) specific companies) and what kind of products (from a list of five (5) product categories

30                                    Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QICE 00004247
Q2017MDL10_00081232

CX7728-030
JX0046-030

A-72

provided by Qualcomm) are not covered by the license or other rights granted to each such Third Party; and (ii) which of the listed patents have been declared to ETSI or any other standards-setting organization as essential, or potentially essential, to any industry standard, as well as whether (F)RAND ((Fair) Reasonable and Non-Discriminatory) commitments or undertakings have been made for the same and, in each case, the identity of each such standards-setting organization. Nokia shall provide the Patent Information for the Patent Families on Exhibit A on or before September 16, 2008. At the same time as Nokia notifies Qualcomm of the ▮▮▮ Patent Families selected by Nokia, Nokia shall also provide Qualcomm with the Patent Information for each of the patents in these Patent Families. Nokia shall use its reasonable efforts to ensure that the Patent Information provided to Qualcomm is accurate and complete to Nokia's knowledge.

After the transfer of the Designated Patents to Qualcomm and at Qualcomm's request, Nokia shall use reasonable efforts to provide to Qualcomm, without undue delay from Qualcomm's written request, the following information regarding each specific Designated Patent which is the subject of Qualcomm's request: (i) whether Nokia has not granted a license or other rights under such patent to a specific company (or list of companies) and the kinds of products (from the list of five (5) product categories provided by Qualcomm under the preceding paragraph) that are not covered by any license or other rights that Nokia has granted to such company under the Designated Patents; and (ii) whether such patent has been declared by Nokia to ETSI or any other standards-setting organization as essential, or potentially essential, to any industry standard, as well as whether (F)RAND ((Fair) Reasonable and Non-Discriminatory) commitments or undertakings have been made for the same and, in each case, the identity of each such standards-setting organization. Nokia shall use its reasonable efforts to ensure that the information provided to Qualcomm in response to Qualcomm's request is accurate and complete to Nokia's knowledge.

For clarity, if any of the information requested by Qualcomm under this Section 6.4 is subject to non-disclosure obligations preventing such disclosure to Qualcomm, the Parties shall negotiate in good faith to attempt to find a confidential and reasonable method for providing Qualcomm with such information to the extent reasonable under the circumstances.

### 6.5    Transfer of Patent Files

Within thirty (30) days after the Designated Patents are assigned to Qualcomm, Nokia shall deliver to Qualcomm the following information, at Nokia's sole cost and expense, for each of the Designated Patents: (i) the assignment records, if any; and (ii) information on any upcoming deadlines related to the Designated Patents due within the next ninety (90) days from the assignment. Further, within ninety (90) days after the Designated Patents are assigned to Qualcomm, Nokia shall, at its sole cost and expense, cause its prosecuting counsel to transfer the applicable patent prosecution files to Qualcomm, to the extent reasonably available. For clarity, Nokia will not be obliged to deliver to Qualcomm copies of any contracts or agreements pursuant to which Nokia has licensed a Designated Patent to any Third Party or granted any other rights or immunities to any Third Party. Nokia also agrees that prior to completion of the assignments of the Designated Patents to Qualcomm in accordance with this Agreement, Nokia shall ensure that all fees due are paid and all filing deadlines are met with respect to the Designated Patents up through the date of assignment. For clarity, it is understood that before July 23, 2008, Nokia may have abandoned, or allowed to lapse or expire, some national patents of Patent Families included in the Designated Patents.

### 6.6    Representations and Warranties

Nokia represents and warrants that: (a) it has sole and exclusive title to each of the Designated Patents, free and clear of any liens or security interests and, to the best of Nokia's knowledge, free and

31                     Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

QICE 00004248
Q2017MDL10_00081233
CX7728-031
JX0046-031

A-73

clear of any competing claims of ownership; (b) no exclusive licenses or other exclusive rights have been granted to any Third Party with respect to any of the Designated Patents; (c) Nokia has not granted (and will not grant) any licenses or other rights of any nature in any of the Designated Patents to any Third Party at any time on or after July 22, 2008 other than those granted under the Sonim Agreement and CMCS Agreement (in each case as defined in Section 6.2 above and in the form such agreements existed as of the Effective Date) and other than any licenses granted by Nokia upon the exercise of unilateral options (including renewals) existing (and in the form they existed) prior to the Effective Date; (d) to the best of Nokia's knowledge, none of the Designated Patents has been adjudicated to be invalid or unenforceable; and (e) none of the patents in the Designated Patents is subject to a royalty-free licensing commitment or obligation as a result of any commitment or undertaking made to a standards-setting organization. Except for the express representations and warranties in this Section 6.6, the Designated Patents are assigned to Qualcomm "as is" and Nokia disclaims all other representations and warranties, express or implied. The Parties further agree that the disclaimers set forth in Section 9.2 apply fully to all Designated Patents, except that (i) Nokia shall not allow any Designated Patent to be abandoned or otherwise lapse or expire prior to the assignment of the Designated Patents to Qualcomm, and (ii) the disclaimers in Section 9.2, solely to the extent conflicting with the express representations and warranties in this Section 6.6, do not override the express representations and warranties set forth in this Section 6.6.

Qualcomm represents and warrants that it will comply with all applicable (F)RAND ((Fair) Reasonable and Non-Discriminatory) undertakings or other like undertakings made by Nokia to any standards-setting organization prior to the Effective Date that are applicable to the Designated Patents, provided that any failure by Qualcomm to comply with any such undertaking prior to the date that Qualcomm is notified by Nokia of such undertaking will not constitute a breach of this Agreement by Qualcomm.

## 7. WITHDRAWAL OF NOKIA'S EUROPEAN COMMISSION COMPLAINT

Nokia will, within five (5) days after the Execution Date and in writing, withdraw its complaint to the European Commission in which Nokia alleges that Qualcomm breaches EU competition law, and promptly provide a copy of such written withdrawal to Qualcomm. However, notwithstanding anything to the contrary in this Agreement, Nokia will not waive any rights it may have based on any remedies that the European Commission may impose on Qualcomm in connection with its current investigation or to any action by Nokia to enforce any such remedies based on breach(es) of competition law.

Nokia represents and warrants to Qualcomm that Nokia has not filed any complaints against Qualcomm's business conduct with governments of, or regulators in, any other country or jurisdiction (other than the complaint filed with the European Commission).

## 8. RESTRICTIONS ON DISCLOSURE OF INFORMATION

### 8.1 Nokia's Financial Information

The Parties agree that in the course of performance under this Agreement, Nokia will disclose financial information associated with the payment of royalties as required under this Agreement, which will be provided in writing and treated as confidential hereunder. Qualcomm shall not use, disclose, or grant the use of Nokia's royalty-related information except on a need-to-know basis to Qualcomm's employees and agents (including any independent certified public accounting firm performing an audit for Qualcomm pursuant to Section 13), and only to the extent such disclosure is reasonably necessary in connection with Qualcomm's exercise or enforcement of its rights, or performance of its obligations, under this Agreement and for the purpose of reporting and forecasting corporate revenues, which include the revenues to be received under this Agreement. To the extent that disclosure is authorized by this

32      Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Agreement, prior to disclosure, Qualcomm shall obtain the written agreement of any such person who is not otherwise bound by fiduciary obligations to Qualcomm to hold in confidence and not make use of the Confidential Information for any purpose other than those permitted by this Agreement. If Qualcomm is required to disclose Nokia's confidential information by law, order, or regulation of a governmental agency or a court of competent jurisdiction, Qualcomm shall use reasonable efforts to provide Nokia with reasonable advance written notice thereof and, if possible under the circumstances, an opportunity to object to and to try to prevent such disclosure.

Qualcomm's obligations under this Section 8 will not apply to any information that (i) is or becomes generally available to the public through no wrongful act or omission on the part of Qualcomm; (ii) was rightfully known by Qualcomm prior to the date of disclosure by Nokia; (iii) was received by Qualcomm from a Third Party that is not subject to any confidentiality obligation with respect to such information; or (iv) is released from confidential treatment by Nokia's prior written consent specifically identifying the information covered by such consent.

### 8.2    Qualcomm Information

The Parties agree that in the course of performance under this Agreement, Qualcomm and/or Nokia's auditors may disclose to Nokia certain information related to one or more license agreements between Qualcomm and a Third Party, which will be treated as confidential hereunder. Nokia shall not use, disclose, or grant the use of Qualcomm's confidential information except on a need-to-know basis to Nokia's employees and agents, and only to the extent such disclosure is reasonably necessary in connection with Nokia's exercise or enforcement of its rights, or performance of its obligations, under this Agreement. To the extent that disclosure is authorized by this Agreement, prior to disclosure, Nokia shall obtain the written agreement of any such person who is not otherwise bound by fiduciary obligations to Nokia to hold in confidence and not make use of the confidential information for any purpose other than those permitted by this Agreement. If Nokia is required to disclose Qualcomm's confidential information by law, order, or regulation of a governmental agency or a court of competent jurisdiction, Nokia shall use reasonable efforts to provide Qualcomm with reasonable advance written notice thereof and, if possible under the circumstances, an opportunity to object to and to try to prevent such disclosure.

Nokia's obligations under this Section 8 will not apply to any information that (i) is or becomes generally available to the public through no wrongful act or omission on the part of Nokia; (ii) was rightfully known by Nokia prior to the date of disclosure by Qualcomm; (iii) was received by Nokia from a Third Party that is not subject to any confidentiality obligation with respect to such information; or (iv) is released from confidential treatment by Qualcomm's prior written consent specifically identifying the information covered by such consent.

## 9.    REPRESENTATIONS AND WARRANTIES

### 9.1    Representations and Warranties

Qualcomm hereby represents and warrants to Nokia that (a) Qualcomm Incorporated: (i) is a duly organized corporation in good standing under the laws of the State of Delaware; (ii) has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby; and (iii) will ensure that all of its Subsidiaries comply with this Agreement (including the grant of licenses to Nokia and the making of non-Litigation covenants to Nokia and its suppliers); and (b) the execution and delivery of this Agreement have been duly authorized by all requisite corporate action on its part.

33                        Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QICE 00004250
Q2017MDL10_00081235

CX7728-033
JX0046-033

Nokia hereby represents and warrants to Qualcomm that (a) Nokia Corporation: (i) is a duly organized corporation in good standing under the laws of Finland; (ii) has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby; and (iii) will ensure that all of its Subsidiaries comply with this Agreement (including the making of non-Litigation covenants to Qualcomm and its suppliers); and (b) the execution and delivery of this Agreement have been duly authorized by all requisite corporate action on its part.

Each Party hereby represents and warrants to the other Party that this Agreement is freely entered into and the result of good-faith, arm's-length negotiations.

### 9.2 Disclaimers

Except as expressly provided in this Agreement, nothing in this Agreement shall be construed as: (i) requiring the filing of any patent application, the securing of any patent, or the maintaining of any patent in force; (ii) a warranty or representation by either Party as to the validity, enforceability, value, or scope of any patent, copyright, or other intellectual property right; (iii) a warranty or representation that any manufacture, sale, offering to sell, lease, use, importation, or other disposal will not infringe or will be free from infringement of patents, copyrights, or other intellectual property rights of others (and it will be the sole responsibility of each Party to make such determination as is necessary with respect to its acquisition of licenses under patents and other intellectual property of Third Parties); (iv) an agreement to bring or prosecute actions or suits against Third Parties for infringement; (v) an obligation to furnish any manufacturing assistance or information; or (vi) conferring any right to use (in advertising, publicity, or otherwise) any name, trade name, or trademark of the other Party or any contraction, abbreviation, or simulation thereof.

### 10. ACQUISITION OF A PARTY

In this Section 10, the term "Acquisition" (and variations such as "Acquired") means any acquisition of a Party, including (a) mergers or consolidations that result in a change in the ultimate beneficial ownership of a majority (more than fifty per cent) of the shares or other securities in the Party entitled to vote for the election of directors or other managing authority; (b) the sale or other transfer to a Third Party of the beneficial ownership of all or the majority (more than fifty per cent) of the shares or other securities in the Party entitled to vote for election of directors or other managing authority; or (c) the sale of all or substantially all of the assets of the Party to a Third Party.

#### 10.1 Acquisition of Qualcomm

If Qualcomm Incorporated is Acquired, then the non-Litigation covenants made by Nokia hereunder will remain in force and will continue to apply to Qualcomm Incorporated (or the surviving, resulting, or other successor entity) and all of its Subsidiaries, but will be limited to the annual sales of products and services covered by such covenants with a total cumulative selling price no greater than the total cumulative selling price of all corresponding products and services sold by Qualcomm during the twelve (12) months immediately before the date of the acquisition plus an annual growth rate of ten per cent (10%) for each year thereafter during the Term. Notwithstanding the foregoing, Nokia will be entitled to terminate such non-Litigation covenants made by Nokia if (a) the Third Party that Acquired Qualcomm or any of such Third Party's Affiliates Litigates based on any patents against: (i) Nokia; (ii) Nokia's customers, with respect to products or services supplied by Nokia; or (iii) Nokia's suppliers, with respect to products or services supplied to Nokia; and (b) such Third Party (or its Affiliate) does not withdraw such Litigation within ninety (90) days after receiving written notice from Nokia seeking such withdrawal. For clarity, it is the intention of the Parties that Nokia's rights under this Agreement will not be adversely affected by any Acquisition of Qualcomm Incorporated.

34 Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QICE 00004251
Q2017MDL10_00081236

CX7728-034
JX0046-034

A-76

### 10.2    Acquisition of Nokia

If Nokia Corporation is Acquired, then the licenses granted and non-Litigation covenants made by Qualcomm hereunder will remain in force and will continue to apply to Nokia Corporation (or the surviving, resulting, or other successor entity) and all of its Subsidiaries, but will be limited to the annual sales of products and services covered by such licenses and covenants with a total cumulative selling price no greater than the total cumulative selling price of all corresponding products and services sold by Nokia during the twelve (12) months immediately before the date of the acquisition plus an annual growth rate of ten per cent (10%) for each year thereafter during the Term. Notwithstanding the foregoing, Qualcomm will be entitled to terminate such licenses and non-Litigation covenants granted by Qualcomm if (a) the Third Party that Acquired Nokia or any of such Third Party's Affiliates Litigates based on any patents against: (i) Qualcomm; (ii) Qualcomm's customers, with respect to products or services supplied by Qualcomm; or (iii) Qualcomm's suppliers, with respect to products or services supplied to Qualcomm; and (b) such Third Party (or its Affiliate) does not withdraw such Litigation within ninety (90) days after receiving written notice from Qualcomm seeking such withdrawal. For clarity, it is the intention of the Parties that Qualcomm's rights under this Agreement will not be adversely affected by any Acquisition of Nokia Corporation.

### 11.    EFFECT ON 2001 SULA PROVISIONS

#### 11.1    Extension of Covenants for Transferred Patents

Each Party represents to the other Party that any patents or patent applications that the first Party has transferred to any Third Party since July 2, 2001 (the "Transferred Patents") were transferred subject to all existing rights and obligations under the 2001 SULA (either by specific reference to the 2001 SULA or by general reference to all existing rights and obligations). Each Party agrees to and hereby does extend only the covenants not to assert to each Party set forth in Sections 6.1.1 and 6.2 of the 2001 SULA (but no other part of the 2001 SULA or its Sections 6.1.1 and 6.2) solely with respect to such Transferred Patents as if Nokia had elected the Later Patent Extension under the 2001 SULA thereby extending such covenants not to assert set forth in Sections 6.1.1 and 6.2 of the 2001 SULA solely with respect to such Transferred Patents, and each Party agrees that such extended non-assert covenants to each Party will survive the termination of the 2001 SULA solely with respect to such Transferred Patents. However, a Party will not be in breach of this Agreement if such extended covenants are found not to cover such Transferred Patents. In the event any one or more of the Transferred Patents are Litigated against the other Party: (i) the Party making the representation shall reasonably co-operate with the other Party (unless such co-operation will result in liability to such Party under its agreement (in the form it existed as of the Effective Date) with the transferee of such Transferred Patent(s)), at such other Party's cost and expense, in any defense against such Transferred Patents; and (ii) the first Party (i.e., the Party making the representation) shall pay to the other Party any and all amounts that the first Party receives from a Third Party as a result of the Litigation of such Transferred Patents against the other Party. Neither Party shall take or support in any way any position that the covenants in Sections 6.1.1 and 6.2 of the 2001 SULA have not been extended with respect to the Transferred Patents or that such covenants do not cover the Transferred Patents.

#### 11.2    Surviving Rights

The Parties acknowledge and agree that, upon the effectiveness of this Agreement and subject to Section 11.1 above, all obligations under the 2001 SULA are hereby satisfied and discharged. The Parties further acknowledge and agree that Nokia's license under Qualcomm's Early Patents (as that term is defined in the 2001 SULA) solely for Complete CDMA Telephones (as that term is defined in Section

35    Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

4.2.1 of the 2001 SULA) became fully paid-up pursuant to Section 4.2.1 of the 2001 SULA on April 9, 2007 and, subject to Section 12.1, continues in full force and effect.

The license granted in Section 4.1 under QUALCOMM's Applicable Infrastructure Patents (as that term was defined in the 2001 SULA) for Infrastructure Equipment (as that term was defined in the 2001 SULA) will be fully paid up and royalty free during and after the Term for the life of each of QUALCOMM's Applicable Infrastructure Patents. For clarity, Nokia-Branded Infrastructure Equipment that is CDMA2000 Infrastructure Equipment is not covered by the immediately preceding sentence.

### 11.3    Termination of 2001 SULA

Notwithstanding anything to the contrary in the 2001 SULA, the 2001 SULA between Nokia and Qualcomm is terminated in its entirety, subject only to Sections 11.1 and 11.2 above.

## 12.    TERMINATION

### 12.1    No Termination

The Parties acknowledge and agree that, with the sole exception of Section 12.2, upon Nokia having paid the Lump Sum Fee to Qualcomm, this Agreement is not subject to termination during its Term. If Nokia fails to pay the Lump Sum Fee in full to Qualcomm in a timely manner in accordance with Section 3 and does not cure the breach within thirty (30) days after having been informed thereof by Qualcomm, Qualcomm may terminate this Agreement and all of Nokia's surviving rights under the 2001 SULA in their entirety by written notice to Nokia. For clarity, the foregoing termination right does not apply to a failure by Nokia to pay an Additional Payment (as defined in Section 3).

### 12.2    Bankruptcy, Dissolution, or Liquidation

Each of Nokia Corporation or Qualcomm Incorporated will be entitled to terminate this Agreement with immediate effect upon the occurrence of any of the following events with respect to the other (Nokia Corporation or Qualcomm Incorporated, as applicable): (a) insolvency, bankruptcy, or liquidation or filing of any application therefor, or other commitment of an affirmative act of insolvency; (b) attachment, execution, or seizure of substantially all of the assets or filing of any application therefor; (c) assignment or transfer of that portion of the business to which this Agreement pertains to a trustee for the benefit of creditors; or (d) termination of its business or dissolution.

## 13.    AUDITS AND RECORDS

### 13.1    Nokia Audit Rights and Qualcomm Records

Nokia may designate an internationally recognized certified public accounting firm (the "CPA Firm") to perform an audit of Qualcomm for compliance with Section 4.5 of this Agreement. Such audit will be subject to a separate reasonable non-disclosure agreement to be concluded between Qualcomm and the accounting firm. Qualcomm shall co-operate and permit the CPA Firm to audit Qualcomm's books and records (excluding information indicating which license agreement is with which Third Party Qualcomm licensee) during Qualcomm's normal business hours for the purpose of verifying Qualcomm's compliance with Section 4.5 solely with respect to license agreements entered into (or amended) between Qualcomm and a Third Party after the Effective Date and during the period of time following any previous audit under this Section 13.1, and provided that such CPA Firm agrees to keep such information in confidence and report to Nokia only whether Qualcomm has complied or not complied with the terms of Section 4.5, and in the case of non-compliance, only the information that Qualcomm would have been

36                    Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

required to provide to Nokia under Section 4.5 with respect to the Third Party license agreement that the auditors contend created such non-compliance. The audits will be conducted at the premises chosen by Qualcomm. Such audits may be conducted no more than once per calendar year and the costs of each such audit, including the CPA Firm costs and fees, will be paid by Nokia, unless Qualcomm is in non-compliance with Section 4.5, in which case Qualcomm shall, in addition to any other remedy to which Nokia may be entitled, pay the CPA Firm's reasonable costs and fees for such audit. Qualcomm shall preserve and maintain all relevant documents, books and records required for such audits for a period of three (3) years after the end of each fiscal year of Qualcomm in which such books and records were created. In the event that Nokia's auditors report to Nokia that Qualcomm has not complied with Section 4.5, Qualcomm and Nokia agree to negotiate in good faith to determine a confidential and reasonable method for notifying Nokia of the identity of the Third Party whose agreement the auditors claim created such non-compliance.

### 13.2 Qualcomm Audit Rights and Nokia Records

Qualcomm may, no more than once each calendar year, cause an independent certified public accounting firm to conduct an audit on reasonable notice, during Nokia's normal business hours, of Nokia's books and records reasonably necessary to confirm that Nokia has correctly calculated and reported the Covered Product Revenue and to confirm the amount of royalties payable by Nokia to Qualcomm, in each case in accordance with the terms of this Agreement. The audits will be conducted at the premises chosen by Nokia and will be limited to the period of time after the Effective Date and to the period of time following any previous audit under this Section 13.2.

Such audits will be subject to a separate reasonable non-disclosure agreement to be concluded between Nokia and the accounting firm. The accounting firm's reporting right to Qualcomm will be limited to: (a) whether or not (i) Nokia's calculation and reporting of Covered Product Revenue complies with the terms of this Agreement and (ii) Nokia has paid all royalties due to Qualcomm under this Agreement, and (b) in the event of non-compliance, overpayment, or underpayment, the extent, including the amounts of underpayments or overpayments and of such non-compliance or misreporting, providing therewith to Qualcomm the auditor's factual findings and supporting data related to such non-compliance and/or underpayment and/or overpayment in order to facilitate potential dispute resolution between Qualcomm and Nokia. In conducting such audits, the accounting firm may test the accuracy of Nokia's books and records by selecting and reviewing samples of the data, information, methods, and records that support, or were used to prepare, Nokia's books and records, but the accounting firm shall not require Nokia to provide backup or supporting documentation for all the information related to such samples and will not presume that Nokia's books and records are inaccurate.

The cost of each such audit will be borne by Qualcomm, unless such audit determines that Nokia has underpaid the royalties hereunder by more than three per cent (3%) during the audit period; in which case, Nokia shall, in addition to paying the deficiency plus late payment charges, pay the accounting firm's reasonable costs and fees for such audit.

Nokia shall preserve and maintain the books and records necessary for such audits for a period of three (3) years after the end of each fiscal year for which the books and records apply, provided that Nokia will also preserve and maintain the books and records necessary for any pending audit until such audit is concluded by the Parties.

37          Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## 14. MISCELLANEOUS

### 14.1 Oppositions

The Parties acknowledge and agree that the Settlement Agreement requires both Parties to withdraw from, and no longer participate in, any currently pending interference, re-examination or other proceeding in which ownership, validity, scope, priority date, and/or enforceability of a patent or patent application of the other Party is being challenged ("Oppositions"), provided that such withdrawal will not limit the Party's ability to challenge the validity of the patent later, if such patent is Litigated against such Party. Subject to the preceding sentence, each Party shall withdraw from any pending Opposition of the other Party's patents or patent applications no later than thirty (30) days after the Execution Date.

### 14.2 Competition or Antitrust Law Notifications and Approvals

Should the patent transfer set forth in Section 6 above require notification to or approval by any competition or anti-trust authority anywhere in the world, then the Parties agree to undertake all reasonable efforts, and to co-operate with one another to duly make such notifications and obtain such approvals. Each Party shall do so at its own cost and expense.

### 14.3 No Implied Licenses or Sublicensing Rights

Except for the licenses and non-Litigation covenants expressly set forth in this Agreement, no other, further, or different licenses or non-Litigation covenants or other rights or immunities are granted, whether impliedly, by estoppel, or otherwise, under any patents or other intellectual property rights owned, controlled, or otherwise licensable by either Party. The licenses granted in this Agreement do not include any rights to sublicense.

### 14.4 Release

Notwithstanding anything to the contrary in Sections 1 and 4 of the Settlement Agreement, the Parties acknowledge and agree that any claims of patent infringement based on acts prior to the Effective Date shall be treated as subject to the licenses and covenants not to Litigate set forth in Sections 4 and 5 of this Agreement, as applicable, as if such acts had occurred after the Effective Date but without the payment of any further consideration or royalties for such acts under this Agreement. Notwithstanding the foregoing, Sections 1 and 4 of the Settlement Agreement do not cover any claims for patent infringement based on acts occurring, including the sale of products, on or after the Effective Date.

## 15. ASSIGNMENT

### 15.1 Limited Assignment of Rights under Agreement

Except as expressly provided in Sections 4.1.1, 15.3, and 15.4, neither Party may assign this Agreement or any right or interest under this Agreement (an "assignment"), without the other Party's prior written consent, which consent may be given or withheld at such other Party's sole discretion. Any attempted assignment in contravention of this Section 15.1 shall be void and ineffective. However, an assignment that occurs by operation of law as a result of a Party being Acquired will not require the consent of the other Party and will be subject to Section 10.1 or 10.2, as applicable.

38                          Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## 15.2    Assignment of Patents

Neither Party may assign or otherwise release or transfer any of its rights under any patents that are licensed or the subject of any non-Litigation covenant under this Agreement unless such assignment, release, or transfer is made subject to the full maintenance of all licenses and all non-Litigation covenants granted under this Agreement.

## 15.3    Assignment by Nokia

Nokia will be entitled to assign in writing its licenses and the non-Litigation covenants protecting Nokia (and its suppliers) (and delegate its corresponding royalty payment and other applicable obligations) set forth in this Agreement as to Subscriber Terminals, Broadcast Devices, Local Area Network Devices, Modem Cards, M2M Modules, and Embedded Modules (all six together "Nokia's Subscriber Device Business" solely for the purpose of this Section) to a successor to all, or substantially all, of Nokia's Subscriber Device Business, provided that such successor and its Affiliates grant royalty-free non-Litigation covenants under their patents to Qualcomm of equivalent scope as those granted by Nokia to Qualcomm under this Agreement.

## 15.4    Assignment by Qualcomm

### 15.4.1   Components

Qualcomm will be entitled to assign in writing the non-Litigation covenants protecting Qualcomm (and its suppliers) under Section 5 with respect to Components, Broadcast Components and Local Area Network Components (all three together "Qualcomm's Components Business" solely for the purpose of this Section) to a successor to all, or substantially all, of Qualcomm's Components business, provided that such successor and its Affiliates grant royalty-free licenses and non-Litigation covenants under their patents to Nokia of equivalent scope as those granted by Qualcomm to Nokia under this Agreement.

### 15.4.2   Content Broadcast Business

Qualcomm shall offer Nokia access and licenses during the Term on commercially reasonable terms and conditions to the versions of MediaFLO client software and other technologies or software, in each case that Qualcomm makes commercially available to Third Parties, that are necessary for Nokia to implement MediaFLO services in its Subscriber Terminals without seeking from Nokia any licenses, rights, or immunities under any Nokia Patents. Further, to the extent that Qualcomm does not charge Third Party suppliers of Subscriber Terminals for licenses to the above software or technologies, Qualcomm shall not charge Nokia for similar licenses to such software or technologies.

Qualcomm will be entitled to assign in writing the non-Litigation covenants protecting Qualcomm under Section 5.5 with respect to content broadcast services provided in the United States to MediaFLO USA ("MUI", a Qualcomm Subsidiary as of the Effective Date), if MUI ceases to be a Subsidiary of Qualcomm, provided that: (i) MUI and its Affiliates grant royalty-free licenses and non-Litigation covenants under their patents to Nokia of equivalent scope as those granted by Qualcomm to Nokia under this Agreement; and (ii) Qualcomm and MUI shall continue to offer to Nokia access and licenses on commercially reasonable terms and conditions to the versions of MediaFLO client software and other technologies or software, in each case that Qualcomm or MUI makes commercially available to Third Parties, that are necessary for Nokia to implement MediaFLO services in its Subscriber Terminals without requiring Nokia to grant any licenses, rights, or immunities under any Nokia Patents. Further, to the extent that Qualcomm or MUI does not charge Third Party suppliers of Subscriber Terminals for licenses

39                     Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QICE 00004256
Q2017MDL10_00081241
CX7728-039
A-81                          JX0046-039

to the above software or technologies, Qualcomm or MUI (as the case may be) shall not charge Nokia for similar licenses to such software or technologies.

For clarity, after such assignment Qualcomm will not benefit from non-Litigation covenants set forth in Section 5.5 in respect of content broadcast services provided in the United States. Further, if MUI is Acquired (as such term is defined in Section 10 and applied as if MUI were still a Party), then the non-Litigation covenants set forth in Section 5.5 will remain in force and will continue to apply to MUI (or the surviving, resulting or other successor entity), but will be limited to the annual sales of products and services covered by such covenants with a total cumulative selling price no greater than the total cumulative selling price of all corresponding products and services sold by MUI during the twelve (12) months immediately before the date of the acquisition plus an annual growth rate of ten per cent (10%) for each year thereafter during the Term.

Notwithstanding the foregoing, Nokia will be entitled to terminate said non-Litigation covenants made by Nokia if (a) the Third Party that Acquired (as such term is defined in Section 10 and applied as if MUI were still a Party) MUI or any of such Third Party's Affiliates Litigates based on any patents against: (i) Nokia; (ii) Nokia's customers, with respect to products or services supplied by Nokia; or (iii) Nokia's suppliers, with respect to products or services supplied to Nokia; and (b) such Third Party (or its Affiliate) does not withdraw such Litigation within ninety (90) days after receiving written notice from Nokia seeking such withdrawal.

### 15.5 Notice of Assignment

If either Party makes an assignment under Section 15.3 or 15.4, it shall promptly notify the other Party of such assignment in compliance with Section 20.

### 15.6 Treatment of Royalties upon Assignment

Any assignment made pursuant to Section 15.3 or 15.4 will be effective only on a going-forward basis from the date of the assignment. For example, and without limiting the generality of the foregoing, any Sales made by the assigning Party before the date of the assignment will continue to be protected by the applicable licenses and non-Litigation covenants in this Agreement and if royalties are owed for such Sales, the assigning Party will be solely responsible for paying such royalties. In the case of royalties subject to the Annual Cap in Section 4.3, the Annual Cap and the Quarterly Cap Amount for the relevant year and quarter will be prorated between Nokia and its assignee based on the number of days elapsed before and including, and the number of days remaining after, the date on which the assignment was made, such that Qualcomm will receive the same amount it would have received if no assignment had been made and Sales made by the assignee after the date of the assignment had been made by Nokia.

## 16. NON-CIRCUMVENTION

Subject to Section 7 above:

(i) Nokia and Qualcomm agree that they will not seek to circumvent this Agreement in any way during its Term; and

(ii) Nokia agrees that it will not, during the Term, claim or take the position (based on any legal, equitable, or other theory or principle of any nature) in any litigation, dispute, or regulatory proceeding that Nokia is not obligated to pay the full amount of royalties owed under Sections 4.2 and 4.3 (as specified in such Sections) of this Agreement for Royalty-Bearing Products Sold by Nokia during the Term (it being understood that if a good-faith

40                    Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

dispute arises concerning the interpretation of this Agreement with respect to the amount of royalties actually owed under Sections 4.2 and 4.3, neither Party will be precluded from advocating its position regarding the interpretation of the royalty obligations in these provisions).

## 17.    SURVIVAL OF OBLIGATIONS

The Parties' rights and obligations under Sections 6, 8, 9.2, 13 (for a period of three (3) years after the expiration or termination of this Agreement), 14.3, 14.4, 16 (solely with respect to acts occurring, and products, software and services sold or licensed, during the Term), 19, 20, 21, 22, 23, 24, 25 (solely with respect to acts occurring, and products, software and services sold or licensed, during the Term), and 26 of this Agreement, as well as Nokia's obligations to pay royalties on Sales of Royalty-Bearing Licensed Products prior to such expiration or termination, will survive the expiration of the Term of the Agreement or any termination of this Agreement.

## 18.    SEVERABILITY

Except as set forth herein, if any provision in this Agreement is held to be invalid or unenforceable, the remaining portions will remain in effect and the Parties shall promptly negotiate a replacement provision which has the same economic effect.

## 19.    NON-WAIVER

No waiver of the terms and conditions of this Agreement, or the failure of either Party strictly to enforce any such term or condition on one or more occasions, shall be construed as a waiver of the same or of any other term or condition of this Agreement on any other occasion.

## 20.    NOTICES

All notices, requests, demands, and other communications required or permitted to be given under this Agreement shall be in writing and shall be delivered to the Party to whom notice is to be given, by facsimile, and confirmed by first class mail, postage prepaid, and properly addressed as follow (in which case such notice shall be deemed to have been duly given on the day the notice is first received by the Party):

Qualcomm, Incorporated
5775 Morehouse Drive
San Diego, CA  92121

Facsimile No.: (619) 658-2500
Telephone No.: (619) 587-1121
Attn:  President

with a copy to:
General Counsel, President QTL

Nokia Corporation
Keilalahdentie 4
FIN-02150 Espoo
Finland
Facsimile No.: +358-718038503
Telephone No.: +358-718034317
Attn: General Counsel

with a copy to:
Vice President, Intellectual Property
Facsimile No.: +358-7180 34496

The above addresses and numbers can be changed by providing notice to the other Party in accordance with this Section 20.

41          Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## 21.   PUBLICATION OF AGREEMENT

Absent the written consent of the other Party and except as provided below and in Section 5.3, each Party shall keep the terms of this Agreement confidential and shall not disclose them to any Third Party.

The Parties recognize that certain enumerated disclosures of certain terms of this Agreement may be reasonably necessary for the enjoyment of their rights and the performance of their obligations hereunder, and that such disclosures will not require the other Party's consent.  The enumerated disclosures are: (i) disclosure to the extent reasonably necessary for arranging any equity or debt financing; (ii) disclosure either required by (or to rebut a claim under) a "most favored licensee" or "most favored royalty rate" provision or requirement in Third Party license agreements (including disclosures intended to establish the invalidity of a Third Party's claim under such a provision or requirement); (iii) disclosure to effect have-made rights; and (iv) disclosure with respect to the not to exceed royalty rates set forth in Section 5.3 (in the manner specified in Section 5.3).  Prior to making an enumerated disclosure to a Third Party, the Party making such disclosure shall obtain the written agreement of such Third Party that such Third Party will not disseminate the information disclosed regarding the terms of this Agreement to any subsequent Third Party.  Notwithstanding the above, in no event shall either Party disseminate the terms of this Agreement to any Third Party that does not reasonably need access to such information.

If either Party is required to disclose this Agreement or any of its terms or provisions by law, order, or regulation of a governmental agency or a court of competent jurisdiction, then such disclosing Party shall use reasonable efforts to provide the other Party with reasonable advance written notice thereof and, if possible under the circumstances, an opportunity to object to and to try to prevent such disclosure.

The Parties' obligations under this Section 21 will not apply to any information that: (a) is or becomes generally available to the public through no wrongful act or omission on the part of the disclosing Party; or (b) is released from confidential treatment by the other Party's prior written consent specifically identifying the information covered by such consent.

## 22.   APPLICABLE LAW; VENUE

This Agreement is made and entered into in the State of Delaware and will be governed by and construed and enforced in accordance with the laws of the State of Delaware without regard to conflict of laws principles.  The Parties agree that any dispute arising under or relating to this Agreement shall be litigated in the Court of Chancery of the State of Delaware, pursuant to 10 Del. C. § 346.  The Parties agree to submit to the jurisdiction of the Court of Chancery of the State of Delaware and waive trial by jury.

Notwithstanding the foregoing, if there is a determination that any dispute arising under or relating to this Agreement is not subject to 10 Del. C. Section 346, the Parties agree that: (i) if the Delaware Chancery Court has subject matter jurisdiction over such dispute, then such dispute will be adjudicated only by, and will be subject to the exclusive jurisdiction and venue of, the Delaware Chancery Court; or (ii) if the Delaware Chancery Court does not have subject matter jurisdiction over such dispute, then such dispute will be adjudicated only by, and will be subject to the exclusive jurisdiction and venue of, the Superior Court of Delaware, and each Party hereby irrevocably consents to, and waives any objection to, the jurisdiction or venue of the Delaware Courts with respect to such dispute.

In the case of a conflict between the provisions of Section 5.3 and this Section 22, Section 5.3 will control.

42                          Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QICE.00004259
Q2017MDL10_00081244

CX7728-042
JX0046-042

A-84

### 23. LATE CHARGE

Each Party may charge the other Party a late charge, with respect to any amounts that the other Party owes hereunder and fails to pay on or before the due date, in an amount equal to an annual rate of the London Interbank Offered Rate plus five per cent (LIBOR+5%). For clarity, Qualcomm will not owe any late charges under this Section 23 on any amounts that Nokia claims it overpaid to Qualcomm under this Agreement.

### 24. ATTORNEYS' FEES

In the event of any litigation between the Parties arising from or relating to this Agreement, the prevailing Party in such action, as determined by the court, will be entitled to reasonable attorneys' fees as fixed by the court.

### 25. ENTIRE AGREEMENT

This Agreement supersedes the 2001 SULA (except for the provisions of the 2001 SULA which survive and remain in effect as expressly provided in Section 11 of this Agreement), the Term Sheet (but not the remainder of the Settlement Agreement, which remains in full force and effect), and all other prior or contemporaneous oral or written understandings between the Parties with respect to the subject matter hereof, and constitutes, solely with respect products, services, or software sold or licensed during the Term, the entire agreement of the Parties with respect to such subject matter.

### 26. AMENDMENTS

The terms and conditions of this Agreement can be modified or amended only by a writing signed by authorized representatives of both Parties that specifically refers to this Agreement and expressly states the Parties' intention to amend or modify it.

*[Remainder of page intentionally left blank]*

43                    Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QICE 00004260
Q2017MDL10_00081245

CX7728-043
JX0046-043

A-85

## 27. INDEPENDENT CONTRACTORS

The relationship between Qualcomm and Nokia is that of independent contractors. Qualcomm and Nokia are not joint venturers, partners, principal and agent, master and servant, or employer or employee, and have no other relationship other than independent contracting parties.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed, through their duly authorized representatives, as of September 16, 2008 (the "Execution Date"), in two (2) identical copies, one (1) for each Party.

FOR AND ON BEHALF OF:

QUALCOMM, INCORPORATED

SIGNATURE: _____

BY: DeRek ABeRle

TITLE: EVP + PResiDent, QTC

DATE: OctobeR 22, 2008

FOR AND ON BEHALF OF:

NOKIA CORPORATION

SIGNATURE: _____
TeRo wApAmEAs
BY: EVP, Entertainment&CommunTes

TITLE: _____

DATE: 2/16/08

SIGNATURE: _____

BY: iLKKA RAHNASTO

TITLE: VP, IPR

DATE: 9/16/08

44                Nokia/Qualcomm Confidential

QUALCOMM BUSINESS SECRETS – HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QICE 00004261
Q2017MDL10_00081246

CX7728-044
JX0046-044

A-86

**EFiled:  Jan 25 2021 02:17PM EST**
**Transaction ID 66281178**
**Case No. 2021-0066-**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation, | ) ) ) |  |
|  | ) |  |
| Plaintiff, | ) ) |  |
| v. | ) ) | C.A. No. 2021- |
| NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATION, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation, | ) ) ) ) ) ) ) ) ) |  |
| Defendants. | ) ) |  |

## <u>VERIFICATION PURSUANT TO 10 DEL. C. § 3927</u>

Pursuant to 10 *Del. C.* § 3927 and Paragraph 5 of Administrative Order No.

3 of the Delaware Supreme Court, dated March 22, 2020, as extended by

Administrative Order No. 15 of the Delaware Supreme Court, dated December 30,

2020, Brian Droessler hereby declares:

I, Brian Droessler, am an employee of Continental Automotive Systems, Inc.

("Continental") and the Head of Software and Connected Solutions in the Interior

Division of Continental AG's Infotainment & Connectivity Business Unit.  I have

read the foregoing Verified Complaint and affirm that the matters contained

therein, insofar as they concern Continental's acts and deeds, are true, and so far as they relate to the acts and deeds of any other person, are believed by me to be true.

I declare under penalty of perjury under the laws of Delaware the foregoing is true and correct.

Executed this 25th day of January, 2021.

1/25/2021

2

A-88

**EFiled:  Jan 25 2021 02:17PM EST
Transaction ID 66281178
Case No. 2021-0066-**

SUPPLEMENTAL INFORMATION PURSUANT TO RULE 3(A)
OF THE RULES OF THE COURT OF CHANCERY

The information contained herein is for the use by the Court for statistical and administrative purposes only. Nothing stated herein shall be deemed an admission by or binding upon any party.

1.     Caption of Case:  **Continental Automotive Systems, Inc., v. Nokia Corporation; Nokia of America Corporation; Nokia Solutions and Networks Oy; and Nokia Technologies Oy**

2.     Date Filed:  **January 25, 2021**

3.     Name and address of counsel for plaintiff(s): **Philip A. Rovner (#3215) and Jonathan A. Choa (#5319), Potter Anderson & Corroon LLP, Hercules Plaza, 6th Floor, 1313 North Market Street, Wilmington, DE 19899.**

4.     Short statement and nature of claim asserted:  **Action for breach of contract and FRAND obligations**

5.     Substantive field of law involved (check one):

| | | |
|---|---|---|
| _____Administrative law | _____Labor law | _____Trusts, Wills and Estates |
| _____Commercial law | _____Real Property | _____Consent trust petitions |
| _____Constitutional law | _____348 Deed Restriction | _____Partition |
| _____Corporation law | _____Zoning | _____Rapid Arbitration (Rules 96,97) |
| **X**_ Trade secrets/trade mark/or other intellectual property | _____Other | |

6.     Related cases, including any Register of Wills matters (this requires copies of all documents in this matter to be filed with the Register of Wills):
**N/A**

7.     Basis of court's jurisdiction (including the citation of any statute(s) conferring jurisdiction):  **10 Del. C. §341; 10 Del. C. §342**

8.     If the complaint seeks preliminary equitable relief, state the specific preliminary relief sought.  **N/A**

9.     If the complaint seeks a TRO, summary proceedings, a Preliminary Injunction, or Expedited Proceedings, check here _____. (If #9 is checked, a Motion to Expedite <u>must</u> accompany the transaction.)

10.    If the complaint is one that in the opinion of counsel should not be assigned to a Master in the first instance, check here and attach a statement of good cause _____.

_____
Philip A. Rovner (#3215)



EFiled: Jan 26 2021 09:43AM EST
Transaction ID 66283481
Case No. 2021-0066-JRS

1313 North Market

302

www.potterand

Philip A. Rovner
Partner
Attorney at Law
provner@potteranderson.com
302 984-6140 Direct Phone

January 26, 2021

**VIA FILE & SERVE*EXPRESS***

Register in Chancery
Court of Chancery
Leonard L. Williams Justice Center
500 N. King Street
Wilmington, DE 19801

      Re:    *Continental Automotive Systems, Inc. v. Nokia Corporation, et al.*,
                C.A. No. 2021-0066-

Dear Register in Chancery:

      I write on behalf of Plaintiff in the above-referenced action to respectfully request that the Register in Chancery prepare and issue a summons, pursuant to Court of Chancery Rule 4 and 8 *Del. C.* § 321, via special process server, Parcels, Inc., to the following party:

      Nokia of America Corporation
      c/o Corporation Service Company
      251 Little Falls Drive
      Wilmington, DE 19808

      Please notify my office when the summons is ready to be picked up or if you have any questions.  Thank you for your assistance.

Register in Chancery
January 26, 2021
Page 2

Respectfully,

*/s/ Philip A. Rovner*

Philip A. Rovner (#3215)

Words: 89


Potter
Anderson
Corroon LLP

EFFiled: Jan 26 2021 03:20PM EST
Transaction ID 66239436
Case No. 2021-0066-JRS

1313 North Mar...
...19...
...02
www.potterand...

Philip A. Rovner
Partner
Attorney at Law
provner@potteranderson.com
302 984-6140 Direct Phone

January 26, 2021

**VIA FILE & SERVE***XPRESS*

Register in Chancery
Court of Chancery
Leonard L. Williams Justice Center
500 N. King Street
Wilmington, DE 19801

Re:     *Continental Automotive Systems, Inc. v. Nokia Corporation, et al.,*
        C.A. No. 2021-0066-

Dear Register in Chancery:

I write on behalf of Plaintiff in the above-referenced action to respectfully

request that the Register in Chancery prepare and issue a summons, pursuant to

Court of Chancery Rule 4 and 8 *Del. C.* § 321, via special process server, Parcels,

Inc., to the following party:

> Nokia of America Corporation
> c/o Corporation Service Company
> 251 Little Falls Drive
> Wilmington, DE 19808

Please notify my office when the summons is ready to be picked up or if you

have any questions.  Thank you for your assistance.

A-92

Register in Chancery
January 26, 2021
Page 2

Respectfully,

*/s/ Philip A. Rovner*

Philip A. Rovner (#3215)

Words: 89



# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CONTINENTIAL AUTOMOTIVE
SYSTEMS, INC., a Delaware corporation,
        Plaintiff(s),

v.

NOKIA CORPORATION, a Finnish
corporation, NOKIA OF AMERICA
CORPORATON, a Delaware corporation,
NOKIA SOLUTIONS AND NETWORKS
OY, a Finnish corporation, and NOKIA
TECHNOLOGIES OY, a Finnish
corporation,
        Defendant(s).

C.A. No. 2021-0066-JRS

SUMMONS

Pursuant to Court of Chancery Rule 4
and 8 Del. C. § 321

## THE STATE OF DELAWARE

**TO: Parcels, Inc.**

**YOU ARE COMMANDED:**

To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon Philip A. Rovner, Esquire, plaintiff's counsel, whose address is Potter Anderson & Corroon LLP, Hercules Plaza, P.O. Box 951, Wilmington, DE 19899 an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

**TO THE ABOVE NAMED DEFENDANTS:**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated: January 29, 2021

_Susan Judge_
REGISTER IN CHANCERY

Case # 2021-0066-JRS

Continental Automotive Systems, Inc.
                    Plaintiff(s),
            v.
Nokia Corporation, et al,
                    Defendant(s).


## SUMMONS

Please effectuate service upon:
1. Nokia of America Corporation
   c/o  Corporation Service Company
   251 Little Falls Drive
   Wilmington, DE 19808
            pursuant to Court of Chancery Rule 4 and 8 Del. C. § 321


SERVICE TO BE COMPLETED BY
Parcels, Inc.




 Philip A. Rovner, Esquire
Plaintiff's Counsel



EFiled:  Feb 01 2021 03:56PM EST
Transaction ID 66299802
Case No. 2021-0066-JRS

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899
302
www.potterand...

Philip A. Rovner
Partner
Attorney at Law
provner@potteranderson.com
302 984-6140 Direct Phone

February 1, 2021

**VIA FILE & SERVE*XPRESS***

Register in Chancery
Court of Chancery
Leonard L. Williams Justice Center
500 N. King Street
Wilmington, DE 19801

Re:  *Continental Automotive Systems, Inc. v. Nokia Corporation, et al.,*
     C.A. No. 2021-0066-JRS

Dear Register in Chancery:

I write on behalf of the Plaintiff in the above-referenced action to respectfully request that the Register in Chancery issue summonses for Potter Anderson & Corroon LLP to serve the following parties at the following addresses pursuant to 10 *Del. C.* § 3104 and Article 10(a) of the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil or Commercial Matters, November 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163 (the "Hague Convention") via international registered mail, return receipt requested:

Nokia Corporation
Karakaari 7
02610 Espoo, Finland

Register in Chancery
February 1, 2021
Page 2

        Nokia Solutions and Networks Oy
        Karakaari 7
        02610 Espoo, Finland

        Nokia Technologies Oy
        Karakaari 7
        02610 Espoo, Finland

Finland, a Member of the Hague Convention, has not objected to service by registered mail pursuant to Article 10(a) of the Hague Convention. *See* Hague Convention on the Service of Judicial and Extrajudicial Documents in Civil or Commercial Matters, November 15, 1965, Status Table 14, *available at* https://www.hcch.net/en/instruments/conventions/status-table/?cid=17 (last updated Jul. 27, 2020); *Id.*, Finland - Central Authority & Practical Information, *available at* https://www.hcch.net/en/states/authorities/details3/?aid=255 (last updated March 25, 2019).

    In addition to the summonses above, Plaintiff also respectfully requests that the Register in Chancery prepare additional summonses to be served upon the following parties at the following addresses pursuant to Article 5(a) of the Hague Convention:

        Nokia Corporation
        Karakaari 7
        02610 Espoo, Finland

Register in Chancery
February 1, 2021
Page 3

Nokia Solutions and Networks Oy
Karakaari 7
02610 Espoo, Finland

Nokia Technologies Oy
Karakaari 7
02610 Espoo, Finland

Under Article 5(a), service will be effected via the Central Authority of

Finland by a method prescribed by Finnish law.  The Central Authority of Finland

is:

Ministry of Justice
Unit for International Judicial Cooperation
P.O. Box 25
FIN-00023 Government
Finland

Accordingly, I ask that you please issue summonses to Nokia Corporation,

Nokia Solutions and Networks Oy and Nokia Technologies Oy with directions that

it be served by the Central Authority of Finland.

Additionally, pursuant to Article 3 of the Hague Convention, an appropriate

authority or judicial officer competent under the Jurisdiction of this Court must

forward the service request to the Central Authority of Finland.  Therefore, I

further ask that you please enter the attached proposed order appointing the

following individual as such an authority or judicial officer:

Register in Chancery
February 1, 2021
Page 4

Celeste Ingalls
1020 SW Taylor Street, Suite 240
Portland, Oregon 97205

Please notify my office when the summonses are ready to be picked up or if you have any questions.  Thank you for your assistance.

Respectfully,

/s/ Philip A. Rovner

Philip A. Rovner (#3215)

Words: 406

**EFiled:  Feb 03 2021 11:48AM EST**
**Transaction ID 66305608**
**Case No. 2021-0066-JRS**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )   C.A. No. 2021-0066-JRS |
| NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATION, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation, | ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

## MOTION TO APPOINT INTERNATIONAL PROCESS SERVER

Plaintiff Continental Automotive Systems, Inc., by and through its undersigned counsel, hereby moves this Court for entry of an order authorizing service on Defendants Nokia Corporation; Nokia Solutions and Networks Oy; and Nokia Technologies Oy of the Complaint pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, November 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163 (the "Hague Convention") and furthermore appointing the international process server Celeste

Ingalls to effectuate service of any and all documents to be served in this case pursuant to the Hague Convention.

1.     Nokia Corporation; Nokia Solutions and Networks Oy; and Nokia Technologies Oy are corporations organized and existing under the laws of Finland, with their principal places of business at Karakaari 7, 02610 Espoo, Finland.

2.     Delaware Court of Chancery Rule 4(d) and 10 Del. C. § 3104 provide that this Court may authorize an additional mode of service.

3.     Chapter 1, Article 3 of the Hague Convention provides that the documents to be served shall be forwarded to the Central Authority of the State to which the request for service is made by "[t]he authority or judicial officer competent under the law of the State in which the documents originate."

4.     The United States and Finland are signatories to the Hague Convention and the Ministry of Justice in Finland has been designated as the Central Authority authorized to receive and effect service of judicial documents from US Courts in accordance with the Hague Convention.

5.     In compliance with the requirements of service set forth in Rule 4(d) and because Nokia Corporation; Nokia Solutions and Networks Oy; and Nokia Technologies Oy are corporations organized and existing under the laws of Finland and located in Finland, a signatory to the Hague Convention, Plaintiff respectfully

requests that this Court authorize the appointment of the international process server Celeste Ingalls to forward the Complaint to the Central Authority of Finland in order to effectuate service through the Hague.[1]

6.     Service by international process server Celeste Ingalls pursuant to the Hague Convention will provide formal notice of this action to Defendants Nokia Corporation; Nokia Solutions and Networks Oy; and Nokia Technologies Oy.

---

[1] In connection with the service of process in Finland under the Hague Convention, Plaintiff also intends to ask that the Court execute Form USM-94 (Hague Convention) and a "Request for Judicial Assistance" directed at the appropriate judicial authority in Finland.  It is Plaintiff's understanding that the forms cannot be completed until a summons has been issued, after which time Plaintiff intends to submit the forms to the Court and, subject to the Court's approval, respectfully request that they be completed.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By: */s/  Philip A. Rovner*
    Philip A. Rovner (#3215)

Stephen S. Korniczky
Martin R. Bader
Matthew W. Holder
SHEPPARD, MULLIN, RICHTER
& HAMPTON, LLP
12275 El Camino Real, Suite 200
San Diego, CA 92130
(858) 720-8900

    Jonathan A. Choa (#5319)
    Hercules Plaza
    P.O. Box 951
    Wilmington, DE  19899
    (302) 984-6000
    provner@potteranderson.com
    jchoa@potteranderson.com

Michael W. Scarborough
Mona Solouki
SHEPPARD, MULLIN, RICHTER
& HAMPTON, LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111
(415) 434-9100

*Attorneys for Plaintiff*
*Continental Automotive Systems, Inc.*

Words:  444

Dated:  February 3, 2021

**EFiled: Feb 03 2021 11:48AM EST**
**Transaction ID 66305608**
**Case No. 2021-0066-JRS**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) C.A. No. 2021-0066-JRS |
| NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATION, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation, | ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

## [PROPOSED] ORDER APPOINTING INTERNATIONAL PROCESS SERVER

Pursuant to Chapter 1, Article 3 of the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters developed at the Tenth Session of the Hague Conference on Private International Law on 15 November, 1965 (the "Hague Convention"), and for good cause shown, the Court hereby appoints Celeste Ingalls, specializing in international service of process, 1020 SW Taylor Street, Suite 240, Portland, Oregon 97205, as the authority and judicial officer competent under the Jurisdiction of this Court to issue and forward

a request to the applicable Central Authority, for service of any and all documents

to be served in this case in accordance with the Hague Service Convention.

IT IS SO ORDERED this _____ day of _____, 2021.

BY THE COURT:

_____

EFiled:  Feb 03 2021 01:03PM EST
Transaction ID 66306015
Case No. 2021-0066-JRS



# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation, Plaintiff(s), v. NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATON, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation, Defendant(s). | C.A. No. 2021-0066-JRS SUMMONS Pursuant to Court of Chancery Rule 4 and 8 Del. C. § 321 |

**THE STATE OF DELAWARE**

**TO: Parcels, Inc.**

**YOU ARE COMMANDED:**

To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon <u>Philip A. Rovner, Esquire</u>, plaintiff's counsel, whose address is <u>Potter Anderson & Corroon LLP, Hercules Plaza, P.O. Box 951, Wilmington, DE 19899</u> an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

**TO THE ABOVE NAMED DEFENDANTS:**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated: January 29, 2021

_____
REGISTER IN CHANCERY

Case # 2021-0066-JRS

Continental Automotive Systems, Inc.
                    Plaintiff(s),
          v.
Nokia Corporation, et al,
                    Defendant(s).


### SUMMONS

Please effectuate service upon:
1. Nokia of America Corporation
   c/o  Corporation Service Company
   251 Little Falls Drive
   Wilmington, DE 19808
              pursuant to Court of Chancery Rule 4 and 8 Del. C. § 321


SERVICE TO BE COMPLETED BY
Parcels, Inc.




 Philip A. Rovner, Esquire
Plaintiff's Counsel

A-107

AFFIDAVIT OF SERVICE

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CONTINENTAL AUTOMOTIVE SYSTEMS INC., a Delaware
corporation,

        Plaintiff,

   v.

NOKIA CORPORATION, a Finnish corporation, NOKIA OF
AMERICA CORPORATION, a Delaware corporation, NOKIA
SOLUTIONS AND NETWORKS OY, a Finnish corporation, and
NOKIA TECHNOLOGIES OY, a Finnish corporation,

        Defendants.

C.A. No. 2021-0066-JRS

STATE OF DELAWARE    }
                      } ss.
COUNTY OF NEW CASTLE  }

I, John Garber, of Parcels, Inc., the State of Delaware, County of New Castle,
being duly sworn, says that on the 3rd day of February, 2021, at 11:40 a.m., I
personally served a copy of a Summons, and Verified Complaint with supporting
documents on **NOKIA OF AMERICA CORPORATION,** by serving the
registered agent, Corporation Service Company, 251 Little Falls Drive,
Wilmington, DE 19808.

Name of individual accepting service: Lynanne Gares- authorized to accept.
Description of individual: Caucasian, female, 5'5" tall, 150lbs with brown hair 35-
40 years of age.

Subscribed and sworn before me
This 3rd day of February, 2021
Notary Public

My commission expires:

A-108

**GRANTED**

EFiled: Feb 04 2021 04:56PM EST
Transaction ID 66311418
Case No. 2021-0066-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2021-0066-JRS |
| NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATION, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## [PROPOSED] ORDER APPOINTING INTERNATIONAL PROCESS SERVER

Pursuant to Chapter 1, Article 3 of the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters developed at the Tenth Session of the Hague Conference on Private International Law on 15 November, 1965 (the "Hague Convention"), and for good cause shown, the Court hereby appoints Celeste Ingalls, specializing in international service of process, 1020 SW Taylor Street, Suite 240, Portland, Oregon 97205, as the authority and judicial officer competent under the Jurisdiction of this Court to issue and forward

a request to the applicable Central Authority, for service of any and all documents

to be served in this case in accordance with the Hague Service Convention.

IT IS SO ORDERED this _____ day of _____, 2021.

BY THE COURT:

_____

| This document constitutes a ruling of the court and should be treated as such. | |
| --- | --- |
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Joseph Slights |
| **File & Serve Transaction ID:** | 66305608 |
| **Current Date:** | Feb 04, 2021 |
| **Case Number:** | 2021-0066-JRS |
| **Case Name:** | Continental Automotive Systems, Inc. v. Nokia Corporation |
| **Court Authorizer:** | Joseph Slights |

**/s/ Judge Joseph Slights**



EFiled: Feb 01 2021 09:55AM EST
Transaction ID 66299807
Case No. 2021-0066-JRS

Potter
Anderson
Corroon LLP

Philip A. Rovner
Partner
Attorney at Law
provner@potteranderson.com
302 984-6140 Direct Phone

February 1, 2021

2/8/2021
Issued 6 Summons
(Hague Convention)
6 Copies to Counsel
Via Fed Ex

**VIA FILE & SERVE***XPRESS*

Register in Chancery
Court of Chancery
Leonard L. Williams Justice Center
500 N. King Street
Wilmington, DE 19801

Re:   *Continental Automotive Systems, Inc. v. Nokia Corporation, et al.,*
      C.A. No. 2021-0066-JRS

Dear Register in Chancery:

I write on behalf of the Plaintiff in the above-referenced action to

respectfully request that the Register in Chancery issue summonses for Potter

Anderson & Corroon LLP to serve the following parties at the following addresses

pursuant to 10 *Del. C.* § 3104 and Article 10(a) of the Hague Convention on the

Service Abroad of Judicial and Extra-Judicial Documents in Civil or Commercial

Matters, November 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163 (the "Hague

Convention") via international registered mail, return receipt requested:

Nokia Corporation
Karakaari 7
02610 Espoo, Finland

Register in Chancery
February 1, 2021
Page 2

> Nokia Solutions and Networks Oy
> Karakaari 7
> 02610 Espoo, Finland
>
> Nokia Technologies Oy
> Karakaari 7
> 02610 Espoo, Finland

Finland, a Member of the Hague Convention, has not objected to service by registered mail pursuant to Article 10(a) of the Hague Convention. *See* Hague Convention on the Service of Judicial and Extrajudicial Documents in Civil or Commercial Matters, November 15, 1965, Status Table 14, *available at* https://www.hcch.net/en/instruments/conventions/status-table/?cid=17 (last updated Jul. 27, 2020); *Id.*, Finland - Central Authority & Practical Information, *available at* https://www.hcch.net/en/states/authorities/details3/?aid=255 (last updated March 25, 2019).

In addition to the summonses above, Plaintiff also respectfully requests that the Register in Chancery prepare additional summonses to be served upon the following parties at the following addresses pursuant to Article 5(a) of the Hague Convention:

> Nokia Corporation
> Karakaari 7
> 02610 Espoo, Finland

Register in Chancery
February 1, 2021
Page 3

> Nokia Solutions and Networks Oy
> Karakaari 7
> 02610 Espoo, Finland
>
> Nokia Technologies Oy
> Karakaari 7
> 02610 Espoo, Finland

Under Article 5(a), service will be effected via the Central Authority of

Finland by a method prescribed by Finnish law.  The Central Authority of Finland

is:

> Ministry of Justice
> Unit for International Judicial Cooperation
> P.O. Box 25
> FIN-00023 Government
> Finland

Accordingly, I ask that you please issue summonses to Nokia Corporation,

Nokia Solutions and Networks Oy and Nokia Technologies Oy with directions that

it be served by the Central Authority of Finland.

Additionally, pursuant to Article 3 of the Hague Convention, an appropriate

authority or judicial officer competent under the Jurisdiction of this Court must

forward the service request to the Central Authority of Finland.  Therefore, I

further ask that you please enter the attached proposed order appointing the

following individual as such an authority or judicial officer:

Register in Chancery
February 1, 2021
Page 4

      Celeste Ingalls
      1020 SW Taylor Street, Suite 240
      Portland, Oregon 97205

    Please notify my office when the summonses are ready to be picked up or if

you have any questions.  Thank you for your assistance.

                Respectfully,

                */s/ Philip A. Rovner*

                Philip A. Rovner (#3215)

                Words: 406



### IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation, | CA #:  2021-0066-JRS |
| Plaintiff, | SUMMONS |
| v. | PURSUANT TO 10 Del. C. § 3104 And ARTICLE 10(a) THE HAGUE CONVENTION |
| NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATION, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation, Defendants. | |

**THE STATE OF DELAWARE**
**TO: Potter Anderson Corroon LLP**
**via International Registered Mail, Return Receipt Requested**
**YOU ARE COMMANDED:**

To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon Philip A. Rovner, Esquire, plaintiff's attorney, whose address is Potter Anderson & Corroon LLP, Hercules Plaza, P.O. Box 951, Wilmington, Delaware 19899 (USA), an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

**TO THE ABOVE NAMED DEFENDANTS:**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney name above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated: February 8, 2021

*Susan Judge*

_____
Register in Chancery

A-116

Case # 2021-0066-JRS

Continental Automotive Systems, Inc.,

Plaintiff,

v.

Nokia Corporation, et al.,
Defendants.

---

## SUMMONS

Please effectuate service upon:

1.  Nokia Technologies Oy
    Karakaari 7
    02610 Espoo, Finland

Pursuant to 10 Del. C. Section 3104 and Article 10(a) of the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil or Commercial Matters, November 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163 via international registered mail, return receipt requested.
Finland, a Member of the Hague Convention, has not objected to service by registered mail pursuant to Article 10(a) of the Hague Convention. See Hague Convention on the Service of Judicial and Extrajudicial Documents in Civil or Commercial Matters, November 15, 1965, Status Table 14, available at https://www.hcch.net/en/instruments/conventions/status-table/?cid=17 (last updated Jul. 27, 2020); Id., Finland - Central Authority & Practical Information, available at https://www.hcch.net/en/states/authorities/details3/?aid=255 (last updated March 25, 2019).

SERVICE TO BE COMPLETED BY POTTER ANDERSON CORROON LLP
via International Registered Mail, Return Receipt Requested

Philip a. Rovner, Esquire
Plaintiff's Attorney

**GRANTED**

EFiled: Feb 04 2021 04:56PM EST
Transaction ID 66311418
~~Case No. 2021-0066-JRS~~

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATION, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  C.A. No. 2021-0066-JRS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## [PROPOSED] ORDER APPOINTING INTERNATIONAL PROCESS SERVER

Pursuant to Chapter 1, Article 3 of the Convention on the Service Abroad of

Judicial and Extrajudicial Documents in Civil or Commercial Matters developed at

the Tenth Session of the Hague Conference on Private International Law on 15

November, 1965 (the "Hague Convention"), and for good cause shown, the Court

hereby appoints Celeste Ingalls, specializing in international service of process,

1020 SW Taylor Street, Suite 240, Portland, Oregon 97205, as the authority and

judicial officer competent under the Jurisdiction of this Court to issue and forward

a request to the applicable Central Authority, for service of any and all documents

to be served in this case in accordance with the Hague Service Convention.

IT IS SO ORDERED this _____ day of _____, 2021.

BY THE COURT:

_____

This document constitutes a ruling of the court and should be treated as such.

| | |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Joseph Slights |
| **File & Serve Transaction ID:** | 66305608 |
| **Current Date:** | Feb 04, 2021 |
| **Case Number:** | 2021-0066-JRS |
| **Case Name:** | Continental Automotive Systems, Inc. v. Nokia Corporation |
| **Court Authorizer:** | Joseph Slights |

/s/ Judge Joseph Slights



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation,

Plaintiff,

v.

NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATION, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation,
Defendants.

CA #:  2021-0066-JRS

SUMMONS

PURSUANT TO 10 Del. C. § 3104
And ARTICLE 10(a) THE
HAGUE CONVENTION

**THE STATE OF DELAWARE**
**TO: Potter Anderson Corroon LLP**
        **via International Registered Mail, Return Receipt Requested**
**YOU ARE COMMANDED:**

        To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon <u>Philip A. Rovner, Esquire,</u> plaintiff's attorney, whose address is <u>Potter Anderson & Corroon LLP, Hercules Plaza, P.O. Box 951, Wilmington, Delaware 19899 (USA)</u>, an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

**TO THE ABOVE NAMED DEFENDANTS:**

        In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney name above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated: February 8, 2021

*Susan Judge*
Register in Chancery

A-121

Case # 2021-0066-JRS

Continental Automotive Systems, Inc.,

Plaintiff,

v.

Nokia Corporation, et al.,
Defendants.

---

## SUMMONS

Please effectuate service upon:
    Nokia Corporation
    Karakaari 7
    02610 Espoo, Finland

Pursuant to 10 Del. C. Section 3104 and Article 10(a) of the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil or Commercial Matters, November 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163 via international registered mail, return receipt requested.
Finland, a Member of the Hague Convention, has not objected to service by registered mail pursuant to Article 10(a) of the Hague Convention. See Hague Convention on the Service of Judicial and Extrajudicial Documents in Civil or Commercial Matters, November 15, 1965, Status Table 14, available at https://www.hcch.net/en/instruments/conventions/status-table/?cid=17 (last updated Jul. 27, 2020); Id., Finland - Central Authority & Practical Information, available at https://www.hcch.net/en/states/authorities/details3/?aid=255 (last updated March 25, 2019).

SERVICE TO BE COMPLETED BY POTTER ANDERSON CORROON LLP
via International Registered Mail, Return Receipt Requested

<u>Philip a. Rovner, Esquire</u>
Plaintiff's Attorney

A-122

**GRANTED**

EFiled: Feb 04 2021 04:56PM EST
Transaction ID 66311418
Case No. 2021-0066-JRS

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| | ) | C.A. No. 2021-0066-JRS |
| NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATION, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## [PROPOSED] ORDER APPOINTING INTERNATIONAL PROCESS SERVER

Pursuant to Chapter 1, Article 3 of the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters developed at the Tenth Session of the Hague Conference on Private International Law on 15 November, 1965 (the "Hague Convention"), and for good cause shown, the Court hereby appoints Celeste Ingalls, specializing in international service of process, 1020 SW Taylor Street, Suite 240, Portland, Oregon 97205, as the authority and judicial officer competent under the Jurisdiction of this Court to issue and forward

a request to the applicable Central Authority, for service of any and all documents

to be served in this case in accordance with the Hague Service Convention.

        IT IS SO ORDERED this _____ day of _____, 2021.

                     BY THE COURT:

                     _____

This document constitutes a ruling of the court and should be treated as such.

| | |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Joseph Slights |
| **File & Serve Transaction ID:** | 66305608 |
| **Current Date:** | Feb 04, 2021 |
| **Case Number:** | 2021-0066-JRS |
| **Case Name:** | Continental Automotive Systems, Inc. v. Nokia Corporation |
| **Court Authorizer:** | Joseph Slights |

**/s/ Judge Joseph Slights**



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation,

Plaintiff,

v.

NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATION, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation,
Defendants.

CA #: 2021-0066-JRS

SUMMONS

PURSUANT TO 10 Del. C. § 3104 And ARTICLE 10(a) THE HAGUE CONVENTION

**THE STATE OF DELAWARE**
**TO: Potter Anderson Corroon LLP**
     **via International Registered Mail, Return Receipt Requested**
**YOU ARE COMMANDED:**

To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon Philip A. Rovner, Esquire, plaintiff's attorney, whose address is Potter Anderson & Corroon LLP, Hercules Plaza, P.O. Box 951, Wilmington, Delaware 19899 (USA), an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

**TO THE ABOVE NAMED DEFENDANTS:**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney name above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated: February 8, 2021

*Susan Judge*

Register in Chancery

Case # 2021-0066-JRS

Continental Automotive Systems, Inc.,

Plaintiff,

v.

Nokia Corporation, et al.,
Defendants.

---

## SUMMONS

Please effectuate service upon:

1.  Nokia Technologies Oy
    Karakaari 7
    02610 Espoo, Finland

Pursuant to 10 Del. C. Section 3104 and Article 10(a) of the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil or Commercial Matters, November 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163 via international registered mail, return receipt requested.
Finland, a Member of the Hague Convention, has not objected to service by registered mail pursuant to Article 10(a) of the Hague Convention. See Hague Convention on the Service of Judicial and Extrajudicial Documents in Civil or Commercial Matters, November 15, 1965, Status Table 14, available at https://www.hcch.net/en/instruments/conventions/status-table/?cid=17 (last updated Jul. 27, 2020); Id., Finland - Central Authority & Practical Information, available at https://www.hcch.net/en/states/authorities/details3/?aid=255 (last updated March 25, 2019).

SERVICE TO BE COMPLETED BY POTTER ANDERSON CORROON LLP
via International Registered Mail, Return Receipt Requested

<u>Philip a. Rovner, Esquire</u>
Plaintiff's Attorney

A-127

**GRANTED**

EFiled: Feb 04 2021 04:56PM EST
Transaction ID 66311418
Case No. 2021-0066-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATION, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     C.A. No. 2021-0066-JRS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## [PROPOSED] ORDER APPOINTING INTERNATIONAL PROCESS SERVER

Pursuant to Chapter 1, Article 3 of the Convention on the Service Abroad of

Judicial and Extrajudicial Documents in Civil or Commercial Matters developed at

the Tenth Session of the Hague Conference on Private International Law on 15

November, 1965 (the "Hague Convention"), and for good cause shown, the Court

hereby appoints Celeste Ingalls, specializing in international service of process,

1020 SW Taylor Street, Suite 240, Portland, Oregon 97205, as the authority and

judicial officer competent under the Jurisdiction of this Court to issue and forward

a request to the applicable Central Authority, for service of any and all documents

to be served in this case in accordance with the Hague Service Convention.

IT IS SO ORDERED this _____ day of _____, 2021.

BY THE COURT:

_____

This document constitutes a ruling of the court and should be treated as such.

| | |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Joseph Slights |
| **File & Serve Transaction ID:** | 66305608 |
| **Current Date:** | Feb 04, 2021 |
| **Case Number:** | 2021-0066-JRS |
| **Case Name:** | Continental Automotive Systems, Inc. v. Nokia Corporation |
| **Court Authorizer:** | Joseph Slights |

**/s/ Judge Joseph Slights**



### IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATION, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation, Defendants. | CA #:  2021-0066-JRS<br><br>SUMMONS<br><br>PURSUANT TO 10 Del. C. § 3104 And ARTICLE 5(a) THE HAGUE CONVENTION |

**THE STATE OF DELAWARE**
**TO: Potter Anderson Corroon LLP**
  **via International Registered Mail, Return Receipt Requested**
**YOU ARE COMMANDED:**

   To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon <u>Philip A. Rovner, Esquire,</u> plaintiff's attorney, whose address is <u>Potter Anderson & Corroon LLP, Hercules Plaza, P.O. Box 951, Wilmington, Delaware 19899 (USA)</u>, an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

**TO THE ABOVE NAMED DEFENDANTS:**

   In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney name above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated: February 8, 2021

_Susan Judge_
Register in Chancery

A-131

Case # 2021-0066-JRS

Continental Automotive Systems, Inc.,

Plaintiff,

v.

Nokia Corporation, et al.,
Defendants.

---

## SUMMONS

Please effectuate service upon:

   Nokia Corporation
   Karakaari 7
   02610 Espoo, Finland
c/o Ministry of Justice
   Unit for International Judicial Cooperation
   P.O. Box 25
   FIN-00023 Government
   Finland

Pursuant to 10 Del. C. Section 3104 and Article 5(a) of the Hague Convention
 via Central Authority of Finland

SERVICE TO BE COMPLETED BY POTTER ANDERSON CORROON LLP
via International Registered Mail, Return Receipt Requested

Philip a. Rovner, Esquire
Plaintiff's Attorney

**GRANTED**

EFiled: Feb 04 2021 04:56PM EST
Transaction ID 66311418
Case No. 2021-0066-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CONTINENTAL AUTOMOTIVE )
SYSTEMS, INC., a Delaware )
corporation, )
)
Plaintiff, )
)
v. )
) C.A. No. 2021-0066-JRS
NOKIA CORPORATION, a Finnish )
corporation, NOKIA OF AMERICA )
CORPORATION, a Delaware )
corporation, NOKIA SOLUTIONS )
AND NETWORKS OY, a Finnish )
corporation, and NOKIA )
TECHNOLOGIES OY, a Finnish )
corporation, )
)
Defendants. )

## [PROPOSED] ORDER APPOINTING INTERNATIONAL PROCESS SERVER

Pursuant to Chapter 1, Article 3 of the Convention on the Service Abroad of

Judicial and Extrajudicial Documents in Civil or Commercial Matters developed at

the Tenth Session of the Hague Conference on Private International Law on 15

November, 1965 (the "Hague Convention"), and for good cause shown, the Court

hereby appoints Celeste Ingalls, specializing in international service of process,

1020 SW Taylor Street, Suite 240, Portland, Oregon 97205, as the authority and

judicial officer competent under the Jurisdiction of this Court to issue and forward

a request to the applicable Central Authority, for service of any and all documents to be served in this case in accordance with the Hague Service Convention.

IT IS SO ORDERED this _____ day of _____, 2021.

BY THE COURT:

_____

2

This document constitutes a ruling of the court and should be treated as such.

|  |  |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Joseph Slights |
| **File & Serve Transaction ID:** | 66305608 |
| **Current Date:** | Feb 04, 2021 |
| **Case Number:** | 2021-0066-JRS |
| **Case Name:** | Continental Automotive Systems, Inc. v. Nokia Corporation |
| **Court Authorizer:** | Joseph Slights |

**/s/ Judge Joseph Slights**



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATION, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation,<br>Defendants. | CA #:  2021-0066-JRS<br><br>SUMMONS<br><br>PURSUANT TO 10 Del. C. § 3104 And ARTICLE 5(a) THE HAGUE CONVENTION |

**THE STATE OF DELAWARE**
**TO: Potter Anderson Corroon LLP**
**        via International Registered Mail, Return Receipt Requested**
**YOU ARE COMMANDED:**

To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon Philip A. Rovner, Esquire, plaintiff's attorney, whose address is Potter Anderson & Corroon LLP, Hercules Plaza, P.O. Box 951, Wilmington, Delaware 19899 (USA), an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

**TO THE ABOVE NAMED DEFENDANTS:**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney name above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated: February 8, 2021

*Susan Judge*
Register in Chancery

A-136

Case # 2021-0066-JRS

Continental Automotive Systems, Inc.,

Plaintiff,

v.

Nokia Corporation, et al.,
Defendants.

---

## SUMMONS

Please effectuate service upon:

    Nokia Solutions and Networks Oy
    Karakaari 7
    02610 Espoo, Finland
c/o Ministry of Justice
    Unit for International Judicial Cooperation
    P.O. Box 25
    FIN-00023 Government
    Finland

Pursuant to 10 Del. C. Section 3104 and Article 5(a) of the Hague Convention
via Central Authority of Finland

SERVICE TO BE COMPLETED BY POTTER ANDERSON CORROON LLP
via International Registered Mail, Return Receipt Requested

Philip a. Rovner, Esquire
Plaintiff's Attorney

A-137

**GRANTED**

EFiled: Feb 04 2021 04:56PM EST
Transaction ID 66311418
Case No. 2021-0066-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATION, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

C.A. No. 2021-0066-JRS

## [PROPOSED] ORDER APPOINTING INTERNATIONAL PROCESS SERVER

Pursuant to Chapter 1, Article 3 of the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters developed at the Tenth Session of the Hague Conference on Private International Law on 15 November, 1965 (the "Hague Convention"), and for good cause shown, the Court hereby appoints Celeste Ingalls, specializing in international service of process, 1020 SW Taylor Street, Suite 240, Portland, Oregon 97205, as the authority and judicial officer competent under the Jurisdiction of this Court to issue and forward

a request to the applicable Central Authority, for service of any and all documents

to be served in this case in accordance with the Hague Service Convention.

IT IS SO ORDERED this _____ day of _____, 2021.

BY THE COURT:

_____

2

—

This document constitutes a ruling of the court and should be treated as such.

|  |  |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Joseph Slights |
| **File & Serve Transaction ID:** | 66305608 |
| **Current Date:** | Feb 04, 2021 |
| **Case Number:** | 2021-0066-JRS |
| **Case Name:** | Continental Automotive Systems, Inc. v. Nokia Corporation |
| **Court Authorizer:** | Joseph Slights |

**/s/ Judge Joseph Slights**



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation, <br><br>        Plaintiff, <br><br>      v. <br><br> NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATION, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation, <br>        Defendants. | CA #: 2021-0066-JRS <br><br> SUMMONS <br><br> PURSUANT TO 10 Del. C. § 3104 And ARTICLE 5(a) THE HAGUE CONVENTION |

**THE STATE OF DELAWARE**
**TO: Potter Anderson Corroon LLP**
    **via International Registered Mail, Return Receipt Requested**
**YOU ARE COMMANDED:**

To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon Philip A. Rovner, Esquire, plaintiff's attorney, whose address is Potter Anderson & Corroon LLP, Hercules Plaza, P.O. Box 951, Wilmington, Delaware 19899 (USA), an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

**TO THE ABOVE NAMED DEFENDANTS:**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney name above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated: February 8, 2021

                                      *Susan Judge*
                                     Register in Chancery

Case # 2021-0066-JRS

Continental Automotive Systems, Inc.,

Plaintiff,

v.

Nokia Corporation, et al.,
Defendants.

---

## SUMMONS

Please effectuate service upon:

    Nokia Technologies Oy
    Karakaari 7
    02610 Espoo, Finland
c/o Ministry of Justice
    Unit for International Judicial Cooperation
    P.O. Box 25
    FIN-00023 Government
    Finland

Pursuant to 10 Del. C. Section 3104 and Article 5(a) of the Hague Convention
via Central Authority of Finland

SERVICE TO BE COMPLETED BY POTTER ANDERSON CORROON LLP
via International Registered Mail, Return Receipt Requested

<u>Philip a. Rovner, Esquire</u>
Plaintiff's Attorney

A-142

**GRANTED**

EFiled: Feb 04 2021 04:56PM EST
Transaction ID 66311418
Case No. 2021-0066-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| | ) C.A. No. 2021-0066-JRS |
| NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATION, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## [PROPOSED] ORDER APPOINTING INTERNATIONAL PROCESS SERVER

Pursuant to Chapter 1, Article 3 of the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters developed at the Tenth Session of the Hague Conference on Private International Law on 15 November, 1965 (the "Hague Convention"), and for good cause shown, the Court hereby appoints Celeste Ingalls, specializing in international service of process, 1020 SW Taylor Street, Suite 240, Portland, Oregon 97205, as the authority and judicial officer competent under the Jurisdiction of this Court to issue and forward

a request to the applicable Central Authority, for service of any and all documents

to be served in this case in accordance with the Hague Service Convention.

    IT IS SO ORDERED this _____ day of _____, 2021.

                                BY THE COURT:

                                _____

This document constitutes a ruling of the court and should be treated as such.

| | |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Joseph Slights |
| **File & Serve Transaction ID:** | 66305608 |
| **Current Date:** | Feb 04, 2021 |
| **Case Number:** | 2021-0066-JRS |
| **Case Name:** | Continental Automotive Systems, Inc. v. Nokia Corporation |
| **Court Authorizer:** | Joseph Slights |

**/s/ Judge Joseph Slights**

EFiled:  Feb 23 2021 07:53PM EST
Transaction ID 66365153
Case No. 2021-0066-JRS

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATION, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation, <br><br> Defendant. | C.A. No. 2021-0066-JRS |

## ENTRY OF APPEARANCE

Please enter the appearance of Kelly E. Farnan and Blake Rohrbacher of Richards, Layton & Finger, P.A. as counsel for Defendants Nokia Corporation, Nokia of America Corporation, Nokia Solutions and Networks Oy, and Nokia Technologies Oy in the above-captioned action.

/s/ Kelly E. Farnan
Kelly E. Farnan (#4395)
Blake Rohrbacher (#4750)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

*Attorneys for Defendants Nokia
Corporation, Nokia of America
Corporation, Nokia Solutions and
Networks Oy, and Nokia Technologies
Oy*

Dated:  February 23, 2021

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 23, 2021, true and correct copies of the foregoing were caused to be served by File & Serve*Xpress* on the following counsel of record:

Philip A. Rovner
Jonathan A. Choa
Potter Anderson & Corroon LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)

**EFiled:  Feb 23 2021 07:53PM EST**
**Transaction ID 66365153**
**Case No. 2021-0066-JRS**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation,<br><br>       Plaintiff,<br><br>    v.<br><br>NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATION, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation,<br><br>       Defendant. | C.A. No. 2021-0066-JRS |

## STIPULATION AND [PROPOSED] ORDER
## EXTENDING TIME TO RESPOND TO THE COMPLAINT

WHEREAS, on January 25, 2021, plaintiff Continental Automotive Systems, Inc. ("Plaintiff") filed its Verified Complaint (the "Complaint") in the above-captioned action (the "Action"); and

WHEREAS, Plaintiff and Defendants Nokia Corporation, Nokia of America Corporation, Nokia Solutions and Networks Oy, and Nokia Technologies Oy (collectively, "Defendants") have discussed and agreed to an extension for Defendants to respond to the Complaint.

IT IS HEREBY STIPULATED AND AGREED by the parties hereto, through their undersigned counsel, subject to the approval of the Court, that:

1.      Counsel for Defendants hereby acknowledges service of the Summonses and Complaint on all Defendants in this matter and waive all defenses set forth in Court of Chancery Rule 12(b)(4) and (5).

2.      The time for Defendants to answer, move or otherwise respond to Plaintiffs' Complaint is extended to April 9, 2021.

3.      If Defendants move to dismiss the Complaint, Defendants shall file their opening brief contemporaneously with that motion.

4.      Plaintiff's answering brief shall then be due 30 days after the opening brief.

5.      Defendants' reply shall be due 14 days after the answering brief.

6.      The parties shall contact the Court to obtain a hearing date for the motion after Plaintiff files its answering brief.

| | |
|---|---|
| */s/ Philip A. Rovner* | */s/ Kelly E. Farnan* |
| Philip A. Rovner (#3215) | Kelly E. Farnan (#4395) |
| Jonathan A. Choa (#5319) | Blake Rohrbacher (#4750) |
| Potter Anderson & Corroon LLP | Richards, Layton & Finger, P.A. |
| Hercules Plaza | One Rodney Square |
| P.O. Box 951 | 920 North King Street |
| Wilmington, DE 19899 | Wilmington, Delaware 19801 |
| (302) 984-6000 | (302) 651-7700 |

*Attorneys for Plaintiff*
*Continental Automotive Systems, Inc.*

*Attorneys for Defendants Nokia*
*Corporation, Nokia of America*
*Corporation, Nokia Solutions and*
*Networks Oy, and Nokia Technologies*
*Oy*

Dated: February 23, 2021

SO ORDERED this _____ day of February, 2021.

_____
Vice Chancellor

**GRANTED**

EFiled: Feb 24 2021 02:31PM EST
Transaction ID 66367701
Case No. 2021-0066-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation,<br><br>       Plaintiff,<br><br>   v.<br><br>NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATION, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation,<br><br>       Defendant. | C.A. No. 2021-0066-JRS |

## STIPULATION AND [PROPOSED] ORDER
## EXTENDING TIME TO RESPOND TO THE COMPLAINT

WHEREAS, on January 25, 2021, plaintiff Continental Automotive Systems, Inc. ("Plaintiff") filed its Verified Complaint (the "Complaint") in the above-captioned action (the "Action"); and

WHEREAS, Plaintiff and Defendants Nokia Corporation, Nokia of America Corporation, Nokia Solutions and Networks Oy, and Nokia Technologies Oy (collectively, "Defendants") have discussed and agreed to an extension for Defendants to respond to the Complaint.

IT IS HEREBY STIPULATED AND AGREED by the parties hereto, through their undersigned counsel, subject to the approval of the Court, that:

1.     Counsel for Defendants hereby acknowledges service of the Summonses and Complaint on all Defendants in this matter and waive all defenses set forth in Court of Chancery Rule 12(b)(4) and (5).

2.     The time for Defendants to answer, move or otherwise respond to Plaintiffs' Complaint is extended to April 9, 2021.

3.     If Defendants move to dismiss the Complaint, Defendants shall file their opening brief contemporaneously with that motion.

4.     Plaintiff's answering brief shall then be due 30 days after the opening brief.

5.     Defendants' reply shall be due 14 days after the answering brief.

6.     The parties shall contact the Court to obtain a hearing date for the motion after Plaintiff files its answering brief.

| | |
|---|---|
| */s/ Philip A. Rovner* | */s/ Kelly E. Farnan* |
| Philip A. Rovner (#3215) | Kelly E. Farnan (#4395) |
| Jonathan A. Choa (#5319) | Blake Rohrbacher (#4750) |
| Potter Anderson & Corroon LLP | Richards, Layton & Finger, P.A. |
| Hercules Plaza | One Rodney Square |
| P.O. Box 951 | 920 North King Street |
| Wilmington, DE 19899 | Wilmington, Delaware 19801 |
| (302) 984-6000 | (302) 651-7700 |
| | |
| *Attorneys for Plaintiff* | *Attorneys for Defendants Nokia* |
| *Continental Automotive Systems, Inc.* | *Corporation, Nokia of America* |
| | *Corporation, Nokia Solutions and* |
| | *Networks Oy, and Nokia Technologies* |
| | *Oy* |

Dated: February 23, 2021

SO ORDERED this _____ day of February, 2021.

_____
Vice Chancellor

This document constitutes a ruling of the court and should be treated as such.

|  |  |
|---:|:---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Joseph Slights |
| **File & Serve Transaction ID:** | 66365153 |
| **Current Date:** | Feb 24, 2021 |
| **Case Number:** | 2021-0066-JRS |
| **Case Name:** | Continental Automotive Systems, Inc. v. Nokia Corporation |
| **Court Authorizer:** | Joseph Slights |

**/s/ Judge Joseph Slights**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., a Delaware corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No.  2021-0066-JRS |
| NOKIA CORPORATION, a Finnish corporation, NOKIA OF AMERICA CORPORATION, a Delaware corporation, NOKIA SOLUTIONS AND NETWORKS OY, a Finnish corporation, and NOKIA TECHNOLOGIES OY, a Finnish corporation, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## <u>NOTICE OF SERVICE</u>

The undersigned hereby certifies that, on March 5, 2021, the following

document was served on the following parties at the addresses and in the manner

indicated:

PLAINTIFF CONTINENTAL AUTOMOTIVE SYSTEMS, INC.'S
REQUESTS FOR PRODUCTION OF DOCUMENTS,
SET ONE PROPOUNDED TO DEFENDANTS

<u>**VIA FILE AND SERVEXPRESS**</u>

Kelly E. Farnan, Esq.
Blake Rohrbacher, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801
Tel: (302) 651-7700

*Attorneys for Defendants Nokia Corporation, Nokia of America Corporation, Nokia Solutions and Networks Oy, and Nokia Technologies Oy*

POTTER ANDERSON & CORROON LLP

By: */s/ Philip A. Rovner*
      Philip A. Rovner (#3215)
      Jonathan A. Choa (#5319)
      Hercules Plaza
      P.O. Box 951
      Wilmington, DE  19899
      (302) 984-6000
      provner@potteranderson.com
      jchoa@potteranderson.com

Dated: March 5, 2021
7108194

*Attorneys for Plaintiff*
*Continental Automotive Systems, Inc.*

A-157

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 5, 2021 a copy of the within document was

served electronically by File and ServeXpress on the following attorneys:

Kelly E. Farnan, Esq.
Blake Rohrbacher, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801
Tel: (302) 651-7700

*Attorneys for Defendants Nokia Corporation, Nokia of America Corporation, Nokia Solutions and Networks Oy, and Nokia Technologies Oy*

*/s/ Philip A. Rovner*
Philip A. Rovner (#3215)